```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------   x
                                                   :
UNITED STATES OF AMERICA                           :
                                                   :
              - v -                                :        22 Cr. 9 (JGK)
                                                   :
FIDENCIO CRESPO-CASTELAN,                          :
                                                   :
                          Defendant.               :
------------------------------------------------   x
```

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT BECAUSE 8 U.S.C. § 1326 VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT**

                                        DAVID PATTON, ESQ.
                                        Federal Defenders of New York, Inc.
                                        Attorney for Defendant
                                        FIDENCIO CRESPO-CASTELAN
                                        52 Duane Street - 10th Floor
                                        New York, New York 10007
                                        Tel.: (212) 417-8737

                                        MARTIN S. COHEN
                                        *Of Counsel*

TO:    DAMIAN WILLIAMS
          United States Attorney
          Southern District of New York
          One. St. Andrew's Plaza
          New York, New York 10007
          Attn:   ANDREW JONES, ESQ.
                     Assistant United States Attorney

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT BECAUSE 8 U.S.C. § 1326 VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT**

Fidencio Crespo-Castelan respectfully moves to dismiss the indictment pursuant to Rule 12 of the Federal Rules of Criminal Procedure because the statute under which he is charged – 8 U.S.C. § 1326, which criminalizes the reentry into the United States of a non-citizen previously removed – violates the equal protection guarantee of the Fifth Amendment under the standard articulated in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). *See generally United States v. Gustavo Carrillo-Lopez*, ___ F. Supp. 3d___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).

**INTRODUCTION**

Drafted at the height of the eugenics movement, the Undesirable Aliens Act of 1929 – which included the precursor to the illegal reentry provision set forth at 8 U.S.C. § 1326 – was enacted with explicit racial animus against Latinos. *See Carrillo-Lopez*, 2021 WL 3667330, at *7 (finding such animus, and noting that the Government had conceded that "discriminatory intent motivated the passage of the Act of 1929.").

This discriminatory purpose also animated the recodification of the illegal reentry provision as part of the McCarren-Walter Act of 1952. *See id.* at *10-16. Moreover, despite a legislative history rife with racial animus, and overwhelming evidence of a disparate impact on Latinos, Congress has never "grappled with the laws' sordid history" in order to free it from its discriminatory taint. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (Sotomayor, J., concurring).

In *Ramos*, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. 140 S. Ct. at 1393-94. Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401,

(emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id.* at 1401 n.44. *Ramos* – which concerned a statute allowing for nonunanimous verdicts, a facially neutral rule whose avowed purpose was to "establish the supremacy of the white race", *id.* at 1393 – was not brought as an equal protection challenge, but Justice Sotomayor explained why the laws' historical origins were nevertheless crucial to the constitutional analysis:

> That is not simply because the legacy existed in the first place – unfortunately, many laws and policies in this country have had some history of racial animus – but also because the States' legislatures have never truly grappled with the laws' sordid history in reenacting them. See generally *United States v. Fordice*, 505 U.S. 717, 729, 112 S. Ct. 2727, 120 L. Ed. 2d 575 (1992) (policies that are "traceable" to a State's *de jure* racial segregation and that still "have discriminatory effects" offend the Equal Protection Clause).
>
> Where the law otherwise is untethered to racial bias – and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it – the new law may well be free of discriminatory taint. That cannot be said of the laws at issue here.

*Ramos*, 140 S.Ct. at 1410.

Nor can it be said of 8 U.S.C. § 1326. Congress has never addressed the law's "tawdry past," and it remains tethered to the racial animus that permeated its creation. *Cf. Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2273 (2020) (Alito, J., concurring) (in a case concerning the free-exercise clause, rejecting the argument that the provision at issue "was cleansed of its bigoted past because it was readopted for non-bigoted reasons.").

Accompanying this submission are affidavits from two historians: Eric S. Fish is an acting professor of law at the University of California, Davis, and Dr. S. Deborah Kang is an associate professor at the University of Virginia's Corcoran Department of History who teaches and regularly publishes scholarship on the history of immigration laws in the United States.

Professor Fish is an expert on the legal, political and legislative history of the early 20th century, when the Undesirables Act of 1929 was enacted. *See* Exhibit A.[1] Professor Kang's declaration focuses on the legislative developments since the 1929 Act, including the McCarren-Walter Act of 1952, in which 8 U.S.C. § 1326 was codified, and describes how the subsequent reenactments of the illegal reentry provision were also infected by racism, and how Congress has never attempted to cleanse the statute of its racist origins. *See* Exhibit B.

Because the historical evidence demonstrates that the crime of illegal reentry was enacted with a discriminatory purpose whose taint has never been lifted, and because the statute has disparately impacted Mexican and other Latino individuals in the century since, § 1326 is presumptively unconstitutional under the standard set forth in *Arlington Heights*. The burden thus shifts to the Government to show that Congress would have nevertheless passed the 1929 law and reenacted it in 1952 absent any discriminatory purpose, and that the provision has been freed of its discriminatory taint. Absent such a showing, the Court must find that 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment, and dismiss the one-count indictment in this case. *See Carrillo-Lopez*, 2021 WL 3667330, at *25 (holding that the government has failed to meet its burden to demonstrate that 8 U.S.C. § 1326 would have been enacted independently from its discriminatory motivations, and granting motion to dismiss the indictment).[2]

---

[1] For an even more detailed description of the history of the Undesirables Act, *see* Eric S Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051 (2022).

[2] If the government does attempt to submit evidence suggesting that the statute would have been enacted independently from its discriminatory motivations, we respectfully request that the Court schedule an evidentiary hearing so that the Court can hear directly from the experts in this case before making its decision. If the government proffers no such evidence, however, the Court should dismiss the indictment without a hearing.

**BACKGROUND AND PROCEDURAL HISTORY**

Fidencio Crespo-Castelan was born in Mexico in 1987. Cohen Aff., ¶ 3. In around 2005, when he was 19 years old, Mr. Crespo was convicted of helping to bring non-citizens into the United States, in violation of 8 U.S.C. § 1324. *Id.* He was sentenced to 15 months in prison, and subsequently removed. *Id.* Mr. Crespo returned to the United States after his removal, raised a family, and prior to his arrest in connection with this case on December 14, 2021, had no further interaction with the criminal justice system. *Id.* ¶ 4. On January 5, 2022, a one-count indictment was filed charging Mr. Crespo with unlawfully reentering the United States in violation of 8 U.S.C. § 1326. *Id.* ¶ 5.

**DISCUSSION**

I.   **The standard of review: *Arlington Heights* applies to an equal protection challenge to 8 U.S.C. § 1326.**

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. This clause contains an implicit guarantee of equal protection under federal law which is identical to the explicit guarantee under state law set forth in the Fourteenth Amendment. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways: First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, as argued here, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265-68.

To determine whether a facially neutral law violates the Fifth Amendment's equal protection guarantee, courts apply the burden shifting framework set forth in *Arlington Heights*.

4

Under this framework, a challenger carries the burden to show that a law was created with a "discriminatory intent or purpose." *Id.* at 265.

"Because discriminatory intent is rarely susceptible to direct proof, a district court . . . must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 266). The Supreme Court has identified a non-exhaustive set of factors courts should consider in conducting this inquiry:

1. The impact of the official action and whether it bears more heavily on one race than another;

2. The historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes";

3. The specific sequence of events leading to the challenged decision;

4. The legislative or administrative history, "especially where there are contemporary statements by members of the decisionmaking body"; and

5. Any "departures from the normal procedural sequence" or "substantive departures;"

*Arlington Heights*, 429 U.S. at 266-67; *see also Mhany Management*, 819 F. 3d at 606; *Arce v. Douglas*, 793 F.3d, 968, 977 (9th Cir. 2015).

The threshold for satisfying these factors is low. Because legislatures are rarely motivated solely by a single concern, a law's challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265-66. Rather, the challenger must show only "that a discriminatory purposes has been *a motivating factor* in the decision." *Id.* (emphasis added). The challenger must make this showing by a preponderance of the evidence. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985).

5

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the Government to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. 270 n.21; *see also Hunter v Underwood*, 471 U.S. 222, 228 (1985) ("Once racial discrimination is shown to have been a substantial or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the challenged law violates the Fifth Amendment and must be invalidated. *Id.* at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id.* at 231.

Similarly, the 9th Circuit applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican-American Studies program in the Tucson school district. *See Arce v.*

*Douglas*, 793 F.3d at 981. During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples." *Id*. at 978. Finding that such comments created a genuine issue of material fact as to whether the law was "motivated, at least in part, by an intent to discriminate against [Mexican-American Studies] students," the Court reversed the district court's grant of summary judgment and remanded for a full trial. *Id.* at 981.

These cases demonstrate that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups. As Mr. Crespo will show, the same animus infected § 1326 to an equal (or even greater) degree.

**II.    8 U.S.C. § 1326 violates the equal protection guarantee of the Fifth Amendment under the *Arlington Heights* standard.**

**A.    Overwhelming evidence shows that racism was a "motivating factor" in the creation of the crime of illegal reentry.**

*1.    The historical background and legislative history demonstrates that racism was a key factor in the passage of the the illegal reentry provision in the Undesirable Aliens Act of 1929.*

A close examination of the political context underlying the criminalization of illegal reentry in 1929 reveals that racism was not just a "motivating factor" in enacting this law, but was the primary factor.

In his affidavit, Professor Fish describes the historical background of the provision and its legislative history, which was permeated by racism, often in the guise of the pseudo-scientific theory of eugenics, specifically the argument that people of Northern European descent are racially superior to all others. Cohen Aff., Ex. A, at 1-2. In 1924, Congress passed the Johnson-Reed Act, which established a quota system limiting new immigration from Southern and Central Europe. *Id.* at 2-4. As Harry Laughlin, the "Expert Eugenics Agent" for the House

7


Committee on Immigration and Naturalization explained, Johnson-Reed was a "biologically-based policy" in which future immigration "would have to be compatible with American racial ideals." *Id.* at 4.

The Johnson-Reed Act, however, did not apply to immigrants from Mexico and Latin America, an exception driven by Western agricultural interests who depended heavily on cheap, exploitable laborers. *Id.* Between the passage of Johnson-Reed in 1924 and the passage of the Undesirable Alien Act of 1929, members of the House Committee on Immigration and Naturalization proposed several bills seeking to exclude Mexican and Latin American immigrants from the United States, all of which were rife with racial animus. *Id.* at 4-9. For example, Congressman John Box, the author of several of the proposed bills stated, "The Mexican peon is a . . . blend of low-grade Spaniard, peonized Indian, and negro slave [that] mixes with negroes, mulattoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat." *Id.* at 5.

While the House Committee on Immigration and Naturalization was ultimately unsuccessful in its efforts to block all immigration from Latin America, given the opposition of the agricultural industry, it adopted a complementary strategy to expel the Latin American immigrants already here. *Id.* Chairman Albert Johnson (who served in leadership roles in various pro-eugenics organizations), introduced a series of bills between 1925 and 1928 intended to significantly expand the government's deportation powers. *Id.* In 1929, Johnson incorporated several of his deportation proposals in the House version of the Undesirables Act, including the criminal provision making it a misdemeanor to enter the United States without permission. (The precursor to 8 U.S.C. § 1325.)  *Id.*

In 1929, Secretary of Labor James Davis and Senator Coleman Blease of South Carolina collaborated on drafting and pushing two bills through the senate: one created a system of immigrant registration cards, and the second created the felony criminal offense of reentering the United States after being deported. *Id.* at 9. Both Chairman Johnson's misdemeanor illegal entry provision and Senator Blease's felony reentry provision were included in what became the Undesirable Aliens Act of 1929.[3] *Id.* at 12.

The congressional debates on the 1929 Act focused overwhelmingly on the issue of Mexican immigration, and made clear that the purpose of the Act was to target Latin American immigrants for punishment and deportation because of their race. *Id.* at 9-16; *see also Carrillo-Lopez*, 2021 WL 3667330, at *8. The racial vitriol was solely directed at Mexicans. Congress ignored, for example, the fact that a record number of Canadians were also entering the United States at the same time. *See id.*; *cf. Arlington* Heights, 429 U.S. at 266-67 (courts should consider "the legislature's departure[] from normal procedures or substantive conclusions.").

The illegal reentry provision of the Undesirables Act thus represented a compromise between the nativists and the agricultural industry, allowing for the continued use of exploitable laborers from Mexico, while using the criminal law as a means to punish and deport those laborers once their work was done. Fish Aff*., p. 12-16.

---

[3] In relevant part, the illegal reentry provision of the Undesirables Act reads" "That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000 or by both such fine and imprisonment." *Carrillo-Lopez*, 2021 WL 3667330, at *4 n.9 (quoting Undesirable Aliens Act, Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929)).

As Professor Fish concludes: The law [criminalizing reentry] was conceived and enacted by men deeply convinced of Latin Americans' racial inferiority. These men explicitly advocated the law as a means to help end Latin American immigration in order to protect the white race." *Id.* at 16; *see Carrillo-Lopez*, 2021 WL 3667330, at *9 (finding, after reviewing the five *Arlington Heights* factors, that "racial animus was a strong motivating factor in the passage of the Act of 1929. The evidence clearly indicates, as both parties and other district courts agree, that the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and that these racist theories ultimately fueled the Act's passage.").

> 2. *Racial animus continued to be a motivating factor in the recodification of the illegal reentry provision in the McCarran-Walter Act of 1952.*

The McCarran-Walter Act of 1952 collected, recodified, and revised the many existing laws governing immigration and reorganized the structure of immigration statutes. Among other things, the McCarran-Walter Act recodified the illegal reentry provision of the Undesirable Act of 1929 under Title 8, U.S.C. § 1326.[4] The 1952 reenactment, however, was still motivated by discriminatory intent, and Congress did nothing to "cleanse" Section 1326 of its racist origins. *See Carrillo-Lopez*, 2021 WL 3667330, at **9-16.

---

[4] The recodified statute reads: "Any alien who – (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both." *Carrillo-Lopez*, 2021 WL 3667330, at * 4 n.10 (quoting Immigration and Nationality Act, Pub. L. No 82-414, § 276, 66 Stat. 229 (codified at 8 U.S.C. § 1326 (1952)).

In her affidavit, Professor Kang traces the anti-Mexican racism that undergirded U.S. immigration policy between the 1929 Undesirables Act and the passage of McCarren-Walter in 1952. *See* Cohen Aff., Ex. B. Professor Kang describes, among other things, the disparate prosecutions of Mexicans under the Undesirables Act; the forced repatriation of nearly 500,000 undocumented Mexicans; the Bracero Program, created purportedly to provide Mexican workers with better working conditions, but in fact riven by abuse and discrimination (in the infamous "El Paso Incident" of 1948, for example, the INS unilaterally opened the border to thousands of bracero hopefuls who had gathered upon a rumor that a new recruiting center would open; instead, the INS arrested them on the spot and then paroled them to waiting employers); and the repeated use of racial slurs by members of Congress when referring to Mexican migrants. *Id.* at 1-16.

The legislative history of the 1952 recodification reflects the same desire as the 1929 legislature for a whites-preferred system for permanent immigration while accommodating continued access to an exploitable, racially identified labor force. *Id.* at 16-23. Congress recodified illegal reentry with full knowledge of its disparate impact on Latinos. *Id.* at 22-23. Congress also expanded grounds for deportation, limited discretionary relief, and added language to make illegal reentry easier to prosecute and convict. *Id.* at 21-22. And Congress passed the law over a presidential veto that explicitly called out the law for its racism. *Carrillo-Lopez*, 2021 WL 3667330, at *12.

The legislative history of 1952 demonstrates a choice not to mitigate the racially disparate impact of illegal reentry, nor to repudiate its eugenicist origins. The 1952 congress had the evidence of the disparate impact of illegal reentry in the 23 years since the law's passage. They heard from its enforcers. They received scathing criticism from the President. Yet there

11

was no debate about whether illegal reentry should remain on the books. "Congress was more concerned with which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929." *Carrillo-Lopez*, 2021 WL 3667330, at * 11. "Here, the 1952 Congress remained silent, even when other provisions of the law were being debated. When considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence here weighs in favor of" a finding of discriminatory intent. *Id.*

But there was far more than just Congressional silence. The only substantive change made to Section 1326 in 1952 was an amendment to *expand* the government's authority to enforce the original 1929 provision. In a letter supporting this expansion, Attorney General Peyton Ford's letter included the racial slur "wetback." In fact, at the same time as McCarran-Walter was being considered, Congress was also considering what several members referred to as the "Wetback Bill", whose stated aim was to "assist in preventing aliens from entering or remaining in the United States illegally" by criminalizing the harboring of non-citizens, while specifically excluding employers (who relied on Latinos for cheap and exploitable labor) from prosecution.

As Professor Kang summarizes, "The Undesirable Aliens Act and its subsequent revision in 1952 were passed in a historical period when ant-Mexican racism was explicit and widespread. White House officials, members of Congress, and the INS articulated eugenicist stereotypes of Mexican migrants as an exploitable and deportable workforce, and through their policy administrations, treated them as such. . . . Just as important, in 1952, Washington lawmakers consciously chose not to erase the racial animus from the nation's immigration laws, including § 1326." Kang Aff., at 22-23.

Chief Judge Du reached the same conclusion in *Carrillo-Lopez*:

> The totality of evidence shows that the same factors motivating the passage of Section 1326 in 1929 were present in 1952. Not only did Congress fail to repudiate the racial animus clearly present in 1929, but it expanded the government's power to enforce unlawful reentry, despite President Truman's call to reimagine immigration laws. The 1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents, while contemporaneously passing another bill targeting "wetbacks." Although it is "not easy" to prove that racism motivated the passage of a particular statute, the Court reasons that it cannot be impossible, or *Arlington Heights* would stand for nothing.

*Carrillo-Lopez*, 2021 WL 3667330, at * 16.

### B.     8 U.S.C. § 1326 has had a disparate impact on Latinos.

Section 1326 disparately – indeed virtually exclusively – harms Latinos. Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[5] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants. *Id.* And this trend has continued. In connection with another case, Professor Michael T. Light analyzed the U.S. Sentencing Commission's 2015-2019 data, and found that 99% of the nearly 88,000 people sentenced under the "illegal reentry" guidelines (U.S.S.G. §2L1.2) during this period were Latinos. *See* Decl. of Matthew Light at 2-3, *United States v. Machic-Xiap*, No. 3:19-cr-407 (D. Or. Mar. 31, 2021), ECF No. 52-1, attached as Ex. C; *see also Carrillo-Lopez*, 2021 WL 3667330, at * 5 (determining that "Section 1326 disparately impacts "Latinx individuals.)

---

[5] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939, 37; City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138-39 (UNC Press, 2017).

13

### C. The burden shifts to the government.

Because Mr. Crespo has shown both a discriminatory purpose and a disparate impact underlying § 1326, the burden shifts to the government to show that the Congress would have passed the illegal reentry provision in Undesirables Act of 1929. and reenacted it in 1952 "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68, 270 n.21; *see also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor.").

If the Government provides no evidence to demonstrate that the 1929 Act would have passed without its discriminatory purpose, the charge here should be dismissed. If, however, the Government proffers some evidence, the Court should hold an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See*, *e.g.*, *Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *Democratic National Committee*, 948 F. 3d at 998 (referencing ten-day bench trial); *Arce*, 793 F 3d at 991; *Carrillo-Lopez*, 2021 WL 3667330, at *1 (holding evidentiary hearing to determine whether 8 U.S.C. § 1326 violated the equal protection guarantee of the Fifth Amendment). Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *Hunt v. Cromartie*, 526 U.S. 541, 545 (1999).

### CONCLUSION

As argued, 8 U.S.C. § 1326 was enacted with a discriminatory purpose and has a disparate impact on Latinos. Because the Government cannot demonstrate that it would have been enacted absent racial animus, the statute violates the equal protection guarantee of the Fifth Amendment under the standard articulated in *Village of Arlington Heights v. Metropolitan*

*Housing Dev. Corp.*, 429 U.S. 252." Accordingly, the one-count indictment against Mr. Crespo must be dismissed.

Dated: New York, NY
      April 8, 2022                                                   /s/
                                                                        Martin Cohen
                                                                       Assistant Federal Defender
                                                                       Federal Defenders of NY
                                                                       52 Duane Street, 10th Floor
                                                                       New York, NY 10007
                                                                       (212) 417-8317