UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA           :        **AFFIRMATION**

                                     :

            - v. -                 :        22 Cr. 9 (JFK)

                                       :

FIDENCIO CRESPO-CASTELAN,       :

                                     :

                 DEFENDANT.      :
-------------------------------------------------------------x

       I, MARTIN COHEN, ESQ., hereby declare under the penalties of perjury, pursuant to 28

U.S.C. § 1746, that:

       1.      I am an attorney associated with the Federal Defenders of New York, and have

been appointed by the Court to represent defendant Fidencio Crespo-Castelan in this action. I

make this affirmation in support of a motion to dismiss the indictment because 8 U.S.C. § 1326

violates the equal protection clause of the Fifth Amendment.

       2.      The statements contained in the Affirmation are based on my review of

documents and other evidence related to this case.

       3.      Fidencio Crespo-Castelan was born in Mexico in 1987. In around 2005, when he

was 19 years old, Mr. Crespo was convicted of helping to bring non-citizens into the United

States, in violation of 8 U.S.C. § 1324. He was sentenced to 15 months in prison, and

subsequently removed.

       4.      Mr. Crespo returned to the United States after his removal, raised a family, and

prior to his arrest in connection with this case on December 14, 2021, had no further interaction

with the criminal justice system.

       5.      On January 5, 2022, a one-count indictment was filed charging Mr. Crespo with

unlawfully reentering the United States in violation of 8 U.S.C. § 1326.

6.      Attached to this Declaration are the following exhibits:

▪   Exhibit A: Affidavit of Professor Eric S Fish;

▪   Exhibit B: Affidavit of Dr. S. Deborah Kang;

▪   Exhibit C: Decl. of Matthew Light.

Dated:  New York, New York
        April 5, 2022


                                        /s/ Martin Cohen
                                        Martin Cohen
                                        Ass't Federal Defender
                                        Federal Defenders of New York
                                        52 Duane Street – 10th Floor
                                        New York, NY 10007
                                        (212) 417-8737

Exhibit A

Affidavit

Eric Fish

Acting Professor of Law

University of California at Davis

efish@ucdavis.edu

December 6, 2021

I have been asked to write a declaration setting out the evidence that racial animus motivated the enactment of the 1929 Undesirable Aliens Act (hereinafter the "UAA"). This is the law that first created the crime of reentering the United States after deportation, now codified at 8 U.S.C. § 1326. The following declaration is drawn from historical research I conducted for my article "Race, History, and Immigration Crimes," which is forthcoming in the Iowa Law Review. This declaration will address: 1. The creation of the quota system in 1924 and the predominance of eugenicist beliefs among those responsible for its enactment; 2. The efforts of Chairman Albert Johnson and Representative John Box in the House of Representatives to enact laws restricting Latin American immigration from 1924 to 1930; 3. The eugenicist claims about Latin Americans' racial inferiority that were made during those legislative efforts; 4. The racial beliefs of Secretary of Labor James Davis and Senator Coleman Blease, who respectively authored the unlawful reentry provision of the UAA and introduced it in the Senate; and 5. The debate in Congress over the UAA, which focused on the supposed racial inferiority of Latin American immigrants.

**(1) Racial eugenics and the creation of the quota system.** In the 1920s, the science of racial eugenics was the dominant ideology of American immigration policy. A 1916 book by Madison

Grant entitled *The Passing of the Great Race* popularized eugenics in the United States. It specifically spread the theory of Nordicism, which is the idea that people from Northern Europe (so-called "Nordics") are racially superior to people from Southern and Central Europe ("Mediterraneans" and "Alpines"), as well as to racial groups from Asia, Africa, Latin America, and elsewhere. This belief system motivated Congress to create the first comprehensive federal immigration system through a series of laws passed in 1917, 1921, and 1924. The last of these laws, the Johnson-Reed Act, established a quota system that limited new immigration based on the proportion of each foreign nationality present in the U.S. population as of 1890. This change was primarily intended to exclude immigrants from Southern and Central Europe, who only began immigrating in large numbers after 1890.

The main architect of this quota system was Albert Johnson, the Chairman of the House Committee on Immigration and Naturalization. Johnson's efforts to restrict immigration were informed by his deep commitment to racial eugenics. He met regularly with Madison Grant and other leading race-science intellectuals. He invited eugenicists to testify and submit reports for his committee's hearings. He also personally served in leadership roles at pro-eugenics organizations. He was president of the Eugenics Research Institute from 1923 to 1924, and was an active member of the American Eugenics Society.  He also worked with Grant on the Eugenics Committee of the United States Committee on Selective Immigration. In that capacity, he helped produce a report arguing that Northern and Western Europeans are of "higher intelligence" and provide "the best material for American citizenship."[1] After the Johnson-Reed Act's passage, Johnson wrote that "[t]he day of indiscriminate acceptance of all races has definitely ended."[2]

---

[1] MATTHEW FRYE JACOBSON, WHITENESS OF A DIFFERENT COLOR: EUROPEAN IMMIGRANTS AND THE ALCHEMY OF RACE 83 (1998)

[2] ROGER DANIELS, GUARDING THE GOLDEN DOOR: AMERICAN IMMIGRATION POLICY AND IMMIGRANTS SINCE 1882 at 55 (2004).

Another key player in the creation of the quota system was a eugenicist named Harry Laughlin. Laughlin was a public intellectual whose work inspired several major changes in American law. He managed the Eugenics Record Office, the largest and best-funded eugenics organization in the United States. At the Eugenics Record Office, Laughlin became an influential proponent of laws against interracial marriage. He also popularized laws providing for forced sterilization of the disabled. In 1922 he published a model involuntary sterilization law, and his lobbying efforts were instrumental in convincing thirty states to adopt such laws by 1935. Laughlin personally testified as an expert supporting sterilization in the *Buck v. Bell* case, which culminated in the Supreme Court affirming the government's power to forcibly sterilize people it deems unfit. Laughlin's model law also served as a template for Nazi Germany's own sterilization law. Laughlin himself was antisemitic, and expressed great enthusiasm about the Nazis' embrace of scientific racism. He was even fêted by the Nazi regime, which awarded him a Doctorate of Medicine from the University of Heidelberg to recognize his contributions to the "science of racial cleansing."[3]

From 1920 until 1931, Chairman Johnson employed Laughlin as the "Expert Eugenics Agent" for the House Committee on Immigration and Naturalization. From this position Laughlin exerted enormous influence over the legislative debate on immigration. In a series of hearings concerning the Johnson-Reed Act and its predecessor statute, Laughlin argued that Southern and Eastern European immigrants were burdens on society that threatened to dilute America's Nordic racial stock. In 1920 he presented to the Committee his estimate of the total cost of maintaining immigrants deemed "feeble-minded"—the insane, criminals, the disabled, and those with chronic illnesses, among others. He concluded that racially undesirable foreigners contributed disproportionately to these groups. In 1922 he returned to the Committee with a new report, as

---

[3] DESMOND KING, MAKING AMERICANS: IMMIGRATION, RACE, AND THE ORIGINS OF THE DIVERSE DEMOCRACY 167 (2002).

well as numerous visual aids including maps from *The Passing of the Great Race*. This report again concluded that the "socially inadequate" came disproportionately from Southern and Eastern Europe. He came back once more in 1924, to present his eugenicist case for the Johnson-Reed Act based on a factfinding trip he had taken to Europe. Laughlin's arguments ultimately carried the day, with Congress embracing his ideas and enacting a permanent quota that basically excluded non-Nordic Europeans. As Laughlin later observed, Johnson-Reed created "a biologically-based policy" in which future immigration "would have to be compatible with American racial ideals."[4]

**(2) Legislative efforts to restrict Latin American immigration in the 1920s.** The Johnson-Reed Act contained an exception for immigration within the Western Hemisphere. This meant that immigrants from Mexico and elsewhere in Latin America could enter without limitation, so long as they passed a literacy test and paid an entry fee. Congress created this exception for two main reasons: because western agricultural interests wanted workers from Mexico, and because the executive branch wanted to maintain strong diplomatic relationships with other countries in the Western Hemisphere. This exception, combined with the exclusion of low-wage immigrant workers from Europe, caused immigration from Mexico to increase dramatically.

From 1924 to 1930, Johnson's House Committee on Immigration and Naturalization engaged in a sustained effort to end immigration from Latin America. During this period, Johnson's Committee held hearings on numerous bills designed to keep Latin Americans out of the United States. These bills adopted two distinct but complementary strategies. One strategy was to end lawful immigration from Latin America by expanding the quota system to include Latin American countries. Congressman John Box of Texas repeatedly introduced a bill with that aim. Box's Bill

---

[4] HARRY LAUGHLIN, IMMIGRATION AND CONQUEST 39 (1939).

4

was introduced in the House in 1926, 1928, and 1930. The 1930 version of the Bill specifically targeted only immigrants from Mexico, and would have excluded them completely from the United States. In a committee report approving that Bill, Johnson wrote: "Congress, exclusively charged with the great responsibility of protecting the country from the menace of infiltration by alien people whose numbers, economic standards, social and racial qualities threaten serious injury to the country, should meet that responsibility with American welfare as a paramount consideration."[5] Similarly, Box declared in a 1928 speech that "The Mexican peon is a . . . blend of low-grade Spaniard, peonized Indian, and negro slave [that] mixes with negroes, mulattoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat."[6] The House Committee's other strategy was to expel the Latin American immigrants already here. To this end, Chairman Johnson introduced a series of bills intended to significantly expand the government's deportation powers. Johnson proposed these bills in 1925, 1926, and 1928. In 1929, he incorporated several of his deportation proposals into the House version of the UAA. This included a criminal provision making it a misdemeanor to enter the United States without permission.

**(3) Legislative publications on the racial characteristics of Latin Americans.** Eugenic racism was a major theme of the congressional debates over Latin American immigration between 1925 and 1929. To understand the role that this ideology played, it will be helpful to review two congressionally issued publications that were part of these debates. The first is a 1925 report by

---

[5] Restriction of Immigration from the Republic of Mexico, House Report No. 1594 at 2, 71st Cong. 2d sess., 1930.
[6] Statement of Mr. Box, Restriction of Mexican Immigration, 69 Cong. Rec. 2817, Feb. 9, 1928.

Robert Foerster, a professor of economics at Princeton, entitled "The Racial Problems Involved in Immigration from Latin America and the West Indies to the United States." This report is provided as EXHIBIT A to this declaration. The second is a 1928 report by Harry Laughlin, the House Committee's Expert Eugenics Agent, entitled "Six Major Racial Problems in American History." An excerpt of his report is provided as EXHIBIT B to this declaration.

Foerster originally wrote his report for the Department of Labor, at the request of Secretary of Labor James Davis. Chairman Johnson then held a hearing on the report in March 1925, and published it as part of the House Committee's official record. In his comments introducing Foerster's work, Johnson noted that he believed it "worthy of incorporation in the permanent records of the Committee" and that it contained "some very illuminating matter which members probably will desire to study."[7] Foerster framed his report as an inquiry into the effects of the "recent rapidly rising tide of immigration into the United States from the southern lands of this hemisphere," including "whether the new additions to the race stock of the United States can be regarded as beneficial or as detrimental."[8] He came down strongly on the side of "detrimental." He argued that, in Latin America, the superior white racial stock had become degraded by mixing with other races:

> "By far the most usual generalization concerning hybrids produced by the union of distant stocks is that they tend to be superior to the poorer strain and inferior to the better strain. The Mexican mestizo, for example, is deemed more capable than the Indian but less capable than the pure Spanish, and the mulatto is deemed more capable than the negro but less capable than the white. . . . [T]he observation accords precisely

---

[7] Exhibit A at 303.
[8] Exhibit A at 304.

6

with the implication of Mendelian heredity."[9]

He goes on to assert: "Where a race is in a position to maintain its purity, it is best that it should not breed with what appears to be an inferior or distant race."[10] Foerster then ends his report by applying these insights about racial hierarchy and racial mixing to the specific issue of Latin American immigration. He writes:

> "In its simplest terms, then, the question of Latin American immigration may be stated thus: Are the race elements involved therein such as this country should today welcome into its race stock? To this question the answer is bound to be negative. When every allowance is made for the fact that some pure Indian strains and some pure negro strains may be better than other Indian or negro strains and when the most favorable judgment on the mixed strains, mulatto and mestizo, is given of which they are capable, it still apparently remains true that one or another of these groups merely approaches but does not attain the race value of the white stocks, and therefore that the immigrants from these countries tend to lower the average of the race value of the white population of the United States."[11]

He concludes by arguing for an increase of immigration from Europe, and for a total prohibition on immigration from Latin America.

Harry Laughlin's 1928 work echoed the themes of Foerster's 1925 report. Laughlin appeared at a hearing in the House Committee concerning Box's proposal to exclude Latin American immigrants through the quota system, as well as a bill to increase the size of the Border Patrol. He later corresponded with Chairman Johnson about having his remarks published by the Committee

---

[9] Exhibit A at 330-31
[10] Exhibit A at 331.
[11] Exhibit A at 335.

7

as an independent volume, which Johnson agreed to do. Laughlin's topic was "the eugenic aspects of Mexican immigration in the light of American history."[12] He claimed that the rise of immigration from Mexico was the most recent in a list of six historical "race problems" that the United States had faced. The prior five race problems were, in order: "the white colonists and the Indians," "the conflict between the British and French, Dutch, and Spanish colonists," "negro slavery," "oriental migration," and "the change in American immigration sources from North-Western to Southern and Eastern Europe."[13] Laughlin argued that the immigration of Mexicans posed an existential racial threat to white Americans. He was especially concerned with what he called racial "hybrids." He stated that when people of different races reproduce, "[t]he hybrids resulting from such wide crosses are not assimilated into either of the parent stocks, but they establish new and highly variable and unstable races."[14] He claimed that white Americans could only preserve their "best qualities" if they reproduced exclusively with fellow whites, and avoided creating such hybrids. Laughlin further believed that men of mixed racial heritage posed a unique threat to white racial purity, because white women might mate with them: "[I]f the time ever comes when men with a small fraction of colored blood could readily find mates among the white women, the gates would be thrown open to a final radical race mixture of the whole population. The racial integrity of the white races would be jeopardized."[15] In this regard, Laughlin warned specifically against immigration of mixed-race people from Mexico. "The common Mexican, of course, is, as we know him, of mixed racial descent—principally Indian and Spanish, with occasionally a little mixture of black blood."[16] He observed that "the racial problem has become acute in the

---

[12] Exhibit B at 702.
[13] Exhibit B at 702-08.
[14] Exhibit B at 708.
[15] Exhibit B at 709.
[16] Exhibit B at 711.

8

Southwest," because "during the last few years [the Mexican] has come here in such great numbers as almost to reverse the essential consequences of the Mexican War."[17] Once the Committee had finished discussing Laughlin's testimony, Chairman Johnson concluded by stating: "The task of our committee is to prepare proposed statutes which will develop the American people along the racial and institutional lines laid down by the founders of the country, so far as the control of immigration can do it."[18]

**(4) Coleman Blease, James Davis, and the 1929 Senate bills.** In 1929, the Secretary of Labor and a Senator from South Carolina collaborated to pass the first significant restrictionist law since the Johnson-Reed Act. Secretary of Labor James Davis drafted two proposed bills, one creating a system of immigrant registration cards and the other making it a felony to reenter the United States after being deported. Senator Coleman Blease of South Carolina then introduced both bills and pushed them through the Senate. Together these bills represented a new strategy for fighting Latin American immigration, one based on surveillance and criminal prosecution. Together they would have enabled the government to demand people's immigration cards and then prosecute those caught in the United States after having been deported.

Blease served two terms as South Carolina's governor from 1911 to 1915, and a single term in the Senate from 1925 to 1931. Anti-black racism was a defining theme of his political career. He was an enthusiastic proponent of lynching black men accused of crimes against white women. At a national governor's conference he was asked if his advocacy of lynching violated his state's constitution, and he replied: "Whenever the constitution of my state steps between me and the defense of the virtue of the white woman, I will resign my commission, tear it up, and throw it to

---

[17] Exhibit B at 711.
[18] Exhibit B at 717.

the breezes and march to the defense of her honor and virtue. If the constitution causes my state to blush and allows her women to be forsaken, then I say to hell with the constitution!"[19] In 1928 he proposed a constitutional amendment that would criminalize interracial marriages. In 1929 First Lady Lou Hoover hosted Jessie De Priest, the wife of a black congressman, at a traditional White House tea for congressional wives. Blease protested by introducing a resolution containing a poem entitled "N****** in the White House," which was then read on the floor of the Senate. The resolution was only withdrawn because a senator objected. Blease served on the Senate Committee on Immigration, and he harbored animosity towards Mexican immigrants. In a 1928 committee hearing on Box's bill, he stated that Mexicans are "[p]eaceable only in our own country; that is the reason I want them kept out. They know when they get over here they have got to behave or we will kill them."[20]

James Davis served as Secretary of Labor from 1921 to 1930, working under the Harding, Coolidge, and Hoover administrations. The Labor Department was responsible for administering immigration laws in the 1920s, so Davis was the chief immigration policymaker in the executive branch. He was a restrictionist and believed strongly in racial eugenics. Davis was a major proponent of the Johnson-Reed Act. He also supported Johnson and Box's efforts to include Latin America in the quota system. Davis solicited Robert Foerster's 1925 report on the eugenics of Mexican immigration, discussed above. He also, at Johnson's request, hired Harry Laughlin to serve as "special immigration agent" of the Labor Department in Europe. Davis wrote two books that helpfully lay out his views on race and immigration. One was an autobiography titled *The Iron Puddler*. In it he uses some vivid metaphors to illustrate his racial beliefs. For example, he labels

---

[19] Anthony Barry Miller, Masters Thesis, Coleman Livingston Blease, South Carolina Politician 59-60, 183 (University of North Carolina at Greensboro, 1971).
[20] Restriction of Western Hemisphere Migration, Hearings Before the Committee on Immigration, United States Senate, 70th Cong., 1st sess., Feb. 1 to Mar. 5, 1928, at 25.

different races as beavers and rats:

> "Some men are by nature beavers, and some are rats; yet they all belong to the human race. The people that came to this country in the early days were of the beaver type and they built up America because it was in their nature to build. Then the rat-people began coming here, to house under the roof that others built. . . . A civilization rises when the beaver-men outnumber the rat-men. When the rat-men get the upper hand the civilization falls. Then the rats turn and eat one another and that is the end. Beware of breeding rats in America."[21]

Davis also compares racially undesirable immigrants to swine. He claims that "racial characteristics do not change," and that "[t]ribes that have swinish traits were destroyers there and will be destroyers here."[22] He refers to "hottentots" and "bushmen" as "pig iron," because "They break at a blow. They have been smelted out of wild animalism, but they went no further; they are of no use in this modern world because they are brittle."[23] He also describes, in some detail, how much he loves wearing blackface and performing in minstrel shows. The other book by Davis is *Selective Immigration*, which focuses on race and immigration policy. In it he praises the new "biological attitude" towards immigration policy, and in particular the work of Johnson and Laughlin in applying eugenic principles to the 1924 Johnson-Reed Act. He also criticizes the exemption of Mexico from the quotas, noting that under the new system "nearly sixty-five thousand Mexicans entered this country in one year, bringing into American communities lower standards of living."[24]

---

[21] JAMES DAVIS, THE IRON PUDDLER: MY LIFE IN THE ROLLING MILLS AND WHAT CAME OF IT, Chp. VIII (1922).
[22] *Id.* at Chp. III.
[23] *Id.* at Chp. XV.
[24] JAMES DAVIS, SELECTIVE IMMIGRATION 208 (1925).

**(5) The debate in Congress.** Senator Blease presented his two bills to the Senate on January 23, 1929. The bills were then passed on a voice vote with no debate and sent over to the House. In the House Committee on Immigration and Naturalization, Chairman Johnson declined to take up the registration bill. Johnson did, however, combine the bill creating the felony reentry provision with a number of other deportation-related provisions, several of which were from prior bills he had proposed. This new hybrid bill contained both Blease and Davis's felony reentry provision and Johnson's misdemeanor illegal entry provision. These are the original versions of the laws now codified at 8 U.S.C. §§ 1326 and 1325, respectively. The bill also contained numerous other provisions that created new categories of deportability and removed statutes of limitations for deportation, among other things. Johnson's committee approved the bill. The bill was then debated on the floor of the House on February 15 and 16, 1929. In the record it is referred to by the title "S. 5094, making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law."[25] Chairman Johnson announced during the debate that the Committee had given it a shorter title: "The Undesirable Aliens Act of 1929."[26]

The congressmen debating the Undesirable Aliens Act revealed its purpose: to target Latin American immigrants for punishment and deportation because of their race. Portions of this debate are provided as EXHIBIT C. John O'Connor of New York began the debate by criticizing the bill (and two other immigration bills proposed simultaneously) as racist. He stated "I do not like the spirit behind all these measures. There seems to be a spirit of bigotry and intolerance in America directed at the races of the rest of the world that surely is un-American."[27] And further: "How long can demagogues in all political parties continue to preach this doctrine of saying 'America for

---

[25] 70 Cong. Rec. 3525, Feb. 15, 1929.
[26] 70 Cong. Rec. 3542, Feb. 15, 1929.
[27] Statement of Mr. O'Connor, 70 Cong. Rec. 3526, Feb. 15, 1929.

12

Americans only' and further foment this vindictive intolerance evidenced by these bills?"; "Every one of these bills is directed at one or a few particular races."; "These three bills are not needed now, but they will go to credit some men here in their districts with having furthered the cause of intolerance."; "Perhaps immigration should be regulated. Perhaps we should close the doors. But I do detest the giving of false economic reasons to disguise intolerance."[28]  The record indicates that O'Connor's speech was followed by applause.

The subsequent debate would validate O'Connor's point. Congressman Charles Edwards of Georgia said the following:

> "Hordes of undesirable immigrants from Mexico are coming into the United States. I have seen it stated that anywhere from 65,000 to 100,000 Mexicans are annually coming over the border into this country. As a rule they are not the better or higher-type Mexicans, but generally of the less desirable type, and in many cases the criminal and diseased element. Something must be done to stop this."[29]

He continued: "This ignorant and undesirable element pouring into the United States from Mexico, not only do not understand American ideals, but many of them come into our country with hatred in their hearts for America and Americans."[30] And he concluded: "Let's be just and fair to our own Republic and not poison her institutions with the riff-raff and scum of other countries who will not, and can not, from the very nature of things, become one of us because they have no conception of Americanism."[31]

After Edwards was finished, Congressman William Hastings of Oklahoma argued: "We need additional legislation as to both countries, and particularly against admissions through Mexico.

---

[28] *Id.*
[29] Statement of Mr. Edwards, 70 Cong. Rec. 3555, Feb. 15, 1929.
[30] *Id.*
[31] *Id.*

Mexican laborers come here in competition with American workmen, and those who come in from that country are less desirable citizens."[32]

Congressman Thomas Blanton also expressed negative views on Mexican immigration:

"There were thousands that came across the border unlawfully. You can go up and down the Mexican border in Texas for 10 and 15 miles and you will not see a house, and sometimes you will not see an immigration agent for 40 miles. They can wade across the river in lots of places. They come into Texas by hordes all of the time. . . . . They are taking away jobs from American citizens. I am surprised that this committee would permit that to exist any longer."[33]

Congressman John Schafer of Wisconsin chimed in to support Blanton's point: "These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor."[34]

Congressman John Box then entered the debate and gave a speech on the immigration laws' failure to deal with Mexican migration. During it he observed: "There are many interested in the importation of these poor peons. They are often imported and left in pitiful conditions. . . . They are raising a serious race question."[35] And further:

"This Congress ought to have statesmanship enough in it to look over the past and see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of people essentially different from us in character, in social position, and otherwise. We are breeding another one of

---

[32] Statement of Mr. Hastings, 70 Cong. Rec. 3557, Feb. 15, 1929.
[33] Exhibit C at 3619.
[34] Exhibit C at 3619.
[35] Exhibit C at 3619.

those great race questions. We are degrading labor, we are defeating all of the essential purposes of the immigration laws."[36]

Box followed this up by observing that Mexicans were criminals, and that they brought in tuberculosis and other diseases.

As these quotes show, the congressmen debating the Undesirable Aliens Act focused overwhelmingly on the issue of Mexican immigration. Mexican immigrants were the main focus of the discussion, and no other race or nationality was mentioned nearly as often. After debate was closed, the House approved Johnson's version of the bill. Because the House and Senate versions differed, the two chambers established an eight-member conference committee to iron out the law's final language. Included in this committee were Johnson, Box, and Blease. This committee stripped out most of the deportation-related provisions from the House version, and kept in the two criminal provisions. The Undesirable Aliens Act was then enacted on March 4, 1929.

Post-enactment commentary by Senator Blease sheds some additional light on the law's purpose. During a May 25 discussion in the Senate about Mexican immigration, Blease said: "Mr. Davis has been doing all he can to remedy the situation to which I have referred. He recommended the enactment of two certain laws. The Senate passed both of the bills and they were sent to the House of Representatives, where one of them was never passed on at all, but is still there, and the other one was mutilated and cut all to pieces . . ."[37] Blease also entered into the congressional record a report from the "Committee on Immigration of the Allied Patriotic Societies," which listed Harry Laughlin as a coauthor. Right after a lengthy discussion of Mexican immigration, this report described the UAA as "a distinct advance in the cause of real restriction," and one of the "only bills of any importance affecting immigration which became law" in the last congressional

---

[36] Exhibit C at 3620.
[37] Statement of Mr. Blease, 71 Cong. Rec 1919, May 25, 1929.

session.[38]  Because of this law, the report asserted, the session "was not without its importance in the history of the struggle to solidify our present national policy of restricting immigration within proper bounds and on scientific principles."[39]

**Conclusion.** The foregoing declaration explains the dominant role of racism, and in particular of racial eugenics, in the debates over Latin American immigration in the 1920s. It also describes the specific role that anti-Latin American racial animus played in the passage of the Undesirable Aliens Act of 1929, which created the unlawful reentry crime now codified at 8 U.S.C. § 1326. The law was conceived and enacted by men deeply convinced of Latin Americans' racial inferiority. These men explicitly advocated the law as a means to help end Latin American immigration in order to protect the white race.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ Eric S. Fish                                                    12/6/2021
_____                          _____
Eric S. Fish                                                        Date
Acting Professor of Law
University of California, Davis

---

[38] 71 Cong. Rec 1833, May 24, 1929.
[39] *Id.*

Exhibit B

Affidavit

Dr. S. Deborah Kang
Associate Professor of History
University of Virginia
sdkang@virginia.edu
December 22, 2021

Introduction

I have been asked to research the legislative history of 8. U.S.C. 1326 and address the question of whether racial animus motivated the passage of the original law and its subsequent amendments. This affidavit provides a report of my findings, which are based on the relevant historical scholarship, the events leading to the legislation, and legislative history.[1] In sum, the Undesirable Aliens Act of 1929 and its amendments under the McCarran-Walter Act of 1952, the Anti-Drug Abuse Act of 1988 (ADAA), the Immigration Act of 1990, the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA), the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) were enacted with a discriminatory purpose. Whereas anti-Mexican racism informed the passage of the Undesirable Aliens Act and its 1952 revision, a combination of anti-Haitian and anti-Hispanic racism drove the enactment of the subsequent amendments in 1988, 1990, 1994, and 1996. Part I focuses on the first two acts while Part II supplies a history of the re-enactments under the 1988 and 1990 Acts. Part III discusses the changes made to §1326 under the VCCLEA and AEDPA and Part IV addresses those rendered by IIRIRA.

---

[1] *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. at 265 (1977).

Part I: The Undesirable Aliens Act (1929) and the McCarran-Walter Act (1952)

*Historical Background and Legislative History*

For more than a century, anti-Mexican racism has been a driving factor in the shaping of America's citizenship and immigration policies. Since the signing of the Treaty of Guadalupe Hidalgo in 1848, racial animus led many Americans to harbor deep reservations about the fitness of ethnic Mexicans for United States citizenship.[2] Thus, despite the promises of citizenship and equal protection guaranteed by the Treaty and the Constitution, widespread racial discrimination and racial violence prevented ethnic Mexicans from the full enjoyment of their political, economic, and social rights.[3]  Anti-Mexican racism also tainted nearly every immigration policy pertaining to ethnic Mexicans, including admissions, deportation, enforcement, legalization, and criminal prosecution under measures such as the Undesirable Aliens Act. From the late nineteenth century to the present, the racist assumptions underlying the nation's immigration laws conveyed the perennial message that ethnic Mexicans did not belong and that they were unfit for citizenship.

In the early twentieth century, anti-Mexican racism took a new form. Whereas earlier articulations of these sentiments denigrated the lifestyles of the Californios, Hispanos, and Tejanos (former subjects of Mexico who became US citizens or legal permanent residents under the Treaty), by the early twentieth century, a different form of xenophobia emerged in response to the migration of 1.5 million Mexicans between 1910 and 1920.[4]  In particular, American

---

[2] David G. Gutiérrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* (Berkeley: University of California Press, 1995).

[3] Neil Foley, *The White Scourge: Mexicans, Blacks, and Poor Whites in Texas Cotton Culture* (Berkeley: University of California Press, 1999); Monica Munoz Martinez, *The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (Cambridge: Harvard University Press, 2018).

[4] David Lorey, *The U.S.-Mexican Border in the Twentieth Century* (New York: Rowman and Littlefield), 69.

industries, especially southwestern agribusiness, created and perpetuated a negative stereotype of the new arrivals as a cheap, exploitable, and deportable labor force. In so doing, they relied upon the ideas of contemporary eugenicists who argued that Mexican migrants were mentally and morally inferior to European immigrants.[5]  These qualities, they further claimed, made Mexicans the ideal work force, particularly for the corporate farms that began to proliferate throughout the American Southwest. As historian Lawrence Cardoso writes, the farmers

> claimed that the braceros' physical and mental makeup ideally suited them for manual labor.  The hot climate of Mexico and the demanding tasks of hacienda labor had conditioned them to withstand high temperatures and carry out stoop labor.  This being the case, the 'betters' of society, the whites, were allowed to pursue occupations more appropriate to their superior station in life.[6]

Growers further asserted that this work force would be a submissive one; they claimed that "braceros were a unique docile group of people, denuded of ambition and complacent with their status in life as a result of centuries of servitude and brutal exploitation on the haciendas."[7] Eugenicist ideas also led American employers to believe that nature or biology had rendered Mexican migrants "birds of passage." In other words, their so-called biological instincts made it impossible for Mexicans to settle in one locale for long periods of time; as a result, it was alleged that Mexicans would never want to remain in the United States as permanent residents and, in turn, pursue American citizenship.

Southwestern agribusiness organizations and their congressional representatives employed these racist stereotypes in lobbying for immigration policies in the early twentieth century.  Most prominently, until 1965, they successfully defeated the efforts of other

---

[5] Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (Princeton: Princeton University Press, 2002)*,* Kindle Loc. 226-262.
[6] Lawrence A. Cardoso, *Mexican Emigration to the United States,*1897-1931 (Tucson: University of Arizona Press, 1980), 125 (paraphrasing statements of farmers interviewed by Paul S. Taylor).
[7] Cardoso, *Mexican Emigration to the United States,* 124.

congressional lawmakers who, while like-minded in their racist antipathy toward Mexican migrants, wanted to establish an explicit ban against the entry of Mexican nationals into the United States. Their victory hinged on their repeated reassurances that Mexican nationals would never remain in the country and thereby threaten the nation's so-called racial stock. Others added that if Mexican nationals chose to remain, their removal, unlike the deportation of unwanted Chinese and European migrants, would be relatively easy given the proximity of Mexico to the United States.[8]  Indeed, by agreeing to the creation of an immigration Border Patrol in 1924 and the Undesirable Aliens Act, which established the first criminal penalties for the acts of illegal entry and re-entry, they demonstrated that their commitment to the elimination of unwanted Mexicans was not merely symbolic.[9]  In addition to placating their opponents, these measures also served agribusiness interests by providing them with a state-financed mechanism to manage their workforce or, more concretely, to detain and/or deport their Mexican employees when they were no longer needed at the end of the harvest season. In short, by 1929, anti-Mexican stereotypes drove the creation of immigration policies that limited their access to permanent residence and citizenship and consigned ethnic Mexicans to a perpetual cycle of welcome and return.

By the early 1930s, the Great Depression triggered another shift in anti-Mexican sentiment by hardening the association between an ethnic Mexican identity and undocumented immigration; as historian Mae Ngai writes, Mexican immigrants became the nation's iconic

---

[8] Tichenor, *Dividing Lines,* Kindle Loc. 228, 252-254.
[9] For an extended discussion of the racial animus that motivated the passage of the Undesirable Aliens Act, see *Brief for Professors Kelly Lytle Hernández, Mae Ngai, and Ingrid Eagly as Amici Curiae Supporting Respondent, United States of America v. Refugio Palomar-Santiago,* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-437.html; Eric S. Fish, "Race, History and Immigration Crimes," *Iowa Law Review*, forthcoming, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3827488.

illegal alien.[10]  Although anti-Mexican forces pronounced that Mexican migrants would never

stay in the United States, they ultimately did settle throughout the country, building families,

livelihoods, and communities.[11]  Yet, in the Depression era, these communities became a source

of resentment among nativists who sought a scapegoat for the economic crisis. Wrongly blamed

for taking the jobs of native-born Americans and consuming an unfair share of welfare benefits,

the federal government, states, and localities used scare tactics to force undocumented Mexican

immigrants into leaving the United States.[12]  These campaigns generated so much fear that

Mexican American citizens and Mexican immigrants, as well as undocumented Mexican

migrants, were driven out of the country; by the end of the decade, it's estimated that nearly half

a million ethnic Mexicans were forcibly repatriated.[13]  On the impact of these removals, historian

Erika Lee writes, "An entire generation of American citizens of Mexican descent were de-

Americanized and exiled to the country of their parents' birth."[14]

The federal government further cemented the link between Mexican identity and

illegality through the enforcement of the Undesirable Aliens Act. In the decade following the

law's passage, "seventy-one percent (71%) of all Mexican federal prisoners [were] charged with

---

[10] Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton: Princeton University Press, 2004).

[11] George J. Sanchez, *Becoming Mexican American: Ethnicity, Culture, and Identity in Chicano Los Angeles, 1900*-1945 (New York: Oxford University Press, 1995); Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965* (Chapel Hill: University of North Carolina Press, 2017), 131-32

[12] Abraham Hoffman, *Unwanted Mexican Americans: The Great Depression Repatriation Pressures, 1929-1939* (Tucson: University of Arizona Press, 1974); Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (Albuquerque: University of New Mexico Press, 1995); Deirdre Maloney, *National Insecurities: Immigrants and U.S. Deportation Policy Since* 1882 (Chapel Hill: University of North Carolina Press, 2012); Cybelle Fox, *Three Worlds of Welfare Relief: Race, Immigration and the American Welfare State, from the Progressive Era to the New* Deal (Princeton: Princeton University Press, 2012); Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (Princeton: Princeton University Press, 2020)

[13] Goodman, *Deportation Machine,* 46.

[14] Erika Lee, *America for Americans: A History of Xenophobia in the United States* (New York: Basic Books, 2019), Kindle Loc. 3007.

immigration crimes."[15] As historian Kelly Lytle Hernández observes, "no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison in those years."[16]  Taken together, the disparate prosecution of Mexicans under the Undesirable Aliens Act and local, state, and federal removal campaigns transformed the United States into a "'deportation nation' that made no distinction between foreign-born Mexican aliens who had entered the United States without documentation, lawful residents, naturalized citizens, and American-born citizens of Mexican descent."[17]

Yet, as World War II loomed on the horizon in the late 1930s, southwestern agribusiness began to resuscitate old arguments regarding the need for a temporary farm labor work force from Mexico.[18] Unwilling to pay the wages that would attract a native-born workforce, southwestern agribusinesses lobbied the government to create what would become the Bracero Program, a federally-sponsored farm labor program that led to the admission of approximately 4.5 million temporary workers from Mexico between 1942 and 1964.[19]  In creating the Bracero Program, the federal government secured the Mexico's assent and, through a series of bilateral treaties, the US pledged that Mexican nationals who signed Bracero contracts would receive a

---

[15] Declaration of Professor Kelly Lytle Hernández, *United States v. Bruno Rios-Montano*, 8.
[16] Declaration of Professor Kelly Lytle Hernández, *United States v. Bruno Rios-Montano*, 8.
[17] Lee, *America for Americans*, Kindle Loc. 3005.
[18] Mireya Loza, *Defiant Bracero: How Migrant Workers Fought for Racial, Sexual, and Political Freedom* (Chapel Hill: University of North Carolina Press, 2016), 34.
[19] Kirstein, *Anglo over Bracero*, 89; Grover C. Wilmoth, District Director, El Paso to Maurice T. Van Hecke, Chairman, President's Commission on Migratory Labor, October 29, 1950, file 56302/267, pt. 1, RG 85, National Archives; Grover C. Wilmoth, District Director, El Paso to Central Office, October 13, 1950, file 56302/267, pt. 1, RG 85, National Archives; Grover C. Wilmoth, "Statement prepared by Grover C. Wilmoth, District Director, Immigration and Naturalization Service, El Paso District, for the President's Commission on Migratory Labor, Holding Sessions at El Paso, Texas on August 4 and 5, 1950," file 56302/267, pt. 1, RG 85, National Archives; Carson Morrow, Chief Patrol Inspector to Grover C. Wilmoth, District Director, El Paso, October 13, 1950, file 56302/267, pt. 1, RG 85, National Archives.

fair minimum wage and humane working and living conditions.[20] In the aftermath of the mass deportation drives of the 1930s, both nations viewed the Bracero Program as a fresh chapter in U.S.-Mexico relations, a chapter in which the two nations would act as wartime allies and in which Mexican national workers would be treated with dignity and respect.

Yet, these optimistic pronouncements belied the ways in which anti-Mexican racism shaped the Bracero Program itself. US officials admitted that the pervasive racism faced by ethnic Mexicans in the United States jeopardized the very signing of the Bracero accords and their subsequent renewal.[21] George S. Messersmith, the US ambassador to Mexico, expressed these reservations shortly after the signing of the Bracero agreement, "The question of discrimination against Mexicans in the United States is one of the few outstanding problems we have with Mexico."[22] For its part, Mexico, long cognizant of the anti-Mexican animus in the United States, sought to protect its nationals by demanding the inclusion of humanitarian protections in the Bracero accords and banning Texas, where anti-Mexican racism took particularly violent forms, from the Bracero Program.[23] These efforts, however, failed to shield Mexican braceros from discrimination. From the onset of the Program, braceros complained

---

[20] These protections were not observed in practice. S. Deborah Kang, The *INS on the Line*: *Making Immigration Law on the U.S.-Mexico Border* (New York: Oxford University Press, 2017), 134.

[21] Having commissioned multiple studies on the issue of anti-Mexican racism in the late 1930s and 1940s, federal officials were keenly aware of the discrimination and racism faced by ethnic Mexicans in the United States. For an account of these studies, see Emilio Zamora, *Claiming Rights and Righting Wrongs in Texas: Mexican Workers and Job Politics During World War II* (College Station, Tex.: Texas A & M Press, 2010), 73-75; 89-93.

[22] Justin Hart, "Making Democracy Safe for the World: Race, Propaganda, and the Transformation of U.S. Foreign Policy during World War II," *Pacific Historical Review,* vol. 72, n. 1 (February 2004):65 (citing George S. Messersmith to the Secretary of State, November 12, 1942, 811.4016 Decimal File, 1940-1944, RG 59, National Archives, College Park, MD). Federal officials were also very concerned that entrenched anti-Mexican racism would disrupt Roosevelt's efforts to create hemispheric unity, especially after the US entered World War II. As the War continued, they feared that Axis powers would campaign for the hearts and minds of Latin American nations by drawing attention to the anti-Latin American animus in the United States. Hart, "Making Democracy Safe for the World," 59, 62.

[23] Zamora, *Claiming Rights and Righting Wrongs in Texas*, 68-71.

about "receiving 'a lower rate of pay for the same work'; on-the-job segregation between Mexicans and Anglos; separate recreational and toilet facilities; and a glass ceiling that prevented them from advancing beyond 'certain low-paying jobs.'"[24] In a widely circulated op-ed, Sumner Welles, former Under Secretary of State to President Franklin Delano Roosevelt, excoriated the "poisoning discriminations" faced by bracero workers and equated their experiences with those of ethnic Mexicans in the United States:

> . . . Mexican children are not permitted in some places to attend the public schools. They do not realize that Mexicans are not permitted in certain regions to travel in cars set aside for "white persons." They do not know that in some communities they are not permitted entrance into hotels or moving-picture theaters. They would be amazed to learn that only recently a high official of the Mexican government was refused service in the restaurant of a leading hotel in one of our Southwestern States. They would be shocked to hear that the proprietors of a public recreation center announced that they would not permit the entrance of Mexicans or persons of Mexican origin, "regardless of their state of culture, either social or economic." They are probably not aware that the slum conditions in which many thousands of Mexicans are forced to live in some of our Southwestern States are solely due to the unwillingness of the authorities and residents of those communities to afford them the same opportunity for betterment afforded their neighbors of United States origin. They do not know of the exploitation to which some Mexican laborers have been subjected."[25]

Over the twenty-two-year course of the Bracero Program, multiple investigations and complaints filed by the braceros themselves demonstrated the failure of the Program to protect workers from workplace abuses and discrimination.[26]

By 1943, the Bracero Program triggered an unprecedented increase in the number of undocumented entries; over the twenty-two-year course of the Program, approximately five

---

[24] Hart, "Making Democracy Safe for the World," (citing Ernest W. Trimble to Lawrence Cramer, October 26, 1942, 811.4016, Decimal File, 1940-1944, RG 59 NARA; William P. Blocker, "Some Places Where Mexicans are Discriminated Against in Texas Either by Denying Them Service or by Segregating Them from Anglo-Americans," January 15, 1945, in *ibid.*).

[25] Sumner Welles, "Mexican Nationals: Unfriendly Treatment," *Washington Post*, February 16, 1944, 10.

[26] Maggie Elmore, *In the Name of the Father: Catholic Bureaucrats and Human Rights in the Borderlands,* Draft book manuscript presented at the Clements Center for Southwest Studies, Southern Methodist University, Dallas, Texas, December 11, 2021, 63-121.

million undocumented immigrants would cross the U.S.-Mexico border. By serving as an

indicator of the availability of jobs in the United States, the Bracero Program acted like a

magnet, drawing workers to the country. Yet, the overwhelming demand for Bracero contracts

and the dehumanizing screening process created strong incentives for migrants to pursue

employment outside of the confines of the Bracero Program. Photographer Leonard Nadal, for

example, documented the fumigation of braceros with DDT at the processing centers in the

United States[27] Upon the completion of their medical and immigration inspections, braceros

found themselves further humiliated by growers and their representatives who applied a racist

logic in selecting hires; as Elvon De Vaney, a contractor for Texas cotton growers explained:

> There was only one type of individual or group of individuals we kinda shied away from and this was the little bitty short Indian fellas from way down on the southern end of Mexico. . . . So we had to shy away from them little guys especially in the [irrigation]. . . . They were kinda dwarf, midget type . . . .We tried to get boys. . . if they were from the states of Durango or Zacatecas, San Luis Potosi. . . what we'd call the mountain states . . . those boys were generally bigger and stronger. They were meat eaters, ranch country-type folk. . . . They were bigger and stronger and more stable. A lot of time, Chihuahua and border state boys were kinda rascals, just a little bit a lot of times, so if we had a choice we'd get your mountain type fellars."[28]

More recently, hundreds of former braceros have attested to their experiences of abuse and

discrimination in oral histories collected by the Bracero History Archive, a digital repository that

serves as one of the primary sources of information about the Bracero Program.[29]

---

[27] Leonard Nadel, "Braceros were fumigated with DDT while others stand in line at the Hidalgo Processing Center, Texas," in Bracero History Archive, Item #3000, http://braceroarchive.org/items/show/3000, accessed December 6, 2021. For a short documentary on the history of "gasoline baths" used against Mexican migrants and braceros, see Ranjani Chakraborty, "The dark history of "gasoline baths" at the border: Toxic chemicals—and Nazis—are part of US border history," *Vox,* July 29, 2019, https://www.vox.com/2019/7/29/8934848/gasoline-baths-border-mexico-dark-history, accessed December 6, 2021.

[28] Loza, *Defiant Bracero,* 43 (citing Interview with Elvon De Vaney by Jeff Townsend on March 9, 1974, SWC).

[29] Roy Rosenzweig Center for History and New Media, George Mason University, the Smithsonian Institution National Museum of American History, Brown University, and the Institute of Oral History at the University of Texas at El Paso, *Bracero History Archive*, http://braceroarchive.org/, accessed December 17, 2021.

In crossing without a Bracero contract, many Mexicans sought not only to avoid the indignities of the contracting process but also were encouraged by southwestern growers to make unauthorized entries. Due to the state's banishment from the Program, Texas growers increased their hiring of undocumented Mexican workers. Given that of all farmworkers in the US, undocumented Mexicans typically received the lowest wages and endured the worst working conditions, some Texas growers preferred to hire unauthorized workers rather than be bound by labor protections stipulated in the Bracero contracts.[30] They had become so dependent on this workforce that many, echoing the language of Southern slaveholders, felt that it was their right to employ Mexicans whom they pejoratively referred to as "wetbacks."  As the *New York Times* observed, "They [the farmers] assert boldly that this 3,000 square-mile agricultural empire, with 300,000 inhabitants and an annual income of more than $3,000,000, was built on cheap 'wetback' labor like the Southern slave owners of a century ago—it is a violation of their rights to take it away even if the 'wetbacks' are lawbreakers."[31] Facing enormous pressure from federal lawmakers who represented southwestern agribusiness interests, the Immigration and Naturalization Service (INS) facilitated growers' access to undocumented labor by suspending their enforcement operations during the harvest season. At the same time, many INS officials, particularly those stationed in the Southwest, shared the worldview of southwestern growers regarding their so-called entitlement to undocumented Mexican labor.

---

[30]     Of undocumented Mexican workers, a government investigation wrote, "Last in order of security and first in order of exclusion from the community is the illegal Mexican alien, commonly referred to as a "wet back." Under constant threat of apprehension and deportation, his life is one of furtive insecurity.  In the hands of employers inclined to make use of the wetback's disabilities, the result is virtually peonage." President's Commission on Migratory Labor, *Migratory Labor,* 5, 65-89, 105, 130, 137.

[31] Juan Ramon García, *Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954* (New York: ABC-CLIO, 1980), 214 (citing Gladwin Hill, "'Wetback' Drive Irks 'The Valley,'" *New York Times*, August 2, 1954, 8.)

Despite the complicity of many federal officials in the undocumented entries of Mexican nationals, the federal government ultimately responded to the perceived border crisis by developing an immigration enforcement strategy. Motivated by the same anti-Mexican impulses that informed the immigration enforcement policies of the 1920s, American and Mexican policymakers deployed punitive measures, such as deportation and criminal prosecution for illegal entry and re-entry, to scare Mexican migrants and induce them into signing Bracero contracts. In short, the immigration enforcement policies of the Bracero era powerfully reinforced longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable labor force.[32]  These policies began to take shape in the 1940s as the Mexican government, concerned about losing a source of low-cost labor for its own domestic economy, stipulated that future extensions of the Bracero Program would be contingent on US efforts to halt undocumented migration across the border. To keep the Bracero Program alive, the US government, via the INS, implemented two border control strategies: with the occasional assistance of the Mexican government, the sporadic mass deportation of undocumented workers (particularly at the end of the harvest season); and so-called legalization, which did not provide Mexican migrants with a pathway to citizenship, but instead funneled them back into the Bracero Program as temporary laborers. Thus, for example, during the infamous "El Paso Incident" of October 1948, the INS unilaterally opened the border to the thousands of bracero hopefuls who had gathered upon a rumor that a new recruiting center would open along the line. But instead of granting them

---

[32] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.

bracero contracts, the INS arrested them on the spot and then paroled them to waiting employers.[33]

By the late 1940s, federal policymakers began to adopt a harder vision of immigration law enforcement thanks to the lobbying efforts of the INS.[34]  As many historians have observed, anti-Mexican racism long drove the policies and practices of immigration officials, particularly members of the Border Patrol.[35]  During the Bracero era, the agency clearly shared the anti-Mexican biases of its contemporaries.  In a 1949 tribute to the twenty-fifth anniversary of the Border Patrol, agency leaders reiterated negative stereotypes of Mexican migrants as passive and unintelligent laborers, ". . . each year the number of Mexican farm laborers illegally entering the United States is alarmingly larger than that of the preceding year. The reasons, of course, are that the Mexican farm laborers are more docile and are willing to work for lower wages than are the domestic farm laborers."[36] The agency also helped to dehumanize undocumented Mexican migrants; its correspondence and annual reports, which were available to federal policymakers and the public, routinely used the racist slur "wetback" to refer to undocumented Mexican migrants. The agency not only denigrated Mexican migrants through its words but also its practices. Its treatment of Mexicans during the Bracero era, particularly its unilateral decision to hire out undocumented Mexican migrants to southwestern growers, plainly evidenced the agency's view of Mexican migrants as an exploitable workforce.

The agency's objectification of Mexican migrants enabled it to imagine and implement highly militarized immigration enforcement strategies. Thus, even though Mexican migrants,

---

[33] Kang, *INS on the Line*, 112-113.
[34] Kang, *INS on the Line,* 114-138.
[35] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010); Martinez, *The Injustice Never Leaves You.*
[36] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.

like the hundreds of thousands of European, Asian, and African migrants who came to the United States since its founding, migrated to the United States in search of better lives for themselves and their families, they were regularly described as an "invasion" and treated as such.[37] During the Bracero era, the agency acquired military jeeps, aircraft, and radar to detect undocumented entries on the line, and redesigned its approach to deportation based on combat strategies.

At the same time, the INS worked vigorously to bolster its enforcement authority under law. In 1946, agency officials, particularly those stationed in the Southwest, lobbied for the creation of the so-called 100-mile zone in order to legalize practices, such as its car stops, that it admitted were illegal.[38] By 1949, INS leaders also won the ear of the Truman administration and, as a result, played a central role in helping it to define a response to undocumented immigration on the U.S-Mexico border.[39] This response included the following policy proposals: the increased statutory authority for the INS to enter places of employment to locate undocumented migrants; the creation of employer penalties; a ban on the legalization of undocumented migrants for the purposes of employment in the United States; and a bilateral approach to migration control that included immigration enforcement support from the government of Mexico. The Truman administration published these recommendations as part of its broader effort to investigate the plight faced by undocumented migrants and migrant farm workers in general. In the process, the administration, despite its own use of the term "wetback" and reference to undocumented Mexican migration as an "invasion," tried to present a sensitive portrait of undocumented immigrants in a report titled, *Migratory Labor in American*

---

[37] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York: Routledge, 1992)*,* 47 (citing President's Commission on Migratory Labor, *Migratory Labor*, 69).
[38] Kang, *INS on the Line*, 123-25.
[39] Kang, *INS on the Line,* 114-138.

*Agriculture*.[40] More specifically, it explained the hardships that led many to seek employment in the United States and the discrimination and exploitation they faced as farmworkers. Moreover, the report argued that the Mexican government and American growers created the conditions that drew undocumented workers to the United States in the first place and, as a result, recommended that they, rather than the migrants themselves, bear the principal responsibility for the so-called crisis on the border.

Although the Truman administration appeared to take a more humanitarian approach to the issues of undocumented Mexican migration and immigration law enforcement, it is important to note that it was far from averse to adopting punitive measures vis-a-vis undocumented migrants. As historians have observed, the Truman administration and his wing of the Democratic Party adopted a bifurcated approach to immigration policy.[41] On the one hand, Truman's Cold War priorities led him to advocate for the dismantling of the racist national origins quota system of 1924, which barred Asian immigration and limited migration from southern and European nations. Yet, on the other hand, the Party's labor union constituents compelled it to adopt a hardline approach to immigration law enforcement, one that included more funding for the Border Patrol, a robust deportation policy, an extensive detention system, and employer penalties. In short, it was an approach that perpetuated the so-called deportability of Mexican migrants.  When the Truman administration failed to win passage of an employer sanctions measure in Congress, it made clear its commitment to deportation as an alternative

---

[40] President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* (Washington, D.C.: U.S. Government Printing Office, 1951). For photos of the working and living conditions faced by Bracero workers, see, Smithsonian National Museum of American History, "Broken Promises/Promesas Rotas," Bittersweet Harvest: The Bracero Program 1942-1964/Cosecha Amarga Cosecha Dulce: El programa Bracero 1942-1964, Digital history exhibit, https://americanhistory.si.edu/bracero/introduction, accessed December 6, 2021.
[41] Kang, *INS on the Line,* 114-138.

response to undocumented Mexican immigration; in a telephone call with Border Patrol supervisor Willard F. Kelly, David Stowe, assistant to President Truman, declared, "we should enforce the law and continue to enforce it as hard as we can, and clean out every wetback in the United States, right now."[42]

Ultimately, congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills. As in the 1920s, racist conceptions of Mexican migrants as the ideal agricultural workforce led congressional conservatives to cut appropriations for the Border Patrol and reject efficacious employer penalty proposals.[43] Thus, during a conference committee on P.L. 78 (the 1951 statute that authorized the extension of the Bracero Program until its termination in 1964), Senator Allen Ellender (D-LA), chair of Senate Committee on Agriculture, deleted an amendment that would have penalized employers for hiring undocumented immigrants.[44] The son of Louisiana plantation owners, a

---

[42] Typed notes regarding meeting between Willard F. Kelly and David Stowe at the White House, July 6, 1951, 3:30pm, file 56321/448, RG 85, National Archives. At the same time, the administration, congressional Democrats, and the INS worked closely, albeit in vain, to craft a bill that would appropriate $12 million for the construction of immigration detention facilities. Kang, *INS on the Line,* 133.

[43] The longevity of this orientation toward Mexican migrants was not coincidental; as political scientists have explained, nativist, pro-agribusiness senators and congressmen had held the chairs of the Immigration and Judiciary committees in both chambers where they regularly deployed parliamentary procedures to block the passage and even release of measures that would exercise oversight over and even terminate the Bracero Program and enable the Border Patrol to close the border to undocumented migrants. At the same time, they used their committee chairmanships to block legislation that would abolish the 1924 national origins quota system. Tichenor, *Dividing Lines*, Kindle Loc. 269

[44] On his racism, Ellender's biographer writes: "For his treatment of black Americans alone, he fell short, even if one makes a scrupulous effort to judge him by the standards of his times. During his tenure of office, many striking changes in race relations occurred; he simply refused to change with the times and recognize that most Americans had reached a consensus and agreed at least that racial segregation should end and blacks be given the right to vote. Ellender favored racial segregation all of his political life. By this measurement alone, he could never be considered a great senator." Thomas A. Becnel, "Allen J. Ellender, Consensus Politician," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 32, n. 3 (1991): 237-238.

On Ellender's staunch opposition to desegregation and civil rights, his biographer recounts: Ellender believed in segregation to the end and denounced decisions that struck down laws to reenforce segregation. He liked blacks as individuals, but he feared giving the race special legal status. Starting with his 1937 filibuster of antilynch legislation, Ellender maintained a consistent policy on race: he opposed

lifelong segregationist who opposed civil rights legislation, and an "aggressive [ally] of agribusiness,"[45] Ellender played a key role in ensuring that growers had easy access to Mexican labor. He not only defeated the employer sanctions amendment to P.L. 78, he also successfully convinced reluctant Mexican officials to sign a new set of Bracero accords in 1951, facilitated the swift passage of S. 984 (P.L. 78), and blocked increased appropriations for the Border Patrol.[46]  For southern and western Democrats like Ellender, segregation and weak immigration law enforcement were two halves of a whole; both policies reinforced a racist worldview that relegated ethnic and racial minorities to the bottom of the socioeconomic ladder and justified the denial of their civil and human rights.

As the chair of the Senate Judiciary Committee and the co-author of the McCarran-Walter Act of 1952 (the first major overhaul of the nation's immigration laws since the passage of the Immigration Act of 1924), Senator Pat McCarran (D-NV) was keenly aware of the debates regarding Mexican immigration. For the most part, McCarran expressed his own views on Mexican migration during the hearings of the Senate Appropriations committee. A shrewd political tactician, McCarran must have known that in this venue he could exert more control over the development of Mexican migration policy than he could in the Judiciary Committee (through which he oversaw the debates on the McCarran Walter Act).[47] In the Appropriations Committee, he heard INS leaders repeatedly plea for increased appropriations that would allow

---

the Federal Employment Practices Commission and voted against funding it; he voted against all civil rights bills passed by Congress from 1947 to 1968, he opposed the Voting Rights Act of 1965, and he signed the 1956 Southern Manifesto which denounced the 1954 Brown decision." Thomas Becnel, "Louisiana Senator Allen J. Ellender and IWW Leader Covington Hall: An Agrarian Dichotomy," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 23, n. 3 (1982): 268.

[45] Calavita, *Inside the State,* 45.

[46] Calavita, *Inside the State*, 43-45.

[47] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.

the agency to strengthen its enforcement capacities along the US-Mexico border. The agency specifically requested funds for the hiring of more Border Patrol agents, the execution of more deportations via air, and the construction of detention facilities for the processing of deportees and incarceration of those awaiting criminal prosecution. Agency leaders particularly stressed that by augmenting the airlift program and building detention centers, it could control the increasing number of undocumented entries of Mexican nationals along the U.S.-Mexico border.[48] Yet, like Ellender, McCarran worked to remove obstacles to the undocumented crossings of Mexican workers. In the Senate Appropriations committee, he and his allies routinely supported reductions in funding for border enforcement operations.[49]

McCarran's support of INS budget cuts were not motivated by a desire to reform the racially discriminatory features of US immigration law vis-à-vis Mexican nationals. Instead, McCarran defended a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers. Indeed, during 1951 appropriations hearing McCarran himself referred to both legal and undocumented Mexicans as "wetbacks":

> Except when you get down to the Mexican boundary. Of course, you have all kinds of deportations there and removals from the territory of the United States. But that is a come-and-go proposition. In other words, there is a flood of people who come across the boundary. They are called wet-backs, and they come across legally or illegally during the various harvest seasons. Then they go back, and so you have this come-and-go drifting there.[50]

---

[48] See, for example, Hearings before the Subcommittees of the Committee on Appropriations House of Representatives: The Supplemental Appropriation Bill for 1952, Part 2, Eighty-Second Congress, First Session, May 29, 1951, 751-56.

[49] Calavita, *Inside the State*, 36. See also García, *Operation Wetback,* 121. (citing Ernesto Galarza, *Merchants of Labor: The Mexican Bracero Story* (Charlotte: McNally and Loftin, 1964, 61).

[50] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: Making Appropriations for the Departments of State, Justice, Commerce, and the Judiciary for the Fiscal Year ending June 30, 1952, Part I, Eighty-Second Congress, first session, March 8, 1951, 124.

Relying on this racial slur, McCarran justified a 1952 denial of an INS appropriations request by explaining that the "desire for these wetbacks" among growers in US border states took precedence over the agency's enforcement needs.[51] In the same hearing, Ellender complained about the strictures imposed by the Bracero Program: ". . . the Mexican Government has gone so far as to make us, in a contract, agree to feed these people while en route, take them back, provide minimum wages, and give them health insurance, and all that. It is something they do not get at home." In reply, McCarran added that growers' demands for undocumented Mexican workers superseded the well-being of the migrants themselves; as Ellender concurred, McCarran stated, "The wetback is little interested in that sort of thing. In other words, a farmer can get a wetback and he does not have to go through that red tape."[52]

While congressional conservatives worked to preserve growers' access to a steady supply of legal and undocumented Mexican workers, they also fought to preserve the racist national origins quota system during the debates regarding the McCarran Walter Act of 1952. Proposals to eliminate or modify the national origins quota system, according to Representative Rankin of Mississippi, threatened to "destroy the white race," and discriminated against "White Gentiles."[53] Leading the defense of the quota system, McCarran stated on the floor of the Senate, ""the national origins quota formula was a rational and logical method of numerically restricting immigration in such a manner as to best preserve the sociological and cultural balance in the population of the United States."[54] Immigration restrictionists further argued that the dismantling

---

[51] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974-Making Appropriations for the Departments of State, Justice, and Commerce for the Fiscal Year ending June 30, 1954, Eighty-Third Congress, first session, March 25, 1953, 245.
[52] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974, 246.
[53] 98 Cong. Rec. 4318, 4320 (April 23, 1952)..
[54] 99 Cong. Rec.1517-18 (March 2, 1953). McCarran's racism and anti-Semitism also led him to work vigorously to limit European refugee admissions in the 1940s. Thus, for example, as a co-sponsor of the

of the national origins quota system would expose the nation to the entry of communists, as McCarran averred, "by opening the floodgates of unlimited immigration, without screening and without curtailment, we will have destroyed the national security of the United States."[55]

As chairman of the Senate Judiciary Committee, McCarran regularly wielded his authority to delay and block the passage of any liberal immigration reforms.[56]  With respect to Truman's reform proposals, one historian observes that ". . . the Nevada Democrat used tactics of obstruction, amendment, and congressional investigation to challenge the presidential ascendancy."[57]  During a series of Joint Hearings by the Senate and House Subcommittees on Immigration (which fell under the aegis of the Judiciary Committees) to discuss the McCarran and Walter bills (S. 716 and H.R. 2379, respectively), McCarran blocked debate on Celler's reform bill (H.R. 2816)[58] and refused to even report out the Humphrey-Lehman bill (S. 2842).[59]  Ultimately, the liberals failed to pass any major amendments to the McCarran and Walter bills. By 1956, Senator James Eastland (D-MS), a cotton planter, strident segregationist, and xenophobe, assumed the chair of the Senate Judiciary Committee until 1978.[60]  Along with

---

Displaced Persons Act of 1948, McCarran linked refugee admissions to the quota system.  Given the volume of refugee admissions, some quotas were quickly filled and many others were mortgaged for decades.  McCarran also drafted the provisions which restricted the issuance of Displaced Persons visas to Jews from the Soviet Union and other Eastern European countries. Tichenor, *Dividing Lines,* Kindle Loc. 278.

[55] Joint Hearings, 2.

[56] McCarran characterized his role as chairman of the Judiciary Committee as follows, "[t]he chairman of a committee or a subcommittee cannot always assure passage of a bill which has been referred to his group, but can almost always kill the bill if he wishes to do so." Frank Elmer Whited, Jr., "The Rhetoric of Senator Patrick Anthony McCarran," (Ph.D. diss., University of Oregon, 1973), 23.

[57] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.

[58] Joint Hearings, 6.

[59] McCarran and his cohort rarely remained in chambers long enough to take questions and debate the merits of his bill. As a result, liberals held the floor for much of the two-week debate. When he was present in chambers, McCarran refused to yield to questions or simply repeated his own points in answer to a question. 98 Cong. Rec. 5765 (May 22, 1952).

[60] Eastland himself hired both legal and undocumented Mexican workers and worked directly with the INS to obtain those workers. Thus, for example, INS records reveal that in 1948, an Eastland staffer

Representative Walter, the Chair of the House Judiciary Committee, Eastland blocked any major reform or repeal of the McCarran Walter Act, staunchly opposing the elimination of the national origins quota system during debates over the Immigration and Nationality Act of 1965 and preventing the passage of an employer sanctions measure well into the 1970s.[61]

Realizing that they did not have the political clout to enact any comprehensive immigration reform, no liberal congressman introduced a bill eradicating the national origins quota system during the debates over the McCarran Walter Act.  In his autobiography, Congressman Emanuel Celler (D-NY), a longtime opponent of national origins, observed,  ". . . I knew that a really liberal immigration bill, particularly the discarding of the national origins theory, had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[62]  In the Senate, Lehman noted with regret that his amendment to the McCarran bill retained the national origins quota system "as a practical matter, designed to achieve what can and must be achieved now."[63]  Thus, all of the liberal reform bills contained some variation of the national origins quota system.  Some tried to mitigate its effects by changing the base year for the calculation of the immigration ceiling from 1920 to 1950.[64]  Most of the reform bills tried to ameliorate the quota system's impact by re-pooling and redistributing unused quotas on the basis of preference classes or for the sake of family reunification and refugee relief.[65]

---

contacted A. R. Mackey to follow up on a promise that "he would get 50 Mexican laborers from Monterey."  In lieu of these legally contracted workers, however, Eastland's office indicated that the Senator could procure "50 'wetbacks'" from his uncle who had a ranch in Texas. A.R. Mackey, Memorandum of telephone call between A. R. Mackey and Mr. Payce, Staff Member for Senator Eastland of Mississippi, September 16, 1948, 1:50p.m., file 56246/339B, RG 85, National Archives.
[61] Tichenor, *Dividing Lines,* Kindle Loc. 308, 315, 337.
[62] Celler, *You Never Leave Brooklyn*, 101. See also, 98 Cong. Rec. 5102 (May 13, 1952).
[63] 98 Cong. Rec. 5102 (May 13, 1952).
[64] 98 Cong. Rec. 4407 (April 24, 1952)..
[65] 98 Cong. Rec. 4414 (April 24, 1952); 98 Cong. Rec. 5607-10 (May 21, 1952).

In this context, Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act. It made no effort to examine or cleanse the anti-Mexican racism that infected the Act of March 4, 1929. Indeed, McCarran's structural position in Congress as well as the xenophobia among congressional conservatives would have rendered such an examination nearly impossible. Such an exploration, moreover, would have compelled both congressional conservatives and liberals to ask difficult questions about the nation's engagement with the Bracero Program and whether it also perpetuated anti-Mexican animus. In sum, the recodification of the laws under the McCarran Walter Act did not purge the racial animus of the criminal entry and re-entry provisions.

The changes made to the 1952 Act, moreover, strengthened the clauses regarding unlawful entry and re-entry by making them easier to prosecute. With respect to re-entry, it combined what had been three disparate provisions regarding anarchism, prostitution, and illegal reentry into one general illegal re-entry clause. It also revised the 1929 law by penalizing migrants for being "found in" the United States after a previous deportation. This clause allowed prosecutors to try defendants in the districts in which they were found by the INS, thereby freeing the agency and prosecutors from the task of determining the place of reentry.[66] In addition, the change saved the INS the expense of transporting defendants from the districts in which they were found to the districts in which they re-entered the United States.[67]

Congress also made a minor alteration to the illegal entry provision of the 1952 Act. It specifically lessened the penalty for a first unauthorized entry from one year to six months and thereby rendered it a petty offense. As a result of this revision, defendants, charged under Section

[66] Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the House and Senate Subcommittees of the Committees on the Judiciary, Eighty Second Congress, first session, (1951), 716.
[67] United States, Department of Justice, Immigration and Naturalization Service, *Regional Conference, El Paso, Texas, May* 7-10*, 1951*, 13, file 56316/925, RG 85, National Archives.

275 of the 1952 law, lost their right to a jury trial. Legal scholar Ingrid Eagly explains that the INS, seeking a way to manage the increasing number of criminal prosecutions under the 1929 Act, pursued this revision; she writes, "[the INS] lobbied Congress to establish a misdemeanor court that would allow for criminal immigration enforcement 'at less expense and with a greater amount of effectiveness' than was possible with Article III courts."[68]  As part of this effort, the agency also urged Congress to lessen the sentence for a first offense. For the INS, decoupling the criminal prosecution of illegal entry cases from juries was essential since they typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers[69] and, as a result, often refused to indict.[70] This change persisted in the ensuing reenactments to the statute and "eventually opened the door to having magistrate judges, rather than Article III judges, preside over illegal entry trials."[71]

The Undesirable Aliens Act and its subsequent revision in 1952 were passed in a historical period when anti-Mexican racism was explicit and widespread. White House officials, members of Congress, and the INS articulated eugenicist stereotypes of Mexican migrants as an exploitable and deportable workforce and, through their policy innovations, treated them as such. Farm labor programs like the Bracero Program and measures such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 cemented the second-class status of Mexican nationals in America. Instead of welcoming them as prospective permanent residents and citizens or providing them with a pathway to citizenship in acknowledgement of their contributions to the

---

[68] Ingrid Eagly, "Prosecuting Immigration," *Northwestern University Law Review*, vol. 104, n. 4 (Fall 2010), 1326
[69] For example, Eagly notes that "in El Paso, Texas in the late 1940s, over 90% of immigration crime cases sent to the grand jury were returned as 'no bills.'" Eagly, "Prosecuting Immigration," 1327.
[70] Eagly, "Prosecuting Immigration, 1327, n. 269.
[71] *Brief for Professors Kelly Lytle Hernández, Mae Ngai, and Ingrid Eagly as Amici Curiae Supporting Respondent, United States of America v. Refugio Palomar-Santiago,* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-437.html, 25.

American economy and society, lawmakers ensured the contingency of Mexican migrants' presence in the United States, summarily admitting and deporting them at the will and whim of southwestern growers. The racist stereotype of Mexicans as an exploitable workforce also exposed them to a variety of abuses, from their fumigation with poison gas at Bracero processing centers to the unsafe and unsanitary working and living conditions they faced on the nation's farms.

Just as important, in 1952, Washington lawmakers consciously chose not to erase the racial animus from the nation's immigration laws, including §1326. Those congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists. In particular, as the chair of the Senate Judiciary Committee, Senator Pat McCarran wielded a tremendous amount of power to shape the nation's immigration laws to his liking. Cognizant of McCarran's power and their lack of support among congressional nativists and segregationists, congressional liberals admitted that no truly anti-racist immigration measure could pass under McCarran's watch. As a result, none of the congressional liberals dared to propose a bill that completely eradicated the racist national origins quota system and, instead, drafted bills that perpetuated it. In sum, both congressional conservatives and liberals played an active and deliberate role in extending the racism that inhered in the nation's immigration laws via the passage of the McCarran Walter Act of 1952.

Part II: The Anti-Drug Abuse Act (1988) and the Immigration Act of 1990
*Historical Background*

The 1965 Immigration and Nationality Act marked a watershed in US history. It eliminated the discriminatory national origins quota system and outlawed racial discrimination based on race, sex, nationality, place of birth, or place of residence in the admission of immigrants to the United States. Although the measure was celebrated as a symbol of racial justice and equality, its drafters won the law's passage by reassuring congressional detractors that it would not change the ethnic and racial composition of the United States.[72] To that end, the new law imposed the first cap on migration from the Western Hemisphere.[73] It also created an admissions system that favored elite migrants or those with higher degrees and specialized skills.[74]  Finally, members of Congress argued that the family reunification provisions would principally benefit white ethnics rather than non-Europeans, as Rep. Emanuel Celler (D-NY) explained, "Since the people of Africa and Asia have very few relatives here, comparatively few could immigrate from those countries . . . [There is] no danger whatsoever of an influx from the countries of Asia and Africa."[75]

Yet, in the ensuing decades, the 1965 law wrought several unanticipated consequences that changed the size and composition of the nation. The Act sparked an unprecedented increase in arrivals from Asia, Latin America, and the Caribbean.[76] Asian migrants entered the country via the family reunification and employment-based provisions of the law. Meanwhile, set at

---

[72] Lee, *America for Americans*, Kindle Loc. 3937.
[73] On the racial animus that informed the creation of the ceiling on Western Hemisphere migration, see Lee, *America for Americans*, Kindle Loc. 3836, 3895-3936.
[74] Tichenor, *Dividing Lines,* Kindle Loc. 319.
[75] Lee, *America for Americans,* Kindle Loc. 3947 (citing *Congressional Record*, August 25, 1965, 21758).
[76] David M. Reimers, *Unwelcome Strangers: American Identity and the Turn against Immigration* (New York: Columbia University Press, 1998), 28-29.

120,000, the Western Hemisphere quota failed to reflect the actual number of crossings that had transpired along the US-Mexico border for decades. As a result, the quota transformed former legal border crossers into undocumented immigrants overnight. Finally, from the 1970s through the 1990s, refugees from Vietnam, Cuba, Haiti, and Central America would further change the face of the nation. These new immigrants triggered recurring waves of nativism and racism[77] and fueled the conservative reaction to the legislative victories, including the 1965 Immigration and Nationality Act, of the Civil Rights era. Their antipathy to the reforms of the Kennedy and Johnson administrations led to a fundamental transformation of the nation's immigration laws and immigration law enforcement

In the late twentieth century, Florida's congressional contingent played a key role in expanding federal immigration enforcement capacities. Although immigration scholars have focused on more widely known figures such as President Ronald Reagan and California Governor Pete Wilson, the research undertaken for this affidavit underscores the importance of examining the part of local and state officials in immigration law reform. As explained below, Senator Lawton Chiles (D-FL), Senator Bob Graham (D-FL), and Rep. Bill McCollum (R-FL) authored the bills that would substantially revise 8 U.S.C. §1326 in 1988, 1990, 1994, and 1996. Their common role in the revision of §1326 was no mere coincidence. Like legislators of other border states in this period, Chiles, Graham, and McCollum tried to respond to a perceived crisis that the nation had "lost control of its borders."[78]  In Florida, the arrival of so-called Mariel Cuban refugees and Haitian asylum seekers in the early 1980s led federal policymakers

---

[77] Tichenor, *Dividing Lines*, Kindle Loc. 326.
[78] Tichenor, *Dividing Lines,* Kindle Loc. 376 (citing William French Smith, *Law and Justice in the Reagan Administration* (Stanford: Hoover Institution, 1991), 194-95).

to take draconian steps to prevent their resettlement in the United States and deter additional arrivals. These included the routine denial of asylum, long-term detention in facilities in the United States, Puerto Rico, and Guantanamo, and interdiction at sea.[79]

Many contemporaries, however, criticized these policies for racially discriminating against both the Mariel Cubans and Haitians. As part of its effort to win the loyalties of citizens in communist and incipient communist states during the Cold War, the United States had been admitting Cuban refugees and easing their pathways to citizenship since the mid-1960s.[80]  In contrast, upon their arrival in the spring of 1980, Mariel Cubans were indefinitely detained on US military bases throughout the country.[81]  Although they left Cuba due to their political opposition to the Castro regime, Castro sought to stoke a crisis in the United States by characterizing the Mariel refugees as "'scum,'" undesirables, prisoners, troublemakers, and homosexuals."[82] Indeed, prior to their departure, Castro forced the refugees to "sign documents confessing that they were social deviants and had committed crimes against the state."[83]  Since the Mariel Cubans tended to be "more working-class, blacker, and far less elite than earlier Cuban migrants,"[84] American policymakers and the media "[took] Castro's lead and bait" and disseminated negative images of the refugees on the basis of their race, class, and sexuality.[85] Perhaps most prominently, policymakers and the public associated the refugees with criminality

---

[79] Jana K. Lipman, "The Fish Trusts the Water, and It is in the Water That It Is Cooked": The Caribbean Origins of the Krome Detention Center," *Radical History Review,* vol. 115 (Winter 2013): 131.

[80] Lipman, "The Fish Trusts the Water,"120 (citing to the Cuban Adjustment Act of 1966).

[81] Lipman, "The Fish Trusts the Water," 120.

[82] Jana Lipman, "A Refugee Camp in America: Fort Chaffee and Vietnamese and Cuban Refugees, 1975-1982," *Journal of American Ethnic History*, vol. 33, n. 2 (Winter 2014):71.

[83] Maria Cristina Garcia, *Havana, USA: Cuban Exiles and Cuban Americans in South Florida, 1959-1994* (Berkeley: University of California Press, 1997), Kindle Loc. 915.

[84] Lipman, "The Fish Trusts the Water," 139, fn. 39. Garcia, *Havana, USA*, Kindle Loc. 981

[85] Lipman, "The Fish Trusts the Water," 71. Perhaps most famously, the Hollywood film *Scarface* popularized negative stereotypes of these Cuban refugees. In response, Miami Cubans protested and formed Facts about Cuban Exiles (FACE), an organization that challenged these negative images and stereotypes. Garcia, *Havana, USA,* Kindle Loc. 1003, 1115.

even though the "vast majority were working-class men and women without any criminal background."[86]

Haitian asylum seekers also experienced racially disparate treatment upon their arrival in the United States. Even though they fled political persecution under the political regimes of François Duvalier and Jean-Claude Duvalier, American lawmakers routinely defined them as economic migrants rather than refugees.[87] As historian Jana Lipman writes, "[c]ountless scholars, activists, and legal advocates have noted the hypocrisy and Cold War narrowness of US refugee policy: the US government presumed that Cubans were "refugees" and presumed that Haitians were not."[88] Through nation-wide marches, hunger strikes, and letters and visits to Carter administration officials, these advocates tried to draw attention to the racially discriminatory treatment of the Haitians.[89]  Despite their efforts, in the 1970s and 1980s, only 25 of the approximately 50,000 Haitians who pursued an asylum claim succeeded.[90] In lieu of relief, the United States employed a set of harsh strategies designed to expel the Haitians from the United States and deter future arrivals from that country. Under a so-called "Haitian Program,"

---

[86] Lipman, "The Fish Trusts the Water," 71 (citing Garcia, *Havana, USA,* 54-68; James Stuart Olson and Judith Olson, *Cuban Americans: From Trauma to Triumph* (New York, 1995), 78-91; and Carl Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold* War (Princeton: Princeton University Press, 2015), 179-84). Maria Cristina Garcia explains that less than 4 percent of the Cuban refugees had committed serious felonies; despite this figure, the media chose to "[focus] an exaggerated amount of attention on those with mental disabilities and on the hardcore felons." She continues, "Few journalists ever mentioned the fact that up to 80 percent of the Mariel Cubans had no criminal history." Garcia, *Havana, USA*, Kindle Loc. 933

[87] On the repression and violence of the François Duvalier and Jean-Claude Duvalier regimes, see Laurent DuBois, *Haiti: The Aftershocks of History* (New York: Metropolitan Books, Henry Holt and Company, 2010), 311-359.

[88] Lipman, "The Fish Trusts the Water," 121.

[89] Alex Stepick, "Haitian Boat People: A Study in the Conflicting Force Shaping U.S. Immigration Policy," *Law and Contemporary Problems*, vol. 45, n. 2 (1982): 188.

[90] Lipman, "The Fish Trusts the Water," (citing Joyce A. Hughes and Linda R. Crane, "Haitians: Seeking Refuge in the United States," *Georgia Immigration Law Journal* 7 (1993): 766-67 and Cheryl Little, "United States Haitian Policy: A History of Discrimination," *New York Law Journal of Human Rights,* vol. 10, n. 2 (1993): 273-76).

the US developed an expedited asylum procedure that deported more Haitians than it admitted; as Lipman writes, "At its peak, INS held up to eighty deportation hearings a day, and Haitians were offered as little as fifteen minutes to consult with their lawyers. Of the more than 4,000 Haitians involved, none received asylum."[91] In 1980, the program ended after a judge issued an injunction in response to a class action lawsuit, *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442 (S.D. Fla. 1980). In its opinion, the court drew immediate attention to the discrimination of the Program:

> The Haitians allege that the actions of INS constitute impermissible discrimination on the basis of national origin. They have proven their claim. This court cannot close its eyes, however, to a possible underlying reason why these plaintiffs have been subjected to intentional "national origin" discrimination. The plaintiffs are part of the first substantial flight of black refugees from a repressive regime to this country. All of the plaintiffs are black. In contrast, for example, only a relatively small percent of the Cuban refugees who have fled to this country are black. Prior to the most recent Cuban exodus, all of the Cubans who sought political asylum in individual 8 C.F.R. Sec. 108 hearings were granted asylum routinely. None of the over 4,000 Haitians processed during the INS "program" at issue in this lawsuit were granted asylum. No greater disparity can be imagined.[92]

Continuing to condemn the program, the court concluded:

> Those Haitians who came to the United States seeking freedom and justice did not find it. Instead, they were confronted with an Immigration and Naturalization Service determined to deport them. The decision was made among high INS officials to expel Haitians, despite whatever claims to asylum individual Haitians might have. A Program was set up to accomplish this goal. The Program resulted in wholesale violations of due process, and only Haitians were affected. This Program, in its planning and executing, is offensive to every notion of constitutional due process and equal protection. The Haitians whose claims for asylum were rejected during the Program shall not be deported until they are given a fair chance to present their claims for political asylum.[93]

Yet rather than afford Haitian refugees an opportunity to seek relief as stipulated by the court, the new Carter administration "developed a plan to circumvent the landmark ruling."[94] It

---

[91] Lipman, "The Fish Trusts the Water," 121.
[92] *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442, 451.
[93] *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442, 522.
[94] Lindskoog, *Detain and Punish,* 31.

determined that the ruling only applied to Haitians in the Southern District of Florida and, by September 1980, resumed the streamlined processing of Haitians abroad at a highly controversial detention center at Fort Allen, Puerto Rico.[95]

By refusing to grant asylum to Mariel Cuban and Haitian refugees, the Carter administration contravened both the spirit and substance of the Refugee Act of 1980. Signed by Carter only a few weeks before the arrival of the Mariel Cubans, it signaled the nation's commitment to refugee relief, authorized the admission of 50,000 refugees per year, enabled the president to admit refugees above this cap in response to humanitarian emergencies, and adopted the United Nations' definition of a refugee as an individual who has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[96]  To bypass the 1980 law, US officials created a new legal status—"Cuban-Haitian entrant (status pending)" that maintained the legal fiction that the asylum seekers had not yet entered the country despite their physical presence on U.S. soil.[97] This legal designation enabled US officials to detain Cubans and Haitians in prisons and military bases, which became functional equivalents of the border. In addition, as individuals deemed not to have entered the United States, they, under law, were considered excludable rather than deportable. As excludable noncitizens, they had far fewer rights than deportees and "[could] be detained indefinitely."[98]

---

[95] The detention of Haitians at Fort Allen and sites throughout the country led the migrants to file multiple lawsuits against the government, see Lipman, "The Fish Trusts the Water," 130-134.

[96] The refugee definition under the 1980 Act also aimed to broaden the nation's approach to refugee admissions that, since World War II, served American geopolitical interests during the Cold War by favoring migrants fleeing communist and proto-communist states. Lipman, "The Fish Trusts the Water," 122.

[97] Lipman notes that the Carter administration created this designation in response to charges that the Mariel Cubans received "preferential treatment" vis-à-vis Haitian asylum seekers who arrived at the same time. Lipman, "The Fish Trusts the Water,"122. For criticisms of the Carter administration's unwillingness to process Haitian refugees under the 1980 Act, see Lindskoog, *Detain and Punish,* 38.

[98] Lipman, "The Fish Trusts the Water," 123.

In creating the "Cuban-Haitian entrant" category, the Carter administration aimed to convey the impression that both groups were treated equally. Yet, as it sought ways to expand the nation's detention capacities in response to refugee arrivals, the administration acknowledged that Haitians continued to receive disparate treatment. In detention centers such as Florida's Krome Avenue site, administration officials admitted in August 1980:

> Newly arriving Haitians are either housed in inadequate, unsafe facilities, such as Krome South, or detained in jails and prisons. Cubans are being sent to army camps or being reunified with their families. Grants of $300 per person have been provided to the [voluntary agencies] for the Cubans. The CAA, if it "resettles" the 18,000 Haitians which the grant covers, will be given $27 per person for resettlement. The Cubans have been and are being resettled while the Haitians have not. Cubans are still being processed by INS as applicants for political asylum while Haitians are not. The INS processing itself is done differently for both groups.[99]

Meanwhile, journalists, immigration advocates, and administration officials also documented the disparate treatment faced by Haitian refugees at Krome. Ian Kurzban, a prominent advocate for the Haitian refugees, reported the verbal and physical abuses inflicted by INS officials at Krome.[100] Secretary of Health and Human Services Patricia Roberts Harris wrote to the White House to express her concerns about the inhumane conditions faced at the Florida site:

> For example, no running water is available in the open housing area, water from temporary showers remains stagnant in pools near the tents, toilet facilities are inadequate and stench permeates the air. The Haitians were not provided sheets, towels, soap, toothbrushes or toothpaste. Women and children are housed in an overcrowded administrative building where many of the women sleep on soiled mattresses placed directly on the floor. The males sleep outdoors in open, dirty tents in areas where both mosquitos and coral snakes are prevalent. Housing Haitians, or any other people, in such an intolerable and unsanitary environment is totally unacceptable from the perspective of both health and human decency.[101]

---

[99] Lindskoog, *Detain and Punish*, 42 (citing Phyllis Dichter to Syl Ligsukis, "Policy Issues for the Haitian Entrant Program," August 5, 1980, reel 12, *Records of the Cuban-Haitian Task Force*).

[100] Lindskoog, *Detain and Punish,* 43 (citing Christian R. Holmes to David Crosland, "Haitian INS Processing and Procedures," ca. August 28, 1980, reel 26, *Records of the Cuban-Haitian Task Force*).

[101] Lindskoog, *Detain and Punish*, 43 (citing Patricia Roberts Harris to Victor H. Palmieri, August 9, 1980, reel 12, *Records of the Cuban-Haitian Task Force*; Patricia Roberts Harris to Eugene Eidenberg, August 19, 1980, reel 3, *Records of the Cuban-Haitian Task Force*).

Joseph Innocent, a 23-year-old Haitian carpenter, shared with a *Miami Herald* reporter: "The conditions here are very bad. We live like animals. The food is bad. At night there is no light and we fight the snakes. There are no telephones. We have no way to let our families know that we made it here alive."[102]

Subsequent administrations built upon the precedents established by Carter. In a renewed effort to deter Haitian arrivals, the Reagan administration, in October 1980, redefined them as excludable aliens.[103] He also initiated an interdiction policy whereby the US Coast Guard stopped sailing vessels transporting Haitians, conducted interviews to assess their eligibility for asylum, and pushed back the vast majority to Haiti. Under this policy, "INS officials deemed less than 1 percent of Haitian migrants to have a legitimate 'fear of persecution.'"[104] As a further deterrence measure, the administration, with the Haitians foremost in mind, began searching for sites that could serve as permanent detention centers.[105]  In response to these developments, advocates and journalists harshly criticized the Reagan administration. In a letter to the White House, the National Association for the Advancement of Colored People (NAACP) charged the administration with violating *Civiletti* and the Refugee Act of 1980 and discriminating against the Haitian refugees: "the Haitians alone have been singled out for a peculiar classification and treatment."[106] Despite the widespread condemnation of its interdiction and detention policies, the Reagan administration continued its efforts to "contain a single group [Haitian refugees]."[107]

---

[102] Lipman, "The Fish Trusts the Water," 123 (citing Sarah Rimer, "Haitian, Cuban Camps Side by Side, Worlds Apart," *Miami Herald*, September 13, 1980, Carter, RG 220, box 42, Press Clippings).

[103] Lipman, "The Fish Trusts the Water," 130.

[104] Lipman, "The Fish Trusts the Water," 131.

[105] Lindskoog, *Detain and* Punish, 67; Lipman, "The Fish Trusts the Water," 131.

[106] Lindskoog, *Detain and Punish*, 68 (citing to NAACP to Ronald Reagan, November 25, 1981, box 24, folder 3, Haitian Refugee Collection). For other criticisms of Reagan's Haitian policies, see Lindskoog, *Detain and Punish*, 51-70.

[107] Lindskoog, *Detain and Punish*, 50. On the precedents set by the Haitian detention for immigration detention more generally, see Lindskoog, *Detain and Punish*, 70, 74. See also, Kristina Shull, "Reagan's

Moreover, the Haitian migration led Reagan and restrictionist lawmakers in Congress to undertake the "monumental transformation of immigration policy."[108]

The animus toward the Haitian migrants was a local phenomenon as much as it was a federal one. In the penumbra of the Civil Rights Movement, Floridians feared the cultural, economic, and social impacts of racial integration in their communities. The arrival of the Haitian refugees further triggered their anti-Black sentiments, as historian Carl Lindskoog writes, "The prospect of large numbers of poor black refugees frightened many residents of South Florida."[109]  Locals scapegoated the Haitians, blaming them for the economic and public health crises of the 1970s and 1980s, as one contemporary observed, "negative stereotypes and fears of Haitians became firmly embedded in the general South Florida population. Haitians were perceived by many to be not only disease-ridden, but also uneducated, unskilled peasants who could only prove [to be] a burden to the community."[110] South Floridians' anxieties about the new immigrants led them to initiate the nation's first English-only movement.[111] As one scholar observes, "Miami's English-only campaign was 'a vehicle for the expression of mass native white resistance to Latinization' and a 'political project aimed at symbolically reestablishing Anglo dominance.'"[112]

---

Cold War on Immigrants: Resistance and the Rise of a Detention Regime, 1981-1985," *Journal of American Ethnic History,* vol. 40, n. 2 (Winter 2021).

[108] Lindskoog, *Detain and Punish*, 50.

[109] Lindskoog, *Detain and Punish*, 16.

[110] Lindskoog, *Detain and Punish,* 17 (citing Alex Stepick, "The Refugees Nobody Wants: Haitians in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992), 58-60).

[111] Lindskoog, *Detain and Punish,* 39.

[112] Lindskoog, *Detain and Punish,* 39 (citing Max J. Castro, "The Politics of Language in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992, 119-123, 128).

As the state's nativist movement grew, Floridians placed enormous pressure on federal lawmakers to remove Haitians from their communities, as Lindskoog writes:

> Local political groups goaded national authorities into an unparalleled campaign to repress the flow of Haitians into Miami and to deport those Haitians already in Florida. Members of south Florida's political elite—including Democratic party members, elected officials and some Cubans—believed that the boat people were a disruptive force, destroying the community and draining resources. They appealed to their local members of Congress, who apparently pressured the INS into a response. The INS thereafter began to expend a far greater effort in controlling the flow of Haitians than was expended on nearly any other group of illegal immigrants.[113]

Whether Democrat or Republican, members of Florida's congressional delegation echoed the anti-immigrant concerns of their constituents. Senator Paula Hawkins (R-FL) was particularly outspoken in her attacks on Florida's refugee community, as Lindskoog explains:

> Paula Hawkins added to the sense of crisis by painting a sordid picture of life in South Florida amid wave after wave of refugee arrivals. She referred to 'reports that diseases have been brought into this country by the entrants' and cited one report that claimed that 80 to 90 percent of Haitian refugees were infected with parasites . . .Senator Hawkins warned, 'The greatest concern to Floridians is the increase in crime that has accompanied the arrival of the Cubans and Haitians in this latest influx.'[114]

Chiles added further fuel to the nativist fire when, during a July 31, 1981 hearing of the Senate Subcommittee on Immigration and Refugee Policy, he described how many South Floridians felt that the refugees' arrival forced them to move:

> There is a new bumper sticker that you will see on more and more cars in the Miami area. It says, "Will the last person to leave please bring the flag." That sums up a lot of the feeling of frustration that is down there presently, and I would say with the tremendous movement that we have in Florida and people buying new homes—I now find that people in the central part of the State, the real estate agents are telling me, it is not the people that are coming from out of State that they are selling homes to, it is the migration from

---

[113] Lindskoog, *Detain and Punish,* 17 (citing Alex Stepick, "The Refugees Nobody Wants: Haitians in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992), 58-60). See also, Stepick, "Haitian Boat People," 179.

[114] Lindskoog, *Detain and Punish*, 53 (citing Paula Hawkins, *United States as a Country of Mass First Asylum*, 37).

south Florida that they are selling homes to, people that are leaving the county. This is bad. It is a situation that we have to reverse.[115]

At the 1981 hearing, both Hawkins and Chiles recommended approaches, including interdiction, detention, and abbreviated exclusion procedures, that had been castigated by policymakers, advocates, and even the courts as discriminatory and inhumane.[116] Even more important, Florida lawmakers sated the nativist demands of their constituents and supported the anti-Haitian agenda of the Reagan administration through statutory means. As the White House developed punitive enforcement practices, Florida's congressional delegation rewrote the law on the books in ways that reclassified asylum seekers as undocumented migrants and criminals who merited perpetually increasing civil and criminal penalties.

It was in this xenophobic context that members of Florida's congressional delegation amended 8 U.S.C. § 1326 in 1988, 1990, 1994, and 1996. The following legislative history reveals that their racial animus toward Haitian and Mariel Cuban refugees motivated them to revise the criminal penalties for the reentry of removed aliens. The legislative history further indicates that, by the early 1990s, their anti-Hispanic animus, in addition to their ongoing anti-Haitian sentiments, informed the 1994 and 1996 changes to the law. Finally, during the 1988, 1990, 1994, and 1996 legislative debates, lawmakers made no effort to acknowledge and/or amend the racial animus that informed earlier iterations of this provision of Title 8.

In tracing the racial animus that informed the late twentieth-century revisions to § 1326, it is important to note that this animus took different forms. The racial reforms of the Civil

---

[115] United States as a Country of Mass First Asylum: Hearing before the Subcommittee on Immigration and Refugee Policy of the Committee on the Judiciary, United States Senate, 97 Cong., 1st sess., July 31, 1981, 48.

[116] Chiles also expressed his frustration that the Reagan administration was not doing enough in response to the so-called Haitian crisis. Lindskoog, *Detain and Punish,* 54.

Rights movement slowly instantiated a cultural shift that rendered unacceptable overt expressions of racism. In contrast to the early twentieth century congressional debates regarding § 1326, the late twentieth century debates yield fewer instances of manifest racism. Lawmakers, for example, ceased using the racial slur "wetback" to refer to Mexican migrants. The following discussion, then, examines at least three types of racial animus that emerged in the debates over § 1326. First, it recounts the moments when policymakers did resort to the use of racial slurs, explicitly racist language, or racial stereotypes. Second, it describes racial animus in terms of racially disparate impact; thus, for example, it traces the divergent application of US refugee and asylum policies based on nationality and race. Third, it explores the proxies that supplied policymakers with a race-neutral vocabulary to express their antipathies toward immigrants and racial minorities. Such proxies included anti-population growth movements, the War on Drugs, English-only movements, and anti-birthright citizenship campaigns, among others.

*Legislative History*

In the 1980s, the Federation for American Immigration Reform (FAIR), a Southern Poverty Law Center designated hate group, played a pre-eminent role in the effort to "[upend] the Immigration and Nationality Act of 1965."[117]  From its founding to the present, FAIR has lobbied local, state, and federal lawmakers to pass anti-immigration measures premised on eugenics and racism.[118] In 2009, Dan Stein, who assumed the leadership of FAIR in 1988,

---

[117] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021

[118] Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* (New York: Seven Stories Press, 2007), 212.

"boasted that FAIR leaders had testified before Congress about 100 times."[119] In these public venues, FAIR made a concerted effort to cloak its white supremacist agenda in neutral terms so as to appeal to ordinary Americans.[120] They frequently referred to the impacts of immigration on the environment, population growth, and the economy in order to make their extremist message more palatable.[121] Yet as the SPLC and scholars have repeatedly reported, a combination of eugenics, racism, and xenophobia clearly motivated its policy goals.[122]

In 1979, John Tanton, a self-described environmentalist, founded FAIR with the specific aim of reducing non-white immigration to the United States.[123] He believed that the increasing numbers of family-sponsored visas, refugees, and undocumented migrants[124] threatened the white race, as he explained to fellow eugenicist Garrett Hardin in 1993, "I've come to the point of view that for European-American society and culture to persist requires a European-American

---

[119] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021

[120] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021.

[121] Tichenor explains that in the aftermath of the Civil Rights Movement nativists had to articulate their anti-immigrant sentiments in the race-neutral terms of "environmentalists, population control activists, and cultural protectionists." Tichenor, *Dividing Lines*, Kindle Loc. 724.

[122] Southern Poverty Law Center, "Federation for American Immigration Reform," 237. https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021; Carly Goodman, "The shadowy network shaping Trump's anti-immigration policies," *Washington Post*, September 27, 2018; Carly Goodman, "John Tanton has died. He made American less open to immigrants – and more open to Trump," *Washington Post,* July 18, 2019; Southern Poverty Law Center, "John Tanton is the Mastermind Behind the Organized Anti-Immigrant Movement," *The Intelligence Report,* June 18, 2002; Tichenor, *Dividing Lines*, Kindle Loc. 349.

[123] Tichenor explains that Tanton's own approach to environmental studies was tainted by racism. In an oral history, Tanton remarked, "The cultural values that led to the conservation ethos that's typified by the Sierra Club . . . are values that are characteristic of American society. We could probably trace their roots back through Western civilization. If we look at the conservation ethic of some of the countries from which large numbers of immigrants are coming, we don't find the same sort of respect for the land and our fellow creatures that has developed here. We certainly don't see this in many of the southeastern Asian cultures or in Latin America." Tichenor, *Dividing Lines*, Kindle Loc. 349 (citing Oral History of John Tanton, 72-73).

[124] Tichenor, *Dividing Lines*, Kindle Loc. 349.

majority, and a clear one at that."[125]  Stein, who succeeded Tanton as the head of FAIR, shared

Tanton's white supremacist views, as the SPLC notes, "He told Tanton that those who supported

the 1965 reform wanted to 'retaliate against Anglo-Saxon dominance' and that this 'revengism'

against whites had created a policy that is causing 'chaos and will continue to create chaos.'"[126]

    Shortly after FAIR's founding, Tanton and Roger Conner, FAIR Executive Director,

aggressively pursued an anti-immigration policy agenda. In meetings with members of Congress

and their staff, appearances at congressional hearings on immigration, op-eds and advertisements

in print media, and televised interviews on network news programs, FAIR advocated for the

following: limits to legal immigration and refugee admissions; controls on undocumented

immigration; and the termination of public benefits for undocumented immigrants. In response to

several federal court decisions regarding undocumented immigration, Tanton also attacked what

he dubbed the "civil rights movement of the 1980s" and claimed that the Supreme Court's

---

[125] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021.

[126] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021. By 1994, Stein also expressed his anti-Haitian sentiments during a congressional hearing on Haitian asylum seekers. In an alarmist tone, he urged the exclusion of Haitian and Global South refugees, arguing that their admission would lead to the nation's downfall. These migrants, Stein argued, would transplant to the United States the crises of their home countries – ecological disaster, civil and political unrest, economic collapse, anarchy, and war. Lindskoog, *Detain and Punish*, 132 (citing Haitian Asylum Seekers: Hearing before the Subcommittee on International Law, Immigration, and Refugees of the Committee on the Judiciary, House of Representatives, 103rd Congress, 2nd Session, on H.R. 3663, H.R. 4114, and H.R. 4264, June 15, 1994, 221-222, 233.)

holding in *Plyler v. Doe*, 452 U.S. 202 (1982)[127] and a federal district court ruling in *FAIR v. Klutznick,* 486 F. Supp. 564 (1980)[128] were "against the law."[129]

In the 1980s, Senator Lawton Chiles (D-Florida), the drafter of the immigration provisions of the Anti-Drug Abuse Act of 1988, coordinated with FAIR. An oral history of Roger Conner reveals that Chiles and his staff helped to brief other members of Congress on an immigration bill backed by FAIR. Conner specifically recalls that on March 11, 1983:

> We were going around to members of Congress and their staffs, briefing them on our positions on an immigration bill because we were anticipating this as coming out of committee and we were trying to lay the groundwork for what later would be floor votes in both the House and the Senate by going to offices . . . We had a briefing on the 11th of March where we had Simpson, Huddleston, and Lawton Chiles speak.[130]

Conner's decision to have Chiles speak most likely stemmed from FAIR's belief that because of the "Mariel problem," the "Florida delegation would always be the strongest delegation for immigration reform. A combination of the Southerners and the people in Miami who had been affected by the Mariel flotilla."[131]  Chiles worked with not only Conner and FAIR but also

---

[127] In *Plyler,* the Supreme Court struck down a Texas law that prohibited the use of state funds for the education of undocumented children in the United States. FAIR also filed an amicus brief in *Plyer.*

[128] In *Fair v. Klutznick,* the US District Court for the District of Columbia concluded that FAIR lacked standing to pursue its claim that the "exclusion of illegal aliens from the apportionment population base is mandated . . . by the Constitution." *FAIR v. Klutznick,* 486 F. Supp. 564 (1980).

[129] John Tanton, "Illegal Aliens' Movement Gains Support," *Daily Record (Morristown, New Jersey),* February 7, 1982, B3.

[130] Roger Conner, Tenth Anniversary Oral History Project for the Federation for American Immigration Reform, interviewed by Otis Graham Jr., January 27, 1989, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University. 131. The author wishes to thank Dr. Carly Goodman for sharing this source, a copy of which is in her possession.

Senator Alan Simpson (R-WY) remains on FAIR's National Board of Advisors to this day; see https://www.fairus.org/about-fair/board-directors, accessed September 17, 2021. Senator Walter Huddleston (D-KY) also served on the Board, and upon his death, was highly praised by Dan Stein for his service to FAIR and his work on immigration policy in the Senate. Dan Stein, "Sen. Walter Huddleston was a reminder that immigration used to be a bipartisan issue," *The Hill*, October 19, 2018.

[131] Roger Conner, Tenth Anniversary Oral History Project for the Federation for American Immigration Reform, interviewed by Otis Graham Jr., January 27, 1989, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University. 131.

Senator Walter Huddleston (D-KY) who "worked closely with FAIR and other restrictionist groups, which helped his office draft restrictive immigration bills."[132]

The bills introduced and co-sponsored by Chiles served FAIR's immigration policy agenda. Several of these bills, for example, aimed to reduce immigration and refugee admissions. As the co-sponsor of a 1981 comprehensive immigration reform bill (S. 776), Chiles criticized the exclusion of certain migrants—specifically, refugees and recipients of family reunification visas, from the yearly immigration cap, which, in 1981, was set at 270,000. In turn, he called for the creation of a 350,000 cap on yearly immigration that would include refugee admissions and family members of U.S. citizens. On this point, Chiles received Conner's endorsement. Testifying on behalf of FAIR before the Select Commission on Immigration and Refugee Policy (SCIRP),[133]  Conner expressed FAIR's concern that the exclusion of refugees and family members led to the undue admission of hundreds of thousands of immigrants over and above the annual immigration cap and, as a response to this purported problem, "support[ed] the kind of ceiling set in the Immigration and National Security Act of 1981, which is S. 776 and H.R. 2782."[134]

Later that year, Chiles pursued other approaches to reducing the number of entries into the United States. In December, Chiles and Huddleston co-sponsored S. 2003 which, in

---

[132] Tichenor, *Dividing Lines*, Kindle Loc. 350. Huddleston also firmly supported Reagan's detention policy vis-à-vis Haitian refugees in Florida. Lindskoog, *Detain and Punish,* 53.

[133] The Select Commission helped to define the parameters of immigration law and policy in the 1980s. Tichenor, *Dividing Lines*, Kindle Loc. 367. See also Maggie Jane Elmore, "Wielding the Cross: How Mexican American Organizations and the Catholic Church Made Immigration Reform a Civil Rights Issue," in *Claiming the Cross: How Mexican Americans, Mexican Immigrants, and the Catholic Church Worked to Create a More Inclusive National State, 1923-1986* (Ph.D. Diss., University of California at Berkeley, 2017): 158-189.

[134]  Final report of the Select Commission on Immigration and Refugee Policy: joint hearings before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary and Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, Ninety-seventh Congress, first session, on the final report of the Select Commission on Immigration and Refugee Policy, May 5, 6, and 7, 1981, 342, 338.

Huddleston's words, sought to close "one of the biggest loopholes in our immigration laws," specifically the recently passed Refugee Act of 1980.[135] Expanding upon Huddleston's claim, Chiles discussed the "refugee crisis" in Florida and charged that the weaknesses of federal immigration statutes and immigration authorities placed economic burdens upon the state of Florida for the care and education of the refugees. Chiles further argued that the remedy included stronger immigration laws and immigration enforcement capacities, a fixed cap on immigration to the United States, and the rescission of "special rights" accorded to undocumented immigrants (which, for Chiles, referred to Mariel Cuban and Haitian asylum seekers in Florida).[136]  By enabling states and localities to assist the federal government in setting the annual refugee ceiling, S. 2003, Chiles averred, would begin the work of reducing migration to the United States.

Two years later, Chiles and Huddleston co-sponsored two bills that intended to staunch the entries of asylum seekers and refugees through the expansion of the nation's immigration enforcement capacities. Although they titled S. 588, "A bill to amend the Immigration and Nationality Act to prevent the unauthorized entry into, and the transportation to and within, the United States of illegal aliens," it clearly targeted the Mariel Cubans and the family members who had helped them to leave Cuba.[137] The so-called lapses of illegal entry statutes, Chiles concluded, made it impossible to deter their arrival, as he stated on the floor of the Senate:

> One U.S. district court concluded that the current law against illegal entry only applies to "surreptitious entries." In the court's view, the thousands of Cubans who came with the

---

[135] A bill to amend the Immigration and Nationality Act with respect to procedures for the annual admission of refugees, S. 2003, 97th Cong., December 16, 1981.

[136] 127 Cong. Rec. 32202 (December 16, 1981).

[137] A bill to amend the Immigration and Nationality Act to prevent the unauthorized entry into, and the transportation to and within, the United States of illegal aliens, S. 588, 98th Cong, February 24, 1983. See also 129 Cong. Rec. 2925-26 (February 24, 1983). On the role of families in the flight of refugees from Cuba, see Garcia, *Havana, USA*, Kindle Loc. 668-1148.

flotilla did not come surreptitiously and, therefore, those who assisted them were not guilty of violating immigration law.[138]

Targeting the individuals who assisted the refugees' entry into the United States, S. 588, then, created criminal penalties for the "bringing in and harboring of illegal aliens in this country." [139]

On the same day, Chiles and Huddleston sponsored S. 592, "Immigration Emergency Powers and Procedures Act of 1983," which proposed an even more draconian response to the arrival of asylum seekers and refugees. More specifically, in the event of a sudden increase in asylum arrivals at the nation's borders, it authorized the President to declare an immigration emergency, employ various forms of deterrence (such as the interdiction and/or return of sailing vessels transporting migrants), enforce the nation's admission and asylum laws "beyond the territorial limits of the United States, including the high seas," and deploy the United States military to assist in the execution of the stipulated emergency powers.[140]  In short S. 592, largely encompassed the much maligned practices the Reagan administration had already undertaken vis-à-vis the Haitian refugees.[141]  In 1981, the Congressional Black Caucus led the critique of Reagan's policy, charging that it violated the Universal Declaration of Human Rights and "[compared] the forceful return of refugees to Haiti with the United States' earlier refusal to accept Jewish refugees fleeing Nazi Germany."[142]  Rep. Shirley Chisholm (D-NY), the chair of the Caucus's task force on refugees testified before a Senate committee in July 1981, '"We

---

[138] 129 Cong. Rec. 2925 (February 24, 1983).

[139] 129 Cong. Rec. 2925 (February 24, 1983).

[140] Immigration Emergency Powers and Procedures Act of 1983, S. 592, 98th Cong, February 24, 1983. See also 129 Cong. Rec. 2930-31 (February 24, 1983).

[141] It is possible that Chiles and Huddleston proposed this measure because the Reagan administration had qualms about the lack of statutory authority for its Haitian interdiction program. See Lindskoog, *Detain and Punish,* 58-59.

[142] Lindskoog, *Detain and Punish,* 60.

cannot hope to retain the respect and admiration of the world if our immigration and refugee policies are discriminatory on the basis of ideology or skin color.'"[143]

Meanwhile, Chiles continued to sound the alarm about the increasing number of immigrants, whether legal or undocumented in the United States. During debates regarding a 1982 comprehensive immigration reform bill (S. 2222[144]), Chiles argued that legal and undocumented migrants made undue contributions to the nation's population growth; he stated, "In fact, the reports of the Judiciary Committee indicate that the immigration, legal and illegal, is now amount to 30 to 50 percent of the annual population growth in the United States. Those figures show us that our present immigration policy is, in fact, not a policy at all."[145]  With respect to legal immigration, Chiles particularly objected to the large numbers of immediate relatives of US citizens admitted to the United States and proposed to limit their entries by counting their admissions against the annual immigration cap.[146] Although Chiles did not reference any particular racial or national group, his proposal would have singled out Asian and immigrants who, thanks to the family reunification provisions of the 1965 Immigration and Nationality Act, constituted one of the fastest growing immigrant groups in the late twentieth century. As he had in earlier years, Chiles also called for the inclusion of refugee admissions within the new immigration cap; reiterating Huddleston's earlier attacks on US refugee policy, Chiles claimed that this approach would close "one of the loopholes in legal immigration policies today."[147] By the mid-1980s, Chiles's views continued to propagate the eugenicist ideas

---

[143] Lindskoog, *Detain and Punish*, 60 (citing Statement by New York member of Congress Shirley Chisholm, in United States as a Country of Mass First Asylum, 113, 115).
[144] Immigration Reform and Control Act of 1982, S. 2222, 97th Cong, March 17, 1982. Tichenor, *Dividing Lines,* Kindle Loc. 371-72.
[145] 128 Cong. Rec. S10320 (August 12, 1982).
[146] Chiles specifically stated, "Between 1976 and 1980, the number of immediate relatives increased 40 percent from 114,000 to 152,000." 128 Cong. Rec. S10322 (August 12, 1982).
[147] 128 Cong. Rec. S10323 and S10359 (August 12, 1982).

elaborated by groups such as FAIR; in a 1985 *Time Magazine* cover story on the increasing

number of legal and undocumented arrivals, Chiles spoke in an "alarmist" tone about

undocumented migration along the U.S.-Mexico border, stating, "If we do not regain control of

our borders . . . I think that within ten years, we will not recognize the United States as the

United States we see today."[148]

Finally, like FAIR, Chiles criticized what he characterized as an excessive expansion of

immigrant rights. During the debate regarding S. 2222, he created a sense of anxiety about the

Supreme Court's decision in *Plyler*: "The word is going out that the Texas case says we now

provide educational benefits to all illegal alien children."[149]  In a moment when Haitian asylum

seekers vigorously fought against the immigration policies of the Reagan administration

(particularly with respect to detention),[150] Chiles denounced their habeas corpus petitions as

ploys that allowed them to "tie that process up forever"; he further warned:

> If we do not do something to close off the process of allowing the alien to have all the
> constitutional rights of a citizen, then, again, we might as well admit that we have given
> up the game, we might as well get ready for the deluge of people who are going to come
> because that word is beginning to go out.[151]

He also firmly supported the ongoing detention of the Haitian asylum seekers, despite clear

empirical evidence and the subsequent decision of the Eleventh Circuit Court that such detention

was racially discriminatory.[152] While testifying in support of S. 2222, he expressed his

---

[148] Otto Friedrich, Douglas Brew, and Sidney Urquhart, "The Changing Face of America," *Time
Magazine,* July 8, 1985, 26.
[149] 128 Cong. Rec. S. 10322 (August 12, 1982).
[150] Lindskoog, *Detain and Punish,* 63-64, 68-69, 71-98.
[151] 128 Cong. Rec. S10322 (August 12, 1982).
[152] *Jean v. Nelson*, 683 F.2d 1311 (11th Cir. 1982). See also, Jeffrey C. Gilbert and Steven Kas, *Jean v.
Nelson:* A Stark Pattern of Discrimination, University of Miami Law Review, vol. 36, n. 5 (September
1982): 1012. The *New York Times* compared the Haitian detention to the incarceration of Japanese
Americans during World War II. Lindskoog, *Detain and Punish,* 72 (citing "Release the Haitians," *New
York Times*, April 19, 1982). Prominent legal scholars also condemned immigration detention as did the
United Nations High Commissioner for Refugees, the U.S. Committee for Refugees, the Lawyers

opposition to the June 1982 decision of federal district court judge Eugene P. Spellman to release

Haitian refugees from detention,[153] "The word is now going out from the Spellman case that we

cannot hold an illegal alien, we cannot detain them while they are seeking to determine their

status."[154]

In many ways the immigration provisions of the Anti-Drug Abuse Act of 1988 mark the

culmination of Chiles's efforts to expand federal immigration enforcement capacities to exclude,

deport, and detain asylum seekers, refugees, and immigrants, particularly from Haiti.[155] Indeed, it

---

[153] Committee for Human Rights and fifty-six members of Congress. Lindskoog, *Detain and Punish*, 29, 86-89.

[153] Gregory Jaynes, "Parole of Haitians Ordered; U.S. Balks and Sets Appeal," *New York Times*, June 30, 1982.

[154] 128 Cong. Rec. S10322 (August 12, 1982).

[155]     It is important to note that Chiles, Graham, and McCollum pursued aggressive crime control agendas; Chiles and Graham, for example, were both active participants in the War on Drugs of the Reagan and Bush eras while McCollum staunchly advocated for the expansion of the death penalty. These crime control initiatives served a critical purpose for these elected officials as social scientists in the 1970s found that "racial attitudes—not crime rates or likelihood of victimization—are an important determinant of white support for 'get tough on crime' and antiwelfare measures." The War on Drugs thus offered lawmakers and their constituents a race-neutral language for expressing their antipathies toward racial minorities, particularly Black Americans and Black immigrants.

     Indeed, when the Reagan administration announced its War on Drugs, "less than 2 percent of the American public viewed drugs as the most important issue facing the nation." (62) By 1985, it seized on the emergence of crack cocaine (a commodity that was being sold out of economic desperation by residents of the nation's deindustrializing cities) as an opportunity to expand its drug war. Whereas other nations chose to invest in economic revitalization campaigns or drug treatment, prevention, and education programs, the Reagan administration prioritized "an all-out war on an 'enemy' that had been racially defined years before." (65) As Alexander explains, Reagan's rhetoric on drugs, as well as crime and welfare, enabled him to stoke anti-Black sentiment without explicit references to race. This, in turn, enabled Reagan to win the votes of working-class whites, former Democrats angered by the perceived gains made by African Americans in the post-civil rights era.

     The Anti-Drug Abuse Acts of 1986 and 1988 were the legislative centerpieces of Reagan's campaign. The former appropriated $2 billion and authorized the military to participate in drug control efforts, sanctioned the death penalty for certain drug crimes, and weakened the exclusionary rule for drug trials. The Anti-Drug Abuse Act of 1988 also took an "extraordinarily punitive" (68) approach to drug crimes by permitting public housing authorities to evict tenants, revoking public benefits such as student loans, expanding the death penalty for certain drug crimes, and establishing severe mandatory minimum sentences for drug offenses. Thanks to Chiles, the 1988 law also drew immigrants into the ambit of the War on Drugs by establishing new criminal penalties for noncitizens convicted of drug offenses and engaging the INS in the work of drug control.

     Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: New Press, 2012), 61-69.

would be one of the last measures Chiles would present before his retirement from the Senate in 1989 and the commencement of his tenure as the governor of Florida—where he would continue to pursue his anti-immigrant agenda.  Chiles presented the law as an essential tool in the nation's war on drugs; by engaging the nation's immigration laws and the INS in the work of criminal law enforcement, it would enhance the capacities of the federal government to pursue and prosecute so-called criminal aliens. It specifically required mandatory detention for those convicted of aggravated felonies (defined as murder, rape, kidnapping, and drug trafficking); created a criminal offense for failure to appear at an immigration proceeding; expanded the criminal penalties against those who assisted immigrants convicted of drug offenses in entering the United States; enhanced cooperation between state and local law enforcement, the FBI, DEA, and INS through the sharing of databases regarding criminal offenders; and greatly expanded the criminal penalties for illegal re-entry.

As Chiles defended these measures (S. 972, S. 973, S. 974, S. 975, S. 976) in Congress, he explained how they would help states like Florida penalize undocumented immigrants for the nation's putative drug crisis.[156] In so doing, he racially profiled Florida's Haitian and Jamaican migrant communities as the sources of the state's so-called drug problem. Appearing before the Senate Subcommittee on Immigration and Naturalization to explain the five bills, he began:

---

[156] S. 972, A bill to amend the Immigration and Nationality Act to require, pending deportation proceedings, the detention of aliens who have been convicted of aggravated felonies; S. 973, A bill to provide for additional criminal penalties for deported aliens who reenter the United States, and for other purposes; S. 974, A bill to impose criminal penalties upon persons who neglect or refuse to appear before certain proceedings under the Immigration and Nationality Act; S. 975, A bill to impose criminal penalties against persons aiding aliens violating certain laws to enter the United States; S. 976, A bill to amend the Immigration and Nationality Act to establish a connection between certain computerized indexes containing information on deportable aliens.

> A year ago when I introduced my package on alien felons, I found I had to describe these criminals. Today, I simply have to say: Jamaican posses. Haitian crack syndicates. [A]nd there is immediate recognition.[157]

In describing these "alien felons" the year prior, Chiles once again zeroed in on the role of Haitian migrants and called witnesses, including local police officials and a police informant, who supported his claims that Haitians bore responsibility for Florida's drug trade.[158]  At the same time, the hearings reinforced racist stereotypes of the Haitian refugees as criminals.  Thus, for example, the police informant perpetuated negative images of the refugee community when he claimed, "Many Haitians are brought into the United States illegally for the sole purpose of dealing drugs and to recruit other Haitians for the drug business. These dealers are mixed with political refugees to hide their identity."[159]

During the Senate subcommittee hearings, the American Civil Liberties Union (ACLU) challenged Chiles's claims. In his written testimony, Wade J. Henderson, Associate Director of the ACLU Washington office, began the organization's assessment of Chiles's bills by noting,

> Chiles' proposals are offered as a modest step at correcting perceived flaws in the existing system of immigration law enforcement . . . However, the bills misperceive the problem. There is only limited evidence to suggest that the magnitude of the criminal alien problem is as significant as the proposed legislation would suggest.[160]

He based this conclusion on a November 1987 report from the General Accounting Office that examined INS enforcement operations vis-à-vis criminal aliens. While the GAO conceded that

---

[157] United States, Senate, Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, The Implementation of the Immigration Reform and Control Act, April 14, 1988, Serial No. J-100-60 (US GPO, 1989), 26.
[158] Illegal alien felons: a federal responsibility: hearing before the Subcommittee on Federal Spending, Budget, and Accounting of the Committee on Governmental Affairs, United States Senate, One Hundredth Congress, first session, March 12, 1987.
[159] Illegal alien felons: a federal responsibility, 13.
[160] The Implementation of the Immigration Reform and Control Act, 38.

INS officials in five cities believed that "alien involvement in crime is a serious problem," it also

discovered that there was no objective basis for such a belief; as Henderson explained:

> The GAO also found generally that crime statistics identify individuals as foreign-born rather than as aliens. Accordingly, the GAO report examined the problem by using FBI arrest statistics related to foreign-born individuals (which includes aliens and naturalized citizens) reported by law enforcement agencies as an indicator of the problem. As a result, in cities which have experienced immigration-related demographic change, the percentage of criminal aliens may seem higher in comparison to localities which have not experienced such demographic change. [161]

Henderson continued to cast doubt on the perceived increase in the number of criminal aliens:

> For example, FBI statistics indicate that in fiscal year 1985, in Harris County (Houston) and Los Angeles County, more than 20 percent of the arrests in which the offender's place of birth was known involved foreign-born individuals. In Dade County (Miami) the comparable figure was 38 percent. However, each of these localities has recently experienced a relatively high volume of immigration and each has changed dramatically within the last several years which may render percentage assessments of this kind somewhat meaningless.[162]

During his spoken testimony, Henderson offered a summary of the above findings and

concluded, "As a result, there are frequently hyperbolic exaggerations of the volume of the

problem which frequently distorts the way Congress and the public look at these issues."[163]

Henderson then scrutinized each one of Chiles's bills and concluded that they raised

serious civil liberties concerns and failed to achieve the goals of the nation's immigration laws.

On this latter point, Henderson observed that the bills "may be counterproductive in terms of our

immigration policy objectives"[164] and singled out S. 973 (which increased the penalties for

illegal re-entries). He specifically wrote:

> The question presented is whether stiffer fines or greater prison terms will itself solve the problem presented by the failure to deport "illegal alien felons." The answer may well be that such a proposal will have only a marginal impact on the problem since the real

---

[161] The Implementation of the Immigration Reform and Control Act, 38.
[162] The Implementation of the Immigration Reform and Control Act, 38-39.
[163] The Implementation of the Immigration Reform and Control Act, 32.
[164] The Implementation of the Immigration Reform and Control Act, 40.

difficulty seems to be found in the INS' inability to adequately identify and apprehend persons subject to deportation.[165]

As legal scholars have observed, multiple congressional investigations of the criminal alien removal system traced its weaknesses to INS identification procedures, database systems, and a lack of detention space. But, reluctant to appropriate the funds to address these implementation problems and desirous of a quick fix that would satisfy a nativist electorate, Congress repeatedly chose to curtail the procedural rights of immigrants.[166]

He also criticized the bills as "redundant" since the Anti-Drug Abuse Act of 1986 and Immigration Reform and Control Act of 1986, in Henderson's words, "[placed] primary emphasis on the expeditious removal of aliens convicted of serious crimes."[167] Henderson ended his written statement with a broad critique of Chiles's proposals, asking whether the INS ought to be involved in the work of drug enforcement in the first place. Indeed, he, referring to an October 9, 1987 letter from Assistant Attorney General John Bolton to Vice President George H. W. Bush, observed that there was "some doubt as to the statutory authority of the INS' drug and other enforcement activity."[168] Henderson continued,

> The point here is that the INS has an important responsibility for the enforcement of the nation's immigration laws. The agency was never intended to become a front-line soldier in the war on drugs. To the extent that the INS may play a role in the enforcement of other criminal laws, this function should not overshadow the agency's principal mission. In that regard, proposals for change in the present immigration law should be evaluated first on the merit of its impact on immigration policy.[169]

---

[165] The Implementation of the Immigration Reform and Control Act, 43.

[166] Peter H. Schuck and John Williams, "Removing Criminal Aliens: The Pitfalls and Promises of Federalism," *Harvard Journal of Law and Public Policy*, vol. 22, (1999): 423.

[167] The Implementation of the Immigration Reform and Control Act, 40.

[168] The Implementation of the Immigration Reform and Control Act, 48 (enclosing letter from John R. Bolton, Assistant Attorney General, to Honorable George Bush, President of the Senate, October 9, 1987).

[169] The Implementation of the Immigration Reform and Control Act, 49-50. On the longer history of the precise parameters of the INS's authority, see Kang, *INS on the Line*, 36-61.

Congress continued to debate Chiles's proposals and the issue of drug trafficking more generally in a Senate hearing, "Haitian Narcotics Activities," which was held on May 21, 1988, a month after Chiles introduced his bills.[170] During the hearing, Edward Piou, Charge D'Affaires of the Embassy of Haiti criticized lawmakers' approach to hemispheric drug smuggling as racist. Piou specifically expressed his nation's concerns about "attempts to single out [Haiti] for any special blame" and the "inordinate and undeserved attention that this hearing focuses on the Haitian people, undeserved attention that reminds us the AIDS propaganda that stigmatizes our people."[171] Piou outlined the steps the Haitian nation had taken to assist the United States in combatting hemispheric drug trafficking and expressed his dismay that the hearing's organizers did not extend an invitation to his office; as he testified, "I am, it is true, the representative of a small country, but of a sovereign country that deserves recognition."[172] Yet, despite Piou's pleas, the hearing continued to perpetuate racist stereotypes of Haitian immigrants by linking an entire community with criminality. The hearing created a narrative arc whereby Haitian immigrants, while once deserving of sympathy for the hardships they suffered at the hands of their political leaders, succumbed to the temptations of the drug trade.[173]

At the same time, the hearing served an important function in validating Chiles's bills (S. 972, S. 973, S. 974, S. 975, S. 976) as the best solution to the problem of Haitian drug trafficking. The INS lauded Chiles's for "look[ing] for loopholes in the existing law that would allow for Immigration and Naturalization Service to get a better handle on criminal aliens, on convicted offenders, on re-entrants after previous deportation, or against aliens who have

---

[170] Haitian narcotics activities: hearing before the Caucus on International Narcotics Control of the United States Senate, One Hundredth Congress, second session, on the magnitude of Haiti's role as a transshipment point for narcotics in the United States, May 21, 1988, Miami, FL, 4.
[171] Haitian narcotics activities, 4.
[172] Haitian narcotics activities, 4-5.
[173] Haitian narcotics activities, 6, 12.

absconded from the present process."[174] The agency also praised his efforts to expand the agency's detention capacities and asserted that S. 973 would put an end to the re-entry of undocumented drug smugglers: "That is one of Senator Chiles' provisions. If we can catch those guys coming back in, and if we can identify them with a different set of identification documents and nail them, and give them a mandatory 15 or 10 years as opposed to the circular process."[175] Ultimately, the INS and Chiles won the day as Congress expressed its resounding support for the Anti-Drug Abuse Act in a 346-11 vote.[176]

The Anti-Drug Abuse Act of 1988 constituted a major turning point in the history of American immigration law. According to legal scholars Peter Schuck and John Williams, it "created a new class of criminal alien: the 'aggravated felon'"[177] and created the foundation for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws.[178] These revisions, moreover, failed to expunge the racial animus that drove the passage of the 1988 law. The legislative history of the modifications made in 1990, 1994, and twice in 1996 demonstrate that lawmakers made no effort to examine and acknowledge the legacy of racism that informed the passage of the Undesirable Aliens Act of 1929, the Immigration and Nationality Act of 1952, and the Anti-Drug Abuse Act of 1988. Instead, they perpetuated the anti-Mexican and anti-Black racism that informed the passage of these earlier laws.

---

[174] Haitian narcotics activities, 44.

[175] Haitian narcotics activities, 42, 49.

[176] Alexander, *The New Jim Crow*, 68.

[177] Schuck and Williams, "Removing Criminal Aliens," 434.

[178] See also Keller who writes that after 1987, "crimes of illegal entry and re-entry saw a shift at the conceptual level, as the crimes were reconceived as a way to target individuals likely to commit crimes while in the United States illegally." Doug Keller, "Re-thinking Illegal Entry and Re-Entry," *Loyola University of Chicago Law Journal*, vol. 44 (Fall 2012): 92; Schuck and Williams, "Removing Criminal Aliens," 433. Schuck also observes that the 1988 Act "curtail[ed] the procedural rights of aliens" (433); it specifically, "limited relief for aggravated felons, forced them to file expedited appeals, and subjected them to more stringent re-entry conditions and penalties. Had a conference with the House not revised it, the law also would have created an expedited "administrative deportation procedure" allowing for removal without a hearing before an immigration judge." (434)

While the legislative history of the 1990 amendment to 8 U.S.C. § 1326 is very thin,
another Floridian--Senator Bob Graham (D-FL), sponsored the amendment to the law. Like
Chiles, Graham adopted a hardline strategy on immigration enforcement in response to Mariel
Cuban and Haitian migrants in Florida in the 1980s and 1990s. Prior to taking his seat in the
Senate, Graham served as the governor of Florida where he criticized the federal government for
shifting the costs of immigration law enforcement to states like his own. By 1981, Graham sued
the Reagan administration for failing to prevent the entry of Mariel Cuban and Haitian asylum
seekers and asserted that federal inaction led to the overcrowding of Dade County jails.[179] As he
sought to expand federal immigration enforcement capacities, he occasionally perpetuated racist
stereotypes of Haitians and Cubans as criminals and drug traffickers. Thus, for example, in a
1982 letter President Reagan, Graham wrote:

> More than two years ago, I proposed a plan to return these criminals and other
> undesirables through the gates at our Naval base at Guantanamo Bay. This would show
> that our country is serious and tough with Castro in finding a resolution to a major
> problem. By taking action on the matter of these criminals, you would show all Floridians
> of your concern.[180]

By the time Graham joined the Senate in 1987, he continued to characterize Hispanic asylum
seekers in a negative light. As Nicaraguan refugees began making their way from the U.S.-
Mexico border to Florida in 1989, newspapers reported, "Graham told President Reagan in a
message that Florida has suffered enough [and that] 'America must regain control of its
borders.'" Graham continued by effectively urging asylum seekers to remain at home and

---

[179] *Graham v. Smith*, Case No. 81-1497-CIV-JE (S.D. Fla.).

[180] Jenna M. Loyd and Alison Mountz, *Boats, Borders, and Bases: Race, the Cold War, and the Rise of
Migration Detention in the United* States, 130 (citing Graham to Reagan, September 9, 1982, "Case
097544," White House Office Records Management Central Files: Subject Files:
Immigration/Naturalization, Ronald Reagan Presidential Library, Simi Valley, California).

"[abiding] by our strict law on asylum . . . [that] states immigrants must prove persecution at home in order to be granted asylum."[181]

In the Senate, Graham quickly joined forces with others seeking to enhance not only federal immigration enforcement capacities but also local, state, and federal cooperation on the so-called criminal alien problem. More broadly, Graham, like the drafters of the ADAA, worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted migrants in the war on drugs.  In May 1988, Graham co-chaired the Senate committee hearing on "Haitian Narcotics Activities"[182] with Senator Alfonse D'Amato (R-NY) who, like Graham, blamed state prison overcrowding on noncitizens and worked to obtain federal compensation for their detention.[183]  Together, Graham and D'Amato would lead the legislative effort "to more closely align state corrections and federal migration authorities."[184]  With Chiles, Graham also co-chaired a bipartisan task force on law enforcement and interdiction that culminated in the passage of the ADAA.[185] Upon its passage in November of 1988, Graham described it as taking "'important steps toward solving a major problem faced by Federal and State criminal justice

---

[181] Register Wire Services, "Refugee influx pushes Miami to its threshold," *Des Moines Sunday Register*, January 15, 1989, 3A.
[182] Haitian narcotics activities.
[183] Loyd and Mountz, *Boats,* 132. D'Amato is a key figure in the development of so-called crimmigration law. Representing a state experiencing high immigrant inflows, D'Amato, like his border state peers, worked vigorously to expand the nation's immigration enforcement capacities. In the process, he contributed to the racialization of immigrants as lawbreakers and criminals which, in turn, enabled him to justify the deployment of the INS in the work of crime control and the expansion of civil and criminal penalties vis-à-vis criminal aliens. Loyd and Mountz, *Boats,* 131-35.
[184] Loyd and Mountz, *Boats,* 129. On D'Amato's legislative agenda and the ways it sought to bring local law enforcement officials into greater coordination with federal officials, see Loyd and Mountz, *Boats,* 131-42; Schuck and Williams, "Removing Criminal Aliens," 369-70.
[185] Jacquelyn Swearingen, "Senate Oks alien-felon penalties: Chiles proposed tough measures," *The Miami Herald*, October 16, 1988.

systems—the problem of how to expeditiously remove from our streets those aliens who are convicted of murder, or trafficking in drugs and weapons.'"[186]

Yet, many policymakers, including Graham, soon argued that ADAA and the Immigration Reform and Control Act of 1986 (IRCA) did not go far enough.[187] Indeed, two prominent investigations of the nation's deportation system discovered that a lack of resources, particularly appropriations, prevented the implementation of the ADAA's criminal alien provisions.[188] Even before the publication of these reports, however, Graham began preparing amendments to the law that would remedy the perceived lapses of the ADAA and federal immigration enforcement more generally. As Graham explained in broader terms, "[a]ll too often, these nomadic criminals—who are involved in the drug trade—slip away from justice because they move faster than our immigration system."[189] These amendments included an expanded definition of "aggravated felony," increased enforcement authority for INS officers, and the removal of aggravated felon noncitizens from eligibility for suspended deportation or stays of deportation, among others.[190]

Between 1989 and 1990, he sought to incorporate iterations of these amendments into two drug bills—S. 1711: A bill to implement the President's 1989 National Drug Control Strategy and S. 2652: National Drug Control Strategy Implementation Act of 1990. In addition,

---

[186] Loyd and Mountz, *Boats,* 134 (citing Feldman, 202).

[187] The Immigration and Reform Control Act of 1986 was a comprehensive immigration reform measure that aimed to control undocumented immigration. See Tichenor, *Dividing Lines,* Kindle Loc. 326-421.

[188] Schuck and Williams, "Removing Criminal Aliens," 434-435; Criminal aliens : hearing before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, first session, on H.R. 3333, November 1, 1989; United States, General Accounting Office, Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives:  Immigration Control, Deporting and Excluding Aliens from the United States, October 26, 1989.

[189] United States, General Accounting Office, Immigration Control, Deporting and Excluding Aliens from the United States, October 26, 1989, 132.

[190] 136 Cong. Rec. 35621 (October 26, 1990).

during the debates regarding S. 1711, Graham and D'Amato co-sponsored S. Amdt 972 ("To direct the United States Sentencing Commission to establish penalties that constitute a meaningful deterrence to deported aggravated felons reentering the United States"[191]), a " 'sense of the Congress' recommendation to the Federal Sentencing Commission that would upgrade the penalty for an aggravated criminal felon who after conviction returns to the United States in violation of Federal law."[192] Although neither S. 1711 nor S. 2652 became law, Graham's amendments found a place in S. 358, which would become the Immigration Act of 1990.[193] It is also likely that his "sense of the Congress" recommendation to the Federal Sentencing Commission led to the 1990 modifications of 8 U.S.C §1326.

Part III: Violent Crime Control and Law Enforcement Act (1994) and the Antiterrorism and Effective Death Penalty Act (1996)

*Historical Background*

By the 1990s, Floridians, once again, led the effort to revise 8 U.S.C §1326. Representing a deeply conservative and predominantly white district in Central Florida, Rep. Bill McCollum (R-FL) authored the 1994 and 1996 revisions to §1326. These revisions, in conjunction with his contributions to the 1996 Antiterrorism and Effective Death Penalty Act, marked the pinnacle of a career dedicated to the reconfiguration of the nation's criminal and immigration laws.[194] As

---

[191] 135 Cong. Rec. S12799 (October 5, 1989).

[192] Criminal aliens: hearing before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, first session, on H.R. 3333, November 1, 1989, 120.

[193] *Immigration Act of 1990*, P.L. 101-649, *United States Statutes at Large* 104 (1990): 4978-5088.

[194] According to Schrag, McCollum's district was 81% white. Philip G. Schrag, *A Well-Founded Fear: The Congressional Battle to Save Political Asylum in America* (New York: Taylor and Francis Group, 2000), 44; James G. Gimpel and James R. Edwards, Jr. *The Congressional Politics of Immigration Reform* (Needham Heights, MA: Allyn and Bacon, 1999), 164.

McCollum explained in a 1993 C-SPAN interview, he adopted a "weed and seed" approach to crime control.[195] Rather than implement programs that focused on crime prevention, he vigorously supported harsh punitive measures that would effectively remove a wide range of convicted individuals from civil society. He specifically sought to limit habeas corpus appeals in death penalty cases, enable the use of evidence collected in violation of the exclusionary rule, abolish parole through "truth-in-sentencing" measures, implement "three strikes" sentencing rules that mandated life imprisonment for repeat offenders, and incarcerate children and teenagers.[196] At the same time, McCollum applied the logic and language of the criminal law to his immigration law enforcement proposals, especially because he believed that many asylum seekers and refugees were lawbreakers and criminals. As he sought to end what he called the "revolving door" in the criminal law context, he also pursued tough criminal penalties for undocumented entry and re-entry. He harbored few qualms about the indefinite detention of low-level offenders, children and teenagers, asylum seekers, and undocumented immigrants or, in his words, "lock[ing] them up and throw[ing] away the key."[197] To eliminate what he considered time-consuming and frivolous appeals, McCollum worked vigorously to end collateral attacks in death penalty appeals and in challenges to deportation orders.

In their empirical analysis of late twentieth century congressional debates, Smita Ghosh and Mary Hoopes found that "asylum policy was transformed by congressional rhetoric that

---

[195] Crime Legislation, *C-SPAN*, November 3, 1993, https://www.c-span.org/video/?52008-1/crime-legislation, accessed December 1, 2021.

[196] With respect to the latter, McCollum stated on the floor of the House, ". . . these violent youthful offenders, young people 12, 13, 14, 15 years of age. We need to take those very violent criminals, whatever age they are off the streets, lock them up and throw away the key." 139 Cong. Rec. 30466 (November 19, 1993).

[197] 139 Cong. Rec. 30466 (November 19, 1993).

stigmatized asylum seekers as dangerous, risky criminals."[198]  McCollum played a critical role in this shift. His efforts were buoyed by the rampant xenophobia of the 1990s that was triggered by a confluence of factors, including an economic recession, the bombing of the World Trade Center in February of 1993, the arrival of nearly 300 Chinese asylum seekers on the Golden Venture a few months later, the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, and increases in legal and undocumented immigration that had changed the demography and culture of communities throughout the nation. While anti-Haitian and anti-Cuban efforts informed McCollum's immigration enforcement agenda, he found common cause with legislators, particularly from border states, who lobbied for tough sanctions against undocumented Mexican immigrants. Their combined efforts led to the amendment of §1326 under the VCCLEA in 1994 and AEDPA in 1996.

During his twenty years in Congress, McCollum worked tirelessly to pass laws that blocked the admission of refugees and asylum seekers and curtailed their rights in the United States. Attuned to the anti-immigrant sentiments of his Florida constituents, McCollum supported legislation that took an enforcement-minded rather than humanitarian approach to the arrival of Cuban and Haitian asylum seekers. At the same time, his legislative agenda reflected an aversion toward Latin American migrants in general; the arrival of Salvadoran and Nicaraguan asylum seekers and undocumented immigrants from Mexico drove McCollum to pursue harsh sanctions for unauthorized entry and severely limit access to asylum. McCollum's sustained attack on Latin American migration led many observers to criticize his immigration policy proposals for their racially discriminatory impacts and the racist ideas that informed them.

---

[198] Smita Ghosh and Mary Hoopes, "Learning to Detain Asylum Seekers and the Growth of Mass Immigration Detention in the United States," *Law and Social Inquiry,* vol. 46, n. 4 (November 2021): 1013.

McCollum's stand on Latin American migration often aligned him with FAIR. Indeed, very early in his term, he appeared to be working with them on a 1983 measure that would strip undocumented immigrants of welfare benefits.[199] In the ensuing years, he would go on to co-sponsored or endorse measures drafted by FAIR. His own bills occasionally received FAIR's endorsement. While FAIR publicly described its legislative agenda in race-neutral terms, by the mid-1980s, its position on Latin American migration became widely known with the leak of the WITAN memos, a series of writings by Tanton and Connor.[200] Law professor Philip Schrag describes Tanton's views as follows:

> Tanton had agonized over the supposed consequences of Latin American immigration. "Will Latin American migrants bring with them the tradition of the mordida (bribe), the lack of involvement in public affairs, etc?" the memo asked. It suggested that if Latin American Catholics reproduce more quickly than other citizens and "get a majority of the voters," they might "pitch out" the concept of the separation of church and state. And on the declining political influence of older immigrant groups with lower rates of reproduction than Hispanic Americans, Tanton's memo warned that "this is the first instance in which those with their pants up are going to get caught by those with their pants down."[201]

In the early 1980s, McCollum came to prominence for his unrelenting opposition to legalization, a procedure that, at the time, would principally benefit Hispanic immigrants in the United States. FAIR supported McCollum by giving him the chance to educate fellow members of Congress about the issue during a FAIR-sponsored congressional briefing held at the House Rayburn

---

[199] Barnaby Zall, Federation for American Immigration Reform, to Hon. Bill McCollum, Esq. and Hon Hal Daub, Esq., March 18, 1983, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University.

[200]  WITAN stands for "witenagemot," an old English word for a council of wise men. Tanton and Connor wrote the memos in 1986 and they were leaked shortly thereafter. The memos explain Tanton's views on immigration policy, his plans for gaining influence in Congress and the judiciary to implement his policy agenda, and the racism that informed his immigration policy goals. Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* (New York: Seven Stories Press, 2007), 212.

[201] Schrag, *A Well-Founded Fear*, 42. For a copy of the WITAN memo cited by Schrag, see: https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii, accessed September 17, 2021.

office on June 4, 1984.[202] FAIR also endorsed his so-called killer amendment or his aggressive effort to strike the legalization provisions of a 1984 comprehensive immigration reform bill.[203] Two years later, McCollum himself drew upon anti-Hispanic sentiments in a failed attempt to quash the legalization provisions of the 1986 IRCA; along with Rep. Henry Hyde (R-IL), he stoked racist fears that legalization would ultimately lead to the migration of one-third to one-half of the entire population of Mexico to the United States.[204]

McCollum further promoted an anti-Hispanic immigration policy agenda by serving as one of the original co-sponsors of H.J. Res. 96, "A joint resolution proposing an amendment to the constitution of the United States establishing English as the official language of the United States."[205] Introduced on January 24, 1985 by Rep. Norman Shumway (R-CA), the measure was backed by U.S. English, an organization founded by Tanton to challenge "self-serving ethnic politicians" who promoted multilingual education and election ballots.[206] As explained in a 1986 *Miami Herald* story about U.S. English, Tanton perceived multilingual education as a threat because it preserved "'language ghettos' of non-English speakers who vote as they were told."[207] Although Shumway, who currently serves on the U.S. English Advisory Board, denied that anti-Hispanic sentiment informed the measure, his description of the widespread use of the Spanish language in Los Angeles suggested otherwise.[208] In a 1985 interview, he recounted:

---

[202] Agenda, Immigration Reform Briefing, June 4, 1983, box 30, folder 8, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University.

[203] "Immigration amnesty provision will have House test Tuesday," *The El Paso Times,* June 18, 1984, A6; see also, "Immigration bill scheduled for major surgery," *St. Petersburg Times,* August 19, 1984, A3.

[204] 132 Cong. Rec. H9785 (October 9, 1986). See also, Bill Ong Hing, "No Place for Angels: In Reaction to Kevin Johnson," *University of Illinois Law Review,* vol. 2000, n. 2 (2000): 600.

[205] William E. Gibson, "Rule sought in Congress on making English official," *South Florida Sun Sentinel* (Fort Lauderdale, Florida), January 31, 1985, A6.

[206] Chris Chrystal, "Resolutions would designate English as official language," *Argus-Courier* (Petaluma, California), April 24, 1985, B4; William Trombley, "English-only proposition traced to small resort city in Michigan," *The Miami Herald,* October 21, 1986, A16.

[207] Trombley, "English-only proposition," A16.

[208] See https://www.usenglish.org/advisory-board/, accessed September 17, 2021.

> I was appalled to see that department stores in downtown Los Angeles have ads in their windows all in Spanish, the music inside the stores is all music you'd expect to here [sic] in Mexico. It's Latin music. The whole commercial sector of Los Angeles – at least where I was – was just totally devoted to something non-English, non-American.[209]

Meanwhile, other policymakers criticized U.S. English and its federal and state English-only campaigns as xenophobic and racist; Jerry Tinker, an aide to Sen. Edward Kennedy (D-MA), observed, "Long before they took the garb of U.S. English, this [FAIR] was an anti-immigrant outfit . . .and their newsletters contained barely disguised racism."[210] Author Norman Cousins reinforced Tinker's point when, in October 1986, he resigned from the board of U.S. English because its campaigns "denigrated and demeaned" Latinos and other racial minorities.[211]

As further indicators of McCollum's anti-Hispanic animus, he co-sponsored measures that would deny birthright citizenship to children of undocumented immigrants. Advocates of these measures argued that they would enable border states like California and Florida to mitigate the supposed financial burdens created by undocumented immigration.[212] More broadly, they sought to divest migrants of what they characterized as a reward (birthright citizenship) for violating the nation's immigration laws.[213]  In response, critics frequently charged that these bills were racially discriminatory, as Rep. Jose Serrano forcefully explained (D-NY) during a debate over a bill co-sponsored by McCollum:

> This issue is part of the misguided immigrant bashing that is taking place in this country .
> . . this is also directed at the perception that there is a large number of Hispanics in the

---

[209] "Congressmen revive bid for official language," *Calgary Herald* (Calgary, Alberta, Canada), January 31, 1985, D16.

[210]  Trombley, "English-only proposition," A16.

[211]  Trombley, "English-only proposition," A16.

[212] Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents, Joint Hearing before the Subcommittee on Immigration and Claims and the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, One Hundred Fourth Congress, First Session, on H.R. 705, H.R. 1362, H.J. Res 56, H.J. Res. 64, H.J. Res. 87, H.J. Res 88, and H.J. Res, 93, December 13, 1995, 23-25, 40.

[213] "Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents," 23-25, 40.

country. This is not about people coming from Europe . . . If everyone in this country were coming from Europe right now, we would not be having these discussions right now. We're concerned about language and the browning of America.[214]

Despite these objections, McCollum repeatedly endorsed these bills. On January 23, 1996, he elected to co-sponsor H.J. Res. 93 "Proposing an amendment to the Constitution of the United States to provide that no person born in the United States will be a United States citizen unless a parent is a United States citizen, is lawfully in the United States, or has a lawful immigration status at the time of the birth" that was introduced by Rep. Mark Foley (R-FL) on May 5, 1995.[215] A year later, McCollum co-sponsored Rep. Brian Bilbray's (R-CA) H.R. 7 "Citizenship Reform Act of 1997," which was introduced on January 7, 1997.[216]

For much of his career, McCollum also worked assiduously to transform the nation's asylum system to deter the entry of refugees from countries of the Global South. Claiming that these migrants were not refugees but instead economic migrants and undocumented immigrants, McCollum adopted a punitive rather than humanitarian approach to asylum seekers. In the early 1980s, he focused his efforts on Cuban and Haitian refugees in Florida and, in a 1982 speech delivered before the Dade City Chamber of Commerce, offered a crude overview of his legislative strategy when he recommended that President Reagan "find a hole in our fence at Guantanamo and push these aliens [Cuban refugees] through it. And maybe we can do something similar with the Haitians."[217] In the months following the speech, McCollum

---

[214] "Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents," 62-63.

[215] In 2006, Foley abruptly resigned from his seat after the media alleged that he had been sending sexually explicit internet messages to under-age Congressional pages. Kate Zernike and Abby Goodnough, *Lawmaker Quits Over Messages Sent to Teenage Pages*, September 30, 2006, https://www.nytimes.com/2006/09/30/us/30foley.html, accessed November 30, 2021.

[216] Bilbray currently serves on FAIR's National Board of Advisors. See: https://www.fairus.org/about-fair/board-directors, accessed September 17, 2021.

[217] Andy Taylor, "A Bum Rap? 'Marielista' fears unwarranted," *Tampa Tribune*, March 3, 1982, A1.

sponsored two bills that aimed to make his harsh recommendations a reality. H.R. 7234, "The Immigration Emergency Act," imbued the President with the authority to declare an "immigration emergency" in response to future inflows of refugees and deploy the military to carry out emergency orders. The bill would have also conferred explicit legal sanction for the indefinite detention of migrants pending a determination of their admissibility.[218] Introduced a year later in 1983, H. Con. Res. 215, recommended the return to Cuba those refugees incarcerated in local, state, and federal prisons.[219]

Although neither of these proposals became law, McCollum was undeterred. Each new group of asylum seekers from the Global South seemed to spur McCollum into action as he sponsored additional measures that would block access to asylum and other humanitarian protections for refugees. In response to the presence of 921 Nicaraguan refugees in Miami, McCollum, between 1984 and 1989, proposed three bills that would enable immigration officers to summarily exclude individuals suspected of making fraudulent asylum claims. While McCollum expressed his sympathy for the plight of the refugees, he claimed that at least 50% were economic migrants. McCollum further claimed that the 971 Nicaraguan refugees in Miami imposed undue financial burdens estimated at $21 million.[220] By 1990, McCollum emerged as the main opponent of the law that would create temporary protected status (TPS); refusing to refer to the prospective beneficiaries of the measure as refugees or even migrants, McCollum described them as "El Salvador, Lebanon, Liberia, and Kuwait illegals" and "the illegals who are here from Nicaragua." In so doing, McCollum connoted that TPS unfairly benefited

---

[218] H.R. 7234, Immigration Emergency Act (September 30, 1982) McCollum introduced a similar measure in 1983—H.R. 2304, Immigration Emergency Act (March 23, 1983).
[219] 98 H. Con. Res. 215, Concurrent resolution to express the sense of Congress regarding the return to Cuba of certain Cuban nationals who arrived in the Mariel boatlift and are currently incarcerated in the United States (November 10, 1983).
[220] Rep. Bill McCollum, "U.S. Asylum Stretched too far," *The Miami Herald,* February 5, 1989, C4.

lawbreakers.[221] During the TPS debates, McCollum also argued that if these individuals needed

humanitarian protection such protections might be pursued through an application for asylum.[222]

This recommendation, however, rang hollow, particularly given McCollum's ensuing

effort to bar the entry of Haitian refugees fleeing the violence and persecution that resulted from

the military overthrow of Father Jean-Bertrand Aristide, Haiti's first democratically elected

president. As in the 1980s, McCollum, in 1991, supported measures that "impeded the flow of

immigration from Haiti and other 'third world' nations."[223] At the federal level, the Bush

administration, like the Carter and Reagan administrations, insisted that the Haitians were

economic migrants rather than asylum seekers. Disinclined to take seriously Haitian asylum

claims, the administration authorized the US Coast Guard to intercept Haitian boats on which the

INS then conducted five-minute interviews and made an initial determination as to whether an

applicant had a credible fear of persecution.[224] Arguing that these abbreviated asylum

proceedings failed to meet the standards established under domestic and international law, the

Haitian Refugee Center of Miami won an injunction against the refugees' return to Haiti.[225] Yet,

in response, the Bush administration created a refugee camp at a US navy base in Guantanamo

---

[221] 136 Cong. Rec. 27129 (October 2, 1990).

[222] Commentators have observed that in making this claim, McCollum either ignored or failed to understand that the conditions that qualified individuals for TPS status (typically war and natural disasters) would not have rendered them eligible for refugee and asylum status under US law. Andrew I. Schoenholt, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven, Northwestern Journal of Law and Social Policy*, vol. 15, n. 1 (Fall 2019): 10.

[223] Carl Lindskoog, *Detain and Punish*, 105 (citing Christopher Mitchell, "The Political Costs of State Power: U.S. Border Control in South Florida," in *The Wall around the West: State Borders and Immigration Controls in North America and Europe*, edited by Peter Andreas and Timothy Snyder (Lanham, Md.: Rowman and Littlefield, 2000), 89-91; Reimers, *Unwelcome Strangers*, 30).

[224] Those who passed this initial screening were taken to the United States for a regular asylum interview. But Schrag reports that the INS returned a majority to Haiti after determining that they were economic migrants or individuals fleeing general conditions of political unrest rather than persecution. Schrag, *A Well-Founded Fear*, 36. For more on the interdiction and detention policies adopted by the Bush administration vis-à-vis the Haitians, see Lindskoog, *Detain and Punish*, 99-125.

[225] Schrag, *A Well-Founded Fear*, 36.

Bay, Cuba.[226] Seeking an even more powerful deterrent to Haitian arrivals, Bush dismantled the refugee camps at Guantanamo and issued his "Kennebunkport Order," which instructed the Coast Guard to "surround Haiti" and force fleeing refugees back to that country.[227] Since the refugees were unable to reach US soil, the Bush administration argued that domestic and international refugee law protections did not apply.[228]

During his presidential campaign, Bill Clinton condemned the Kennebunkport Order and promised to end the policy. But, upon taking office, he reversed course after the Bush administration "put forth exaggerated estimates" that 200,000 to 500,000 Haitian refugees" planned to sail to the US during his inauguration and FAIR ran xenophobic radio ads in Florida and Georgia about the Haitian arrivals.[229] Clinton further expanded the enforcement-minded approach of his predecessors by continuing to detain Haitian and Cuban asylum seekers at Guantanamo. Ultimately, Clinton decided to invade Haiti and restore Aristide to power, believing that military intervention would bring stability to the nation and deter the departure of Haitians for America's shores.[230]

In a television interview, McCollum lauded the Bush and Clinton administrations for their Haitian policies, stating,

> And I frankly believe also that it's a problem for us in the sense that if we did not
> intercept the Haitian boat people and either repatriate them forcibly, as President Bush

---

[226] On the summary screening procedures and poor conditions at Guantanamo, see Schrag, *A Well-Founded Fear*, 36; Lindskoog, *Detain and Punish*, 99-125.

[227] As Schrag explains, "When Coast Guard cutters arrived with refugees in the harbor at Port-au-Prince, the Coast Guard officers used fire hoses to force them off the boats, into the hands of Haitian military officials who were waiting to arrest them." Schrag, *A Well-Founded Fear*, 36.

[228] A federal appeals court issued an injunction against the implementation of the Kennbunkport Order. But the Supreme Court later stayed and reversed the injunction. Schrag, *A Well-Founded Fear*, 37.

[229] Joseph Nevins, *Operation Gatekeeper: The Rise of the "Illegal Alien" and the Making of the U.S.-Mexico Boundary* (New York: Routledge), 88; Schrag, *A Well-Founded Fear*, 38; Lindskoog, *Detain and Punish,* 188.

[230] On Clinton's decision to continue detaining Cubans and Haitians at Guantanamo, see Lindskoog, *Detain and Punish,* 115-131. On his invasion of Haiti, see Lindskoog, *Detain and Punish*, 124.

was doing and President Clinton did up until just recently, or do some other alternative that's constructive, these boat people would come to Florida, and would inundate our state, as many of them have been doing.[231]

He also contributed to their efforts by taking legislative action. From the late 1980s to the early 1990s, McCollum repeatedly introduced bills to bar the entry of individuals diagnosed with AIDS[232]-- bills that fueled racist stereotypes by associating Haitians with illness and disease.[233] By 1993, lawmakers used the language of one of these bills, H.R. 985 ("To include infection with the agent for acquired immune deficiency syndrome as a communicable disease of public health significance for which an alien is excludable under the Immigration and Nationality Act"[234]) to codify the exclusion of HIV-positive immigrants under the National Institutes of Health Revitalization Act of 1993.[235]   In so doing, they wrested control over the determination of the excludability of AIDS sufferers from the Public Health Service (PHS). The agency garnered the ire of anti-immigrant lawmakers when it proposed to lift the AIDS exclusion applied to HIV-infected Haitians at Guantanamo between 1991 and 1993.[236] Concern for the well-being of the Haitians as well as the unscientific premises of the exclusion motivated the agency's

---

[231] Interview with Senator Bill McCollum, *ABC News This Week With David Brinkley*, ABC, July 10, 1994.

[232] These included H.R. 2590, A bill to amend the Immigration and Nationality Act to clarify that immigrant visas may not be issued to aliens who are infected with the etiologic agent for acquired immune deficiency syndrome," introduced on June 3, 1987, and H.R. 278, To amend the Immigration and Nationality Act to clarify that immigrant visas may not be issued to aliens who are infected with the etiologic agent for acquired immune deficiency syndrome, introduced on January 3, 1989.

[233] On a 1983 "flawed declaration" by the Centers for Disease Control that created the racist stereotype of Haitians a high-risk group for AIDS, see Lindskoog, *Detain and Punish*, 105.

[234] McCollum introduced H.R. 985 on February 18, 1993.

[235] National Institutes of Health Revitalization Act of 1993, Pub. L. 103-43, 107 Stat. 122 (1993). For an account of the congressional debates regarding the 1993 Act and the inclusion of H.R. 985, see, Juan P. Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus: Recent Developments and Prospects for the Future," *Houston Journal of International Law*, vol. 16, n. 1 (Fall 1993): 18-39.

[236] On the HIV exclusion, see Michael Ratner, "How We Closed the Guantanamo HIV Camp: The Intersection of Politics and Litigation," *Harvard Human Rights Journal,* vol. 11 (1998): 187-220.

recommendation; more specifically, the agency's research demonstrated that "[t]he risk of (or protection from) HIV infection comes not from the nationality of the infected person, but from the specific behaviors that are practiced."[237] In response, conservative lawmakers such as Connie Mack (R-FL) argued that the admission of the detained Haitians would impose unfair fiscal burdens on their states.[238]

Senator Ted Kennedy (D-MA) rebutted these arguments by observing that immigrants with other types of diseases, such as kidney failure and cancer, were not excluded due to cost concerns. He further cited to recent immigrant admission statistics to deflect claims that the lifting of the ban would result in the admission of thousands of HIV noncitizens.[239] Finally, he argued that anti-Haitian racism and homophobia inspired the HIV ban: "[W]hat the supporters of the Nickles amendment are saying--and we all know what they are saying here today-- is you have 268 black Haitians in Guantanamo Bay, 40 children and 2 have HIV, and 20 pregnant women . . . The proponents of this amendment say, 'Send them back. Send them back. We do not care'."[240] By June 1993, the Clinton administration paroled 139 HIV-infected Haitians who had been held at Guantanamo since early 1992; yet the administration did so without challenging the new HIV exclusion.

---

[237] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 19. Yet, in response to the outcry about its proposal, the PHS reversed course and retained HIV on its list of communicable diseases. Widespread public criticism of its reversal ensued; Rep. Jim McDermott (D-Wash.) charged, "[o]ur immigration policy toward HIV infected people reflects the Bush administration's continuing capitulation to hysteria, bigotry, and irrational fear." Perhaps most prominently, the Eighth Annual Conference on AIDS moved its conference to Amsterdam in protest of the revived PHS ban. Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 20-21 (citing 138 Cong. Rec. H6253 (daily ed. July 21, 1992) (statement of Rep. Jim McDermott (D-Wash.)).

[238] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 30 (citing 139 Cong. Rec. S1766 (daily ed. February 18, 1993)).

[239] Kennedy observed that "only 450 out of 700,000 immigrants tested positive for the AIDS virus and were thus excluded. Last year only 600 tested positive." Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 31.

[240] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 31-32.

In a 1994 televised interview with ABC News host David Brinkley, Carrie Meek (D-FL), a recently elected congresswoman and member of the Congressional Black Caucus, challenged McCollum's anti-Haitian policies,[241] alleging that they created a "double standard" between Haitians and other immigrants:

> I think we need to remember that the Haitian immigration is less than six percent of the total immigration coming into the United States. There's a loud furor about Haitians but not about other immigrants. Certainly, there is a double standard between the immigration policies as they are inflicted upon Haitians vis-à-vis Cubans and other immigrants. I think it's an unfair policy and it should be corrected.[242]

Meek also contested McCollum's claim that the Haitians were economic migrants, arguing that they, like Cubans, were asylum seekers fleeing political persecution particularly given the documented and widespread violence inflicted upon the Haitian people by coup leader Lieutenant General Raoul Cedras and the military. McCollum was unmoved by Meek's appeals. On the eve of the US invasion of Haiti, McCollum recommended that Clinton assist Aristide in establishing a new government on a neighboring island--an island that, in lieu of the United States, would serve as an asylum for Aristide's supporters.

By the 1990s, McCollum's restrictionist initiatives received a boost from the virulent xenophobia that emerged as a result of an economic recession, the first bombing of the World Trade Center, the arrival of Chinese asylum seekers in New York City in 1993, the Oklahoma City bombing, and increases in both the legal and undocumented immigrant population in the United States, among others. Capturing the popular mood, the headline on the April 1990 cover of *Time* magazine declared, "America's Changing Colors: What Will the U.S. Be Like When Whites Are No Longer the Majority?" and depicted an image of an American flag composed of

---

[241] Interview with Senator Bill McCollum.
[242] Interview with Senator Bill McCollum.

black, brown, and yellow stripes [243] Meanwhile public opinion polls traced Americans'

increasing hostility toward migrants as an unprecedented 54 percent expressed their support for a

reduction in immigration in 1992; that figure grew to 61 percent in 1993 and 65 percent in

1994.[244] Placing these statistics in perspective, Joseph Nevins writes: "Although opinion polls

have consistently shown that since 1945 Americans have wanted lower levels of immigration,

the 1993 results reflected the highest level of hostility toward immigrants 'since the heyday of

nativism in the 1920s.'"[245] Right wing intellectuals flourished in this milieu, publishing best

sellers that "promoted a white supremacist and nativist . . . . vision of the United States."[246]

White nationalist Peter Brimelow characterized the arrival of new migrants from Africa, Asia,

and Latin America as "de facto *discrimination against* Europe" and called for the restoration of

the nation's "specific ethnic core. . . And that core has been white."[247] Summing up the

xenophobia of the 1990s, one *New York Times* reporter wrote, "Americans have felt freer to

voice a rude inhospitality that at other times they might have considered racist or at least

xenophobic."[248]

 Yet, as Lee observes, the anti-immigrant sentiment of the 1990s "did not treat all new

immigrants the same."[249] Thus, while Asian immigrants were increasingly represented as so-

called model minorities, Latin American migrants—and particularly Mexican migrants—were

---

[243] *Time*, April 9, 1990, vol. 135, n. 15,
http://content.time.com/time/magazine/0,9263,7601900409,00.html, accessed November 19, 2021.
[244] Coleman, *The Walls Within: The Politics of Immigration in Modern America* (Princeton: Princeton University Press, 2021), Kindle Loc. 109.
[245] Nevins, *Operation Gatekeeper*, 90.
[246] Lee, *America for Americans,* Kindle Loc. 278.
[247] Lee, *America for Americans,* Kindle Loc. 278 (citing Peter Brimelow, *Alien Nation: Common Sense About America's Immigration Disaster* (New York; Harper Perennial, 1995), xvi, xvii, 79, 219 [emphasis in original]).
[248] Coleman, *The Walls Within,* Kindle Loc. 109 (citing Debora Sontag, "Calls to Restrict Immigration Come from Many Quarters," *New York Times,* December 13, 1992).
[249] Lee, *America for Americans,* Kindle Loc. 260.

represented in negative terms that cemented the association between a Mexican identity and undocumented status.[250] Indeed, numerous studies found that from the 1960s to the 1990s, the media "paired the terms "*undocumented, illegal,* and *unauthorized* with *Mexico* or *Mexican immigrants* and *crisis, flood,* or *invasion.*"[251] Undocumented Mexican migrants, moreover, were blamed for nearly all of the nation's economic, social, and political problems.[252] Conservative writers and policymakers also believed that Mexican immigrants, unlike European immigrants, were incapable of adjusting or assimilating to American society.[253] Former presidential candidate and political commentator Patrick Buchanan revived the early twentieth century eugenicist notion of "race suicide," arguing that declining white birth rates and increasing Mexican birth rates would render Americans of European descent a minority in a nation that supposedly belonged to them.[254]  Given the popular embrace of anti-immigrant sentiment, politicians and policymakers began to adopt stronger approaches to immigration law enforcement, particularly with respect to asylum seekers and undocumented immigrants.

In the early 1990s, the battle for stronger border enforcement measures began at the state and local level where FAIR and other restrictionist organizations launched grassroots

---

[250] Lee, *America for Americans*, Kindle Loc. 260. On the ways in which the model minority myth was used to mask the ongoing racism faced by Asian Americans, denigrated African Americans, and promoted the notion of a colorblind society, see Ellen Wu, *The Color of Success: Asian Americans and the Origins of the Model Minority* (Princeton: Princeton University Press, 2015).

[251] Emphasis in original. Lee, *America for Americans,* Kindle Loc. 261. (citing Leo Chavez, *The Latino Threat: Constructing Immigrants, Citizens, and the Nation* (Stanford, CA: Stanford University Press, 2013), 24, 27, 31-33; Otto Santa Ana, *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse* (Austin: University Texas Press, 2002), 77).

[252] Lee, *America for Americans,* Kindle Loc. 281 (discussing the contributions of former Harvard University professor Samuel Huntington to anti-Mexican animus in the late twentieth century and early aughts).

[253] Lee, *America for Americans,* Kindle Loc. 280 (citing Patrick Buchanan, *The Death of the West: How Dying Populations and Immigrant Invasions Imperil Our Country and Civilization* (New York: St. Martin's Press, 2001), 3).

[254] Lee, *America for Americans,* Kindle Loc. 280 (citing Buchanan, *Death of the West,* 12; Patrick Buchanan, *State of Emergency: The Third World Invasion and Conquest of America* (New York: St. Martin's Press, 2006), 12).

campaigns.[255] In California, local restrictionists, former INS officials such as Harold Ezell,[256] and members of the California Coalition for Immigration Reform (an organization funded by Tanton's US Inc.) met in October 1993 to discuss their shared concerns regarding legal and undocumented immigration.[257] By the end of the meeting, they decided to create the Save our State Committee (SOS) and sponsor a ballot initiative (Proposition 187) that would prohibit undocumented immigrants in California from non-emergency medical care, public schools, and social services. It also required state and local officials to report suspected undocumented immigrants to the state attorney general and the INS.  Elaborating on the committee's strategy, one committee member explained, "It made sense to target the most objectionable recipients first—illegals. Then we could put the issue of too much legal immigration on the table."[258] Even though the federal courts issued an injunction against Proposition 187, the resounding support of California voters for the measure (they approved it by a 59 to 41 margin[259]) reflected the vigor of anti-immigrant sentiment in the state.

Proposition 187 garnered the attention of local, state, and federal officials. In Arizona, Texas, and Florida, anti-immigration forces sought to pass similar ballot measures.[260] It also

---

[255] Tichenor writes, ". . . FAIR and other restrictionist groups set about to build strong grassroots opposition to immigration in key receiving states like California, Texas, and Florida." Tichenor, *Dividing Lines,* Kindle Loc. 402.

[256] On Ezell, Lee writes that he "famously stated that 'illegal aliens' should be caught, skinned and fried" and that Californians were "tired of watching their state run wild and become a third world country." Lee, *America for Americans,* Kindle Loc. 269 (citing Daniel B. Wood, "Ballot Vote on Illegal Immigrants Set for Fall in California," *Christian Science Monitor*, June 1, 1994, 1, 18).

[257] On CCIR's stance on undocumented immigration, Coleman writes, "CCIR claimed that immigration was an 'invasion' that was destroying the cultural fabric of the nation and that unauthorized immigration was a crippling problem for the state. CCIR's literature noted 'illegal aliens . . . [brought] their values and culture into our midst, are major contributors to our mounting financial burdens and moral and social degradation." Coleman, *The Walls Within,* Kindle Loc. 121 (citing Dave Lesher and Eric Lichtblau, "O.C. Group Helps Fuel Anti-Immigrant Furor," *Los Angeles Times,* August 30, 1993).

[258] Tichenor, *Dividing Lines,* Kindle Loc. 403 (citing author's interview with Harold Ezell and anonymous interview with SOS staffer).

[259] Coleman, *The Walls Within,* Kindle Loc. 126.

[260] Coleman, *The Walls Within,* Kindle Loc. 126.

fulfilled the wishes of CCIR leaders by becoming a "blueprint" at the federal level for the

passage of anti-immigrant measures.[261] Indeed, Proposition 187 compelled both the Democratic

Party and the GOP to adopt hardline stances on the issue of immigration law enforcement

particularly given the importance of winning California's electoral votes in the 1996 election.[262]

Clinton, who closely watched the progress of Proposition 187 and the re-election of Governor

Pete Wilson, realized he had to "placate restrictionists."[263] As a result, he remained silent on the

litigation that ensued after the passage of Proposition 187 and reassured California voters he was

working to curtail undocumented immigration.[264] From early in his presidency, Clinton began to

develop an aggressive approach to immigration law enforcement that co-opted the rhetoric and

policies of the right.[265] He "took a hard line on mass asylum," prohibiting the entry of Cubans

and Haitians intercepted at sea.[266] With the approach of the 1994 midterm elections, Clinton

endorsed the recommendations of the Jordan Commission for aggressive enforcement with

respect to undocumented immigration.[267] During his two terms in office, Clinton would pen

---

[261] Coleman, *The Walls Within,* Kindle Loc. 127.

[262] Coleman, *The Walls Within,* Kindle Loc. 116, 124, 127 (citing Melissa Healy, "House GOP Charts California Agenda Congress," *Los Angeles Times,* November 13, 1994.

[263] Coleman, *The Walls Within,* Kindle Loc. 116.
　　　In the early 1990s, Governor Pete Wilson became one of the leading anti-immigrant voices in the country. As Joseph Nevins writes, "Wilson undoubtedly set the stage for immigrant bashing," particularly with respect to undocumented immigration from Mexico. His xenophobic rhetoric and policy proposals escalated with Clinton's election and his own race for a second gubernatorial term. Nevins, *Operation Gatekeeper*, 85, 87.
　　　During his 1994 campaign, Wilson pushed Clinton further to the right by placing full page advertisements in the *New York Times, USA Today,* and the *Washington Times* that called on the administration to end birthright citizenship and deny education and public services to undocumented immigrants. Wilson's strategy paid off as Californians voted to return him to the governor's office. Nevins, *Operation Gatekeeper,* 87; Coleman, *The Walls Within,* Kindle Loc. 115.

[264] Tichenor, *Dividing Lines*, Kindle Loc. 413.

[265] Nevins, *Operation Gatekeeper;* Coleman, *The Walls Within*, Kindle Loc. 127.

[266] As Tichenor observes, this decision broke with a three-decade long precedent by which Cubans were treated as refugees. Tichenor, *Dividing Lines,* Kindle Loc. 413.

[267] Established by the Immigration Act of 1990, the Commission on Immigration Reform (CIR) was led by former representative Barbara Jordan (D-TX) and generated a series of reports on legal and undocumented immigration. The reports were used by both policymakers on both the left and the right to

tough immigration enforcement bills and ultimately sign three of the most draconian law enforcement measures in United States history: the Violent Crime Control and Law Enforcement Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

Meanwhile, restrictionist forces, led by then House minority leader Newt Gingrich, took precedence within the GOP. They shunted aside the concerns of other GOP leaders, such as Governor-elect George W. Bush and William Bennett, regarding the potentially harmful impacts of Proposition 187; the latter accused Wilson of "scapegoating . . . stirring up nativist juices."[268] Although Jack Kemp supported the rescission of services to undocumented immigrants, he also felt that a national version of Proposition 187 could cost the GOP the immigrant vote and land the party "on the wrong side of the civil rights debates of the 1950s and 1960s."[269]  Despite these concerns, Gingrich, upon assuming the speakership, created the Speaker's Task Force on Immigration Reform in December 1994. In so doing he paid heed to the importance of the recent developments in California by assigning Rep. Elton Gallegly (R-CA) as chair and ensuring that almost half of the Task Force's fifty-four members were from California.[270] The year before, GOP restrictionists formed the House Republican Research Committee's Task Force on Illegal Immigration and held hearings in four US cities. In Los Angeles, much of the testimony reinforced the themes articulated by Governor Wilson regarding the negative impact of

justify their policy proposals with respect to legal and undocumented immigration. Tichenor, *Dividing Lines*, Kindle Loc. 407.

[268] Coleman, *The Walls Within*, Kindle Loc. 128-129 (citing Andrew Wroe, *The Republican Party and Immigration Politics: From Proposition 187 to George W. Bush* (London: Palgrave Macmillan, 2008, 121-22).

[269] Coleman, *The Walls Within*, Kindle Loc. 129 (citing Marc Sandalow, "Republicans Battle Over Immigration for 'Soul of Party,'" *San Francisco Chronicle*, November 22, 1994, A3).

[270] Coleman explains that Gingrich created task forces to shift power from congressional committee chairs to the GOP leadership. Gingrich appointed the members of the task forces and his aides served as staff. Coleman, *The Walls Within*, Kindle Loc. 128.

undocumented migrants on the state's economy, crime rate and social services. Witnesses demanded stronger border controls, including the assignment of the US military to the border, and the denial of citizenship to US-born children of undocumented immigrants, among others.[271]

In response to the anti-immigrant fervor of the early 1990s, members of Congress from both sides of the aisle "began tripping over one another to take a tough stand on boundary enforcement and unauthorized immigration."[272] Republicans and Democrats paid multiple visits to the border and held many congressional hearings on the issues of undocumented immigration, so-called criminal aliens, and border enforcement to signal their dedication to these issues.[273] The also proposed numerous immigration enforcement bills. Thus, for example, Representatives Becerra (D-CA) and Nadler (D-NY) introduced bills on summary exclusion (H.R. 3162) and asylum reform (H.R. 3223). In the Senate, Simpson (R-WY) introduced a summary exclusion bill (S. 667) while Senator Bryan (D-NV) addressed asylum and alien smuggling in S. 1348. Meanwhile, California Senators Feinstein (D-CA) and Boxer (D-CA) proposed to increase resources for border enforcement under S. 1571.[274] In proposing these bills, many followed the

---

[271] Others protested the Los Angeles hearing by marching outside the event venue and chanting in Spanish, "We are not illegal here." Pasadena Mayor Rick Cole attended the meeting and told the *Los Angeles Times*, "The issue of immigration is a profound one, and deserves attention and goodwill, but the demonization of immigrants is inhumane and wrong, particularly if it's for partisan gain." Lee Romney, "Illegal Immigration Targeted at Hearing," *Los Angeles Times,* August 17, 1993, A21.

[272] Nevins, *Operation Gatekeeper*, 89; Coleman, *The Walls Within*, Kindle Loc. 128.

[273] Among others, see Criminal Aliens: A Federal Responsibility and a State and Local Burden, Eleventh Report by the Committee on Government Operations, Committee of the Whole House, One Hundred Third Congress, second session, August 1, 1994; The Impact of Federal Immigration Policy and INS Activities on Communities, Hearings before the Information, Justice, Transportation, and Agriculture Subcommittee of the Committee on Government Operations, House of Representatives, One Hundred Third Congress, First and Second Sessions, June 2, August 31, and March 28, 1994; and Federal Prison Population: Present and Future Trends, Hearings before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, First Session, May 12 and July 29, 1993.

[274] For an overview of these and other immigration-related bills proposed in 1993, see, Larry M. Eig, Joyce C. Vialet, Ruth Ellen Wasem, "CRS Issue Brief, Immigration: Illegal Entry and Asylum Issues," January 24, 1994 (Washington, D.C.: Library of Congress, 1994). For an account of the rightward shift of

lead of Clinton who, during a July 27, 1993 press conference, announced his Immigration

Initiative, a series of proposals to strengthen border enforcement.[275]  During the event, Clinton

expressed support for an amendment introduced by Rep. Duncan Hunter (R-CA) that would add

600 officers to the Border Patrol.[276] He also transmitted to Congress his own immigration

enforcement bill, the Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993.

Despite criticism from civil rights groups[277] about provisions that would deny due process to

asylum applicants, various features of the administration bill eventually made their way into a

bipartisan bill, H.R. 3363, the Immigration Enforcement and Asylum Reform Act, sponsored by

Representatives Mazzoli (D-KY), McCollum (R-FL), and Schumer (D-NY).[278]

Political scientist Daniel Tichenor observes that in the 1990s, "neither Republican nor

Democratic leaders wanted to appear lax in their response to unpopular illegal immigration."[279]

In this context, members of Congress made no effort to examine or expunge the racial animus

from the laws criminalizing undocumented entry. Indeed, as in the 1950s, 1980s, and the 1990s,

it would have been politically imprudent for both conservatives and liberals to propose such an

examination. Opinion polls attested to Americans' antipathies toward undocumented immigrants

---

Democrats on immigration detention in the early 1990s, see Ghosh and Hoopes, "Learning to Detain Asylum Seekers," 1007-1013.

[275] In July 1993, Clinton asked Congress for $172.5 million to support the Border Patrol, legislation increasing criminal penalties for alien smugglers, and a corps of immigration officers who would hear asylum claims at ports of entry, among other things. Associated Press, "Immigration crackdown unveiled: Clinton's plan gets bipartisan support," *Daily Press* (Newport News, Virginia), July 28, 1993, 15

[276] Nevins, *Operation Gatekeeper,* 89.

[277] Associated Press, "Immigration crackdown unveiled" (citing Lucas Guttentag, ACLU who said of the asylum provisions of the administration bill, It "panders to America's most primitive fears about immigration.").

[278] Message from the President of the United States Transmitting A Draft of Proposed Legislation Designed to Address the Growing Abuse of Legal Immigration and Political Asylum Systems by Illegal Aliens Holding Fraudulent Documents and by Alien Smugglers; Including a Section-by Section Analysis, 103rd Cong., 2d sess., July 27, 1993. The administration's bill was introduced as S. 1333 in the Senate and H.R. 2836 in the House. See also, Eig, Vialet, Wasem, *CRS Issue Brief,* 10.

[279] Tichenor, *Dividing Lines,* Kindle Loc. 413.

and the passage of Proposition 187 reflected their frustration with federal immigration law enforcement efforts.[280] By taking an aggressive stance on immigration enforcement, politicians saw their own poll numbers rise and increased their chances of reelection. For Democrats and Republicans from border states (including Florida), the issue of undocumented entry and re-entry was of particular concern; as a result, while McCollum drafted the language of the §1326 re-enactment, members of both parties paved the road to its incorporation in and passage under the 1994 VCCLEA.

*Legislative History*

By 1993, McCollum was the ranking member of both the House Subcommittee on Crime and the House Subcommittee on International Law, Immigration, and Refugees. As such, he played an active and prominent role in the debates on the many crime and immigration bills introduced on the floor of the House and even the Senate. Moreover, McCollum was well positioned to consolidate his interests on these issues by advancing the amendment of the nation's immigration laws via the major crime measures of the late twentieth century. On March 24, 1993, McCollum introduced the Criminal Aliens Deportation Act of 1993 (H.R. 1459, "To amend the Immigration and Nationality Act to expand the definition of "aggravated felony," to eliminate the administrative deportation hearing and review process for aliens convicted of aggravated felonies who are not permanent residents or for other purposes").[281] His bill proposed

---

[280] For a discussion of the polls, see Tichenor, *Dividing Lines*, Kindle Loc. 405.

[281] Days before presenting this measure, McCollum held a press conference announcing his plan to reintroduce his summary exclusion bill. In so doing, he role the wave of anti-immigrant sentiment aroused by a *60 Minutes* interview with Dan Stein (FAIR) and William Slattery, the New York INS district director. During the segment, Stein and Slattery used the asylum application of Sheik Omar Abdel Rahman, a cleric who incited the 1993 World Trade Center bombers, to impugn the US asylum system as a whole. Having anticipated the media attention that would follow the CBS interview, FAIR presented a detailed legislative proposal the very next day. Two days later, McCollum, as Schrag describes it, "was

to expand the definition of an aggravated felony to widen the net of deportable aliens, expedited the removal of criminal aliens upon the completion of their sentences, conferred upon US district court judges the authority to issue deportation orders during sentencing, and restricted various deportation defenses for certain criminal aliens. H.R. 1459 also modified §1326 to enlarge the class of individuals subject to criminal prosecution for unauthorized reentry; as McCollum explained, "Currently, an alien convicted of a felony other than an aggravated felony who re-enters is subject to 5 years in prison and a criminal fine: this subsection extends the penalties to aliens convicted of three or more misdemeanors and increases the maximum prison sentence to 10 years. Language is also added to make it clear that any alien who stipulates to deportation during a criminal trial shall be considered to have been formally deported."[282]  Finally, H.R. 1459 added a section (c), "Collateral Attacks on Underlying Deportation Order," that served as the precursor to section (d) of 8 U.S.C. 1326.

Although H.R. 1459 never became law, its proposed modifications to the criminal penalties for illegal reentry served as the basis for its re-enactment under the 1994 VCCLEA. As McCollum himself explained, "Many of the provisions of H.R. 1459 have been incorporated into other bills, including H.R. 2872, the House Republican Crime bill; H.R. 3320, Mr. Bilbray's Immigration Stabilization Act of 1993, Mr. Smith's Illegal Immigration Control Act of 1994;

---

ready to legislate."  Schrag, *A Well-Founded Fear,* 42-44. On McCollum's 1993 summary exclusion bill, see Schrag, *A Well-Founded Fear,* 44, 47-48, 70-71.

     During his press conference, McCollum succumbed to the anti-Muslim sentiment that emerged in the wake of the bombing and used a racial slur to describe an asylum seeker featured in the *Sixty Minutes* interview. He specifically stated, "If you watched the *60 Minutes* thing, you watched that Paki fellow wander off to go get a cab or something. . .This brings us back to the fact that – you'll remember it was a Pakistani who has been accused . . .." Schrag, *A Well-Founded Fear,* 44 (citing News Conference, Introduction of a bill on immigration, *Federal News Service*, March 16, 1993).

[282] 139 Cong. Rec. E749 (March 24, 1993).

and the Senate-passed crime bill."[283]  Sponsored by Senate Judiciary Chair Joe Biden (D-DE), the Senate crime bill to which McCollum referred originally contained no immigration enforcement provisions and instead focused exclusively on the issues of crime control and prevention.[284] Yet, by November 19, 1993, the Senate chose to pass a much tougher crime bill, substituting Biden's bill for H.R. 3355, a House crime bill sponsored by congressmen Jack Brooks (D-TX) and Charles Schumer (D-NY), with substantial amendments.[285] In drafting these amendments, Biden worked primarily with Orrin Hatch (R-UT),[286] the ranking member of the Judiciary Committee, although both acknowledged the many contributions of their colleagues. The amended Senate crime bill (referred to as the Biden-Hatch bill) incorporated new immigration provisions proposed by Senators Simpson, Bob Smith (R-NH),[287] and Robert Dole (R-KS) as well as Rep. McCollum. Indeed, McCollum had helped Hatch and Dole draft their own crime bill, [288] S. 1356, which they introduced on August 3, 1993.[289]  Unlike the original

---

[283] The Smith bill referenced by McCollum was H.R. 3860, introduced by Rep. Lamar Smith (R-TX) on February 10, 1994. Criminal Aliens: Hearing Before the Subcommittee on International Law, Immigration, and Refugees of the Committee on the Judiciary House of Representatives, One Hundred Third Congress, Second Session, H.R. 723, H.R. 1067, H.R. 1279, H.R. 1459, H.R. 1496, H.R. 2041, H.R. 2438, H.R. 2730, H.R. 2993, H.R. 3302, H.R. 3320 (Title IV), H.R. 3860 (Titles II, V, VI), H.R. 2872, and H. Con. Res. 47, February 23, 1994, 157.

[284] S. 1607, A Bill to Control and Prevent Crime, November 1, 1993.

[285] In its original form, H.R. 3355 contained no immigration provisions. H.R. 3355, To amend the Omnibus Crime Control and Safe Streets Act of 1968 to allow grants to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety, October 26, 1993.

[286] 140 Cong. Rec. 30099 (November 18, 1993).

[287] 140 Cong. Rec. 30106 (November 18, 1993),

[288] While speaking in support of S. 1356, Senator Connie Mack (R-FL), thanked Bill McCollum, along with Dole and Hatch, for working on the measure; Mack said, "I am very grateful to all those who have helped formulate this program, especially Congressman Bill McCollum and my colleagues Senator Hatch and Senator Dole and I am confident we can pass this amendment with bipartisan support." 139 Cong. Rec. 27477 (November 4, 1993).

[289] S. 1356, To restore order, deter crime, and make our neighborhoods and communities safer and more secure places in which to live and work, August 4, 1993. On the same day, McCollum introduced his own crime bill, H.R. 2872, To prevent and punish crime, to strengthen the rights of crime victims, to assist

Biden bill (S. 1607), Title III of Dole-Hatch bill, "Criminal Aliens and Alien Smuggling," proposed substantial revisions to the laws regarding deportation, immigrant smuggling, and the Border Patrol.[290] Section 304 of the bill, "Enhancing Penalties for Failing to Depart, or Reentering, After Final Order of Deportation," revised §1326 (b) and added a new section -- §1326 (c), on collateral attacks to underlying deportation orders in terms that were nearly identical to McCollum's H.R. 1459.

On November 19, 1993, the Senate passed the Biden-Hatch bill (S. 1607/H.R. 3355) by a vote of 95 to 4 and sent the measure to the House. It, however, took almost another year for House to debate, further amend, and ultimately pass the measure. During the floor debates, Congress said very little regarding the proposed changes to §1326. Yet, on February 23, 1994, the House Subcommittee on International Law, Immigration, and Refugees held a hearing to review the numerous immigration enforcement bills that had been introduced by Republicans and Democrats to address the so-called criminal alien problem.[291] During the session, the American Bar Association and the American Immigration Lawyers Association, among others, expressed their concerns about H.R. 1459, particularly its summary deportation provisions, expanded definition of aggravated felony, and limits on deportation relief available to long-term permanent residents.[292] Yet, they offered no substantive analysis or commentary on §1326.

In its testimony during the February 23 hearing, the INS also expressed its concerns regarding the new aggravated felony definition and the judicial deportation provisions of

---

State and local efforts against crime, and for other purposes, August 4, 1993. This bill incorporated the modifications to §1326 that he first presented in March 1993 under H.R. 1459.
[290] Hatch explained the differences between his bill and Biden's bill at length. See, 139 Cong. Rec. 27207-212 (November 3, 1993).
[291] In so doing, the Subcommittee acknowledged that debates regarding these measures would continue in the debates regarding the Senate-passed crime bill. Criminal Aliens, February 23, 1994, 2.
[292] Criminal Aliens, February 23, 1994, 199-219.

McCollum's bill. [293] It was also one of the only witnesses that addressed and endorsed the bill's amendments to §1326. Speaking for the INS, Deputy Commissioner Chris Sale observed of the section's increased penalties, "Such an increase in penalties is necessary and helpful and would apply only in cases where the underlying offense was criminal in nature or constituted a security-related ground. These penalties are needed to deter the many aliens who abscond and then continually attempt illegal reentries into the United States." With respect to the new section (c), she wrote, "The amendment would appropriately limit collateral attacks on prior deportation orders to questions of basic due process. It would deter frivolous challenges during criminal prosecutions for illegal reentry into the United States. Deportation and exclusion adjudications provide ample due process protection. Collateral attack in a distant, unrelated criminal proceeding is unnecessary and inefficient."[294]

While he did not discuss Section §1326, Senator Harry Reid also sanctioned the provision insofar as he incorporated it into his own immigration enforcement bill, S. 1351, "To curb criminal activity by aliens, to defend against acts of international terrorism, to protect American workers from unfair labor competition, and to relieve pressure on public services by strengthening border security and stabilizing immigration into the United States." Introduced on September 4, 1993, its proposed amendment of §1326 was more stringent than that of McCollum's bill. Whereas H.R. 1459 subjected to criminal prosecution those who had committed three or more misdemeanors, S. 1351 would include those who had committed "two or more misdemeanors." Reid's version of section (c) simply stated "In any criminal proceeding

---

[293] At the hearing, the INS was represented by Chris Sale, Deputy Commissioner, Immigration and Naturalization Service. She was accompanied by G. H. Kleinknecht, Associate Commissioner for Enforcement, and Paul Virtue, Deputy General Counsel, U.S. Department of Justice. Criminal Aliens, February 23, 1994, 174-183.
[294] Criminal Aliens, February 23, 1994, 178-79.

under this section, no alien may challenge the validity of the deportation order described in subsection (a)(1) or subsection (b)."

In 2006, Reid apologized[295] for introducing S. 1351 and the September 3, 1993 floor speech defending the bill's proposal to revoke birthright citizenship for children born to undocumented immigrants. In the impassioned speech, Reid declared that "no sane country" would confer birthright citizenship to out-of-status parents.[296] Cognizant of the racism underlying his proposal, Reid explained in his 2006 apology:

> . . .  I want to relate to the Senate that the biggest mistake I ever made, the largest error I ever made was 15 or 18 years ago …A group of people came and talked to us and convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States. This period of time for which I am so apologetic — to my family, mostly — lasted about a week or two. I introduced legislation. My little wife is 5 feet tall. We have been together for soon to be 50 years. As I said here on the floor a few days ago, her father was born in Russia. He was run out of Russia. His name was Goldfarb, his family. They were Jewish. My wife heard that I had done this. She does not interfere with my legislation. Only when I ask her does she get involved in what I am doing. I didn't ask her about this. She, in effect, said: I can't believe that you have done it. But I had done it.[297]

On August 21, 1994, H.R. 3355 passed in the House and on August 25, 1994, it was approved by the Senate. During the ten months of debate in the House, the bill underwent several changes and by August 21, 1994, section (b) qualified the phrase "three or more misdemeanors" to include "drugs, crimes against the person, or both." In addition, a House conference committee decided to drop section (c) regarding limits on collateral attacks.[298] The latter

---

[295] In 2018, Reid apologized again when former President Trump, in a tweet, cited to Reid's 1993 speech and used it as support for his own efforts to end birthright citizenship. Michael Brice-Saddler, "Harry Reid once said "no sane country" would allow birthright citizenship. He regrets it again," *Washington Post*, October 31, 2018, https://www.washingtonpost.com/politics/2018/10/31/harry-reid-once-said-no-sane-country-would-allow-birthright-citizenship-he-regrets-it-again/, accessed November 21, 2021.

[296] 140 Cong. Rec., S21710 (September 20, 1993).

[297] Jon Ralston, "An immigration push Reid regrets," *Las Vegas Sun,* July 21, 2010, https://m.lasvegassun.com/news/2010/jul/21/immigration-push-reid-regrets/, accessed November 22, 2021.

[298] 140 Cong. Rec. S23481 (August 21, 1994).

alteration as well as many others made with respect to the criminal and immigration provisions of the bill enraged Senate and House Republicans, including McCollum.[299] They charged that the bill was "soft" on crime and that its crime prevention programs functioned as forms of welfare.[300] McCollum himself voted against the bill and immediately began pursuing amendments to the nation's criminal and immigration laws, including 8 U.S.C. §1326.

Upon its signing by President Clinton on September 13, 1994, the VCCLEA became the largest crime bill passed by Congress, a status it retains to this day.[301] It enabled the hiring of 100,000 new police officers, authorized $9.7 billion for prisons, and $6.1 billion for prevention programs. It also addressed the so-called criminal alien problem by allocating $1.2 billion for border control, deportation, asylum reform, and the creation of a criminal alien tracking center. It also established a $1.8 billion fund to reimburse states for the costs surrounding immigrant detention.[302]  Even though the law contained provisions that aimed to protect communities through an assault weapons ban and protected women in abusive relationships, the VCCLEA also created the "three strikes" sentencing rules and authorized the application of the death penalty to dozens of federal crimes.[303] It also became a "major driver of mass incarceration" of citizens and immigrants alike.[304] Yet, the unprecedented spending on crime control had little impact on crime rates and an outsized impact on Black and Latino communities that were

---

[299] 140 Cong. Rec. H23570-23604 (August 21, 1994); 140 Cong. Rec. S23655-656; S23677-678; S23685-687 (August 22, 1994).

[300] 140 Cong. Rec. H7200-201 (August 9, 1994).

[301] Lauren-Brooke Eisen, "The 1994 Crime Bill and Beyond: How Federal Funding Shapes the Criminal Justice System," *The Brennan Center for Justice*, https://www.brennancenter.org/our-work/analysis-opinion/1994-crime-bill-and-beyond-how-federal-funding-shapes-criminal-justice, accessed November 21, 2021.

[302] U.S. Dep't of Justice, Violent Crime Control and Law Enforcement Act of 1994: Fact Sheet (1994), https://www.ncjrs.gov/txtfiles/billfs.txt, accessed November 22, 2021.

[303] Eisen, "The 1994 Crime Bill and Beyond."

[304] Eisen, "The 1994 Crime Bill and Beyond."

disproportionately sentenced and imprisoned under the new law.[305] One 2019 study found that while Blacks and Hispanics represented 31% of the U.S. population, they constituted 53% of death row inmates.[306]

Despite the scope and scale of the measure, Clinton continued to face criticism from the right and the left that he was not doing enough to stop undocumented border crossings. On the same day that he signed the VCCLEA, Democratic gubernatorial candidate Kathleen Brown called upon the Clinton administration to implement a border enforcement council operation in California similar to Operation Hold-the-Line. Trailing behind Governor Wilson in the polls, she hoped that the announcement of such a campaign would help improve her election day chances.[307] In response, Clinton launched Operation Gatekeeper on October 1, 1994. Rather than pursue immigrants beyond the international boundary (as had been INS strategy since mid-century), the INS placed hundreds of officers at the line itself as a "visible show of force" to block undocumented entries.[308] The line strategy, in turn, forced migrants to alter their crossing

---

[305] Ed Chung, Lea Hunter, and Betsy Pearl, "The 1994 Crime Bill Continues to Undercut Justice Reform—Here's How to Stop It," *Center for American Progress*, March 26, 2019, https://americanprogress.org/article/1994-crime-bill-continues-undercut-justice-reform-heres-stop/, accessed November 21, 2021 (citing John L. Worrall and Tomislav V. Kovandzic, "COPS Grants and Crime Revisited," *Criminology* 45 (1) (2007): 159–190; National Research Council, *The Growth of Incarceration in the United State: Exploring Causes and Consequences* (Washington: The National Academies Press, 2014)).

[306] Ranya Shannon, "3 Ways the 1994 Crime Bill Continues to Hurt Communities of Color," *Center for American Progress,* May 10, 2019, https://americanprogress.org/article/3-ways-1994-crime-bill-continues-hurt-communities-color/, accessed November 21, 2021.

The harsh legacies of the VCCLEA led Clinton to acknowledge that the law "overshot the mark." Michelle Alexander, "Why Hillary Clinton Doesn't Deserve the Black Vote," *The Nation*, February 10, 2016, https://www.thenation.com/article/archive/hillary-clinton-does-not-deserve-black-peoples-votes/, accessed November 25, 2021. During his presidential campaign, Biden proposed a crime plan that would reverse some of the policies created by the 1994 crime law. German Lopez, "Joe Biden's criminal justice reform plan, explained," *Vox,* August 12, 2020, https://www.vox.com/policy-and-politics/2019/7/23/20706987/joe-biden-criminal-justice-reform-plan-mass-incarceration-war-on-drugs, accessed November 25, 2021.

[307] Nevins, *Operation Gatekeeper*, 92.

[308] Nevins, *Operation Gatekeeper*, 90.

routes; rather than crossing at or near urban ports of entry, they attempted dangerous journeys

through the Sonoran Desert. The ensuing increase in migrant deaths transformed the Arizona

borderlands, in the words of anthropologist Jason De Léon, into a "killing field."[309]

The political landscape had tilted in McCollum's favor as he began seeking amendments

to the VCCLEA. Two months after its passage, the Republican Party had taken control of

Congress for the first time in 40 years and supplanted Democrats from the chairs of the Senate

and House immigration committees.[310] In the House and the Senate, members of the GOP

worked to draft legislation based on the policy proposals authored by Gingrich in his *Contract*

*with America.*[311] While the book said little about border enforcement, Gingrich's Task Force on

Immigration Reform issued a June 1995 report that supplied the talking points for Republicans'

immigration agenda, particularly with respect to the issue of undocumented immigration.[312] Yet,

---

[309] Jason De Léon, *The Land of Open Graves: Living and Dying on the Migrant* Trail (Berkeley: University of California Press, 2015); Joseph Nevins, *Operation* Gatekeeper, 145; Ana Minian, *Undocumented Lives: The Untold Story of Mexican Migration*, (Cambridge: Harvard University Press, 2018), 231. One humanitarian organization estimated that 3496 migrants had died in the Sonoran Desert between October 1999 and December 2019. Humane Borders/Fronteras Compasivas, "1999-2019 Recorded Migrant Deaths and Human Borders Water Stations," https://humaneborders.org/wp-content/uploads/deathpostercumulative_2019_stewardship_mid_letter.pdf, accessed December 6, 2021.

[310] In the Senate, Senator Alan Simpson (R-WY) replaced Sen. Kennedy as chair; in the House, Rep. Lamar Smith (R-Tex.) supplanted Rep. Romano Mazzoli (D-KY). Both members of FAIR's National Advisory Board, Simpson and Smith "envisioned a fresh round of restrictive immigration reform to limit legal admissions, to make immigrants ineligible for welfare benefits, and to finally curb illegal immigration." Tichenor, *Dividing Lines*, Kindle Loc. 406.

[311] Ed Gillespie and Bob Schellhas, eds., *Contract with America: The Bold Plan by Rep. Newt Gingrich, Rep. Dick Armey and the House Republicans to Change the Nation* (New York: Times Books, 1994).

[312] To remove undocumented immigrants from the United States, the Task Force specifically proposed dramatic increases in detention space, expedited exclusion at the ports of entry, streamlined deportation proceedings, federal reimbursement of state and local government expenses for the costs of immigration detention, and more "resources to prosecute deported felons who illegally re-enter" the country, among many other proposals. To deter unauthorized entry, it called for increased support for immigration law enforcement along the US-Mexico border and legislative changes. Such legislation would include mandatory fines of no less than $50 and no more than $250 for migrants attempting to enter illegally, asset seizures for undocumented migrants caught re-entering the country twice in one year, mandatory prosecution and full sentencing of all undocumented immigrants caught re-entering the United States over two times, and increased penalties for immigrant smuggling. Finally, the Task Force also recommended the denial of public education and public benefits to undocumented immigrants and an end to birthright citizenship to children of undocumented immigrants. Congressional Task Force on Immigration Reform,

McCollum, who now chaired the House Subcommittee on Crime and led the Political Asylum Working Group of the Task Force on Immigration Reform, didn't wait for the issuance of the report to present his new crime and immigration enforcement bills. On January 4, 1995, he introduced H.R. 3, "Taking Back Our Streets Act of 1995" and, on January 25, H.R. 668, the "Criminal Alien Deportation Improvements Act of 1995." While the House Subcommittee on Crime held hearings on H.R. 3, Congress took no further action on the measure. Despite this, the bill served as a Republican rejoinder to the VCCLEA; sponsored by 124 Republicans and 5 Democrats, it took a hardline on punishment and would have repealed all of the VCCLEA subtitles that pertained to crime prevention and community support.[313] Through H.R. 3, McCollum also aimed to further streamline deportation procedures; as part of this effort, the bill reintroduced the language from H.R. 1459 that limited collateral attacks on underlying deportation orders.

A few weeks after introducing H.R. 3, McCollum presented H.R. 668 because the VCCLEA, in his words, "not gone far enough."[314] The new bill replicated nearly all of the immigration provisions of H.R. 3.[315]  Yet, unlike H.R. 3, H.R. 668 received strong bipartisan support and passed in the House on February 10, 1995 by a 380-20 margin. After passage in the House, H.R. 668 was incorporated into S. 735, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[316] Among other things, H.R. 668 provided additional resources for immigration law enforcement, added new offenses to the definition of an aggravated felony,

---

*Report to the Speaker, The Honorable Newt Gingrich*, June 29, 1995 (Washington, D.C.: The Task Force, 1995), 3-6, Law Library of Congress, Washington, D.C.
[313] Title IX, Amendments to Violent Crime Control and Law Enforcement Act, H.R. 3.
[314] 141 Cong. Rec. H1586 (February 10, 1995).
[315] H. Rpt. 104-22, Criminal Alien Deportation Improvements Act of 1995, 9.
[316] Charles Doyle, "Terrorism: Comparison of House and Senate Versions of S. 735 of the 104th Congress," March 29, 1996 (Washington, DC: Congressional Research Service, the Library of Congress, 1996).

eliminated long term residency as a defense to a deportation or exclusion order, expanded

expedited deportation to permanent residents convicted of an aggravated felony, and rendered

certain immigrant smuggling crimes RICO offenses, and authorized wiretap authority for

immigrant smuggling investigations. H.R. 668 also added new clauses to §1326 that limited

collateral attacks on deportation orders.

During the few congressional debates on §1326, policymakers made clear that the

amended section, like H.R. 668 as a whole, aimed to streamline the deportation process. As Rep.

Lamar Smith (R-TX) explained, "The deportation process can be years in length. H.R. 668 will

streamline the process by eliminating frivolous challenges to deportation orders . . . This bill

addresses the concerns of the American people by giving the INS and prosecutors the tools they

need to expedite the deportation of criminal aliens."[317] McCollum himself explained that

challenges to the original deportation order could only occur in limited circumstances:

> The penalties for illegal reentering were enhanced by the Violent Crime Control and Law
> Enforcement Act of 1994. This section amends the INA to provide that the alien charged
> with this crime may only challenge the validity of the original deportation order if the
> alien can show that he or she has exhausted all administrative remedies, that the
> deportation order improperly deprived the aliens of the opportunity for judicial review,
> and that the deportation order was fundamentally unfair.[318]

In addition to McCollum's proposed changes to §1326, the House agreed to a last-minute

amendment proposed by Mark Foley (R-FL) and Richard Burr (R-NC). Both first term

congressmen, they quickly established their restrictionist credentials through this proposal as

well as their sponsorship of measures that would have denied birthright citizenship to children of

undocumented immigrants.[319]  Responding to the concerns of border states regarding the

perceived lapses in federal immigration law enforcement, Foley and Burr amended H.R. 668 to

---

[317] 141 Cong. Rec. E325 (February 13, 1995).
[318] H. Rpt. 104-22, Criminal Alien Deportation Improvements Act of 1995, 6, 16.
[319] In 1995, Burr co-sponsored H.R. 1363, the Citizenship Reform Act of 1995.

magnify the civil and criminal penalties for undocumented entry. With respect to §1326, they
created a new section (c) that mandated incarceration for individuals who reentered after being
deported. Their amendment also authorized the deportation of noncitizens convicted of
nonviolent crimes prior to the completion of their sentences and it precluded the early release of
noncitizens convicted of violent crimes.[320]  While Foley publicly denied that racism had anything
to do with his views on undocumented immigration, one of his constituents thought otherwise. In
an op-ed, she objected to Foley's description of undocumented immigrants:

> [Foley] claims that these unwanted illegal immigrants come here "with no intention of
> learning the language, no willingness to obey our laws and no desire to work hard like
> many of our ancestors." How is it possible for him to know their intentions? Which group
> is he referring to? Is he talking about Cuban refugees who choose to continue using
> Spanish? Or is he talking only about Mexican illegal aliens? Do all legal aliens intend to
> work hard and learn English? Or are the only immigrants that Rep. Foley approves of
> those who already speak English? According to the standards Rep. Foley is putting in
> place, my grandmother – who emigrated from Poland and never learned to read or write
> English – should not have been allowed to come here.[321]

While a few congressmen raised objections to other provisions of HR 668, none
challenged the additions to §1326.[322] Indeed, during the House Judiciary markup of the bill,
McCollum reported that the Department of Justice, speaking for the administration, supported

---

[320] The amendment also contained language drafted by Burr that explicitly authorized the Attorney
General to deport nonviolent noncitizen offenders prior to the completion of their sentences; this language
was not included in the final bill. 141 Cong. Rec. H1595-96 (February 10, 1995).

[321] Bonnie S. Cohen, "Foley shows only bigotry in ideas on immigration," *The Palm Beach Post*, April
22, 1996, A17; U.S. Representative Mark Foley, "Tightening immigration isn't bigotry," *The Palm Beach
Post*, May 2, 1996, A19.

[322] During the House Judiciary markup of the bill, Becerra tried in vain to amend the provisions regarding
the expedited deportation of legal residents. H. Rpt. 104-22, Criminal Alien Deportation Improvements
Act of 1995, 10.

A few days later, Rep. Jerrold Nadler (D-NY) spoke against the bill's proposed Prisoner Treaty
Transfer because it would return asylum seekers to persecution. As he stated, "People should be punished
for their crimes, but do we want them to have the death penalty for car theft? That is what this bill would
do. A person convicted of trafficking in stolen cars could be deported and could not even have a court
hear evidence that he would be persecuted or murdered if deported. Is that really what our constituents
want? Send car thieves summarily back to the Nazis? Is that what America stands for?" 141 Cong. Rec.
H1594 (February 10, 1995).

the limiting of collateral attacks on deportation orders in reentry prosecutions as stipulated by H.R. 3 and, by extension, H.R. 668.[323] Proposals to add section (b)(3) received further bipartisan support; indeed, the Clinton administration first drafted the amendment as part of its antiterrorism bill. Introduced by Biden in the Senate and Schumer in the House on February 10, 1995, S. 390/H.R. 896 amended section 276(b) so that a noncitizen terrorist excluded under 235(c) who attempted an unauthorized entry would be imprisoned for ten years. Thanks to its provisions regarding the deportation of suspected noncitizen terrorists based on secret information, the Clinton bill generated a tremendous amount of controversy and opposition.[324] Yet, none objected to its proposal to add the new language to §1326. As a further indicator of the bipartisan support for §1326(b)(3), it appeared in measures proposed by Republicans and Democrats, including the following: H.R. 1635 introduced by Richard Gephardt (D-MO) on May 15, 1995; H.R. 1710 and H.R. 2703 introduced by Henry Hyde (R-IL) on May 25, 1995.

    By December 5, 1995, the entirety of H.R. 668 was added to H.R. 1710 or the "Comprehensive Antiterrorism Act of 1995."[325] (H.R. 1710, as just noted, also included an iteration of §1326(b)(3).) Sponsored by Rep. Henry Hyde (R-IL), it was one of many bills presented in Congress that sought to strengthen national security, crime control, and border control in response to the April 19, 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Yet, by December 19, 1995, the House Republican leadership, in Schumer's words, "abruptly yanked" the bill from the floor schedule.[326] In its stead, the House began its

---

[323] H. Rpt. 104-22, "Criminal Alien Deportation Improvements Act of 1995, 18.
[324] Counterterrorism Legislation: Hearing before the Subcommittee on Terrorism, Technology, and Government Information of the Committee on the Judiciary, United States Senate, One Hundred Fourth Congress, First Session on S. 390, A Bill to Improve the Ability of the United States to Respond to the International Terrorist Threat and S. 735, A Bill to Combat Terrorism, May 4, 1995.
[325] 141 Cong. Rec. H13977 (December 5, 1995).
[326] 141 Cong. Rec. E2416 (December 19, 1995).

consideration of H.R. 2703, the Effective Death Penalty and Public Safety Act of 1996. (H.R. 2703 incorporated the additions to §1326 first proposed under H.R. 668 and S. 390/H.R. 896.) By March 14, 1996, the House tabled H.R. 2703 and passed S. 735, the Antiterrorism and Effective Death Penalty Act of 1996, after amending it to include the text of H.R. 2703. By mid-April, S. 735 passed with broad bipartisan support (91-8 in the Senate and 293-133 in the House).[327] On April 24, 1996, President Clinton signed the measure that became AEDPA.

During the debates regarding H.R. 668, H.R. 1710, H.R. 2703, and S. 735, Congress made no effort to review and cleanse the racial animus that informed §1326. As with the VCCLEA of 1994, both Democrats and Republicans strove to win the votes of anti-immigrant electorate in anticipation of the 1996 elections. In this context, policymakers were reluctant to raise questions about the immigration laws that could cost them votes on election day. Instead, members on both sides of the aisle deployed restrictionist arguments. Thus, during the debates on H.R. 668, Bob Menendez (D-NJ) and Porter Goss (R-FL) expressed their frustration with federal immigration law enforcement efforts and argued that the bill's streamlined deportation procedures would ease the burden on the states for noncitizen incarceration.[328] Rep. Gerald Solomon (R-NY), also during debates regarding H.R. 668, reinforced racist stereotypes of Mexican immigrants and complained about the numbers of children born to undocumented immigrants in California, Texas, and Florida.[329]

Even more prominently, H.R. 1710, S. 390, and S. 735 triggered much criticism about how they perpetuated racist stereotypes of Arabs and Muslims.[330] During a Senate Judiciary

---

[327] https://www.govtrack.us/congress/votes/104-1996/h126, accessed November 29, 2021.
[328] 141 Cong. Rec. H1589-90 (February 10, 1995).
[329] 141 Cong. Rec. H1586 (February 10, 1995).
[330] Counterterrorism Legislation. On the anti-Muslim sentiment that emerged after the 1993 World Trade Center bombing and the 1995 bombing of the federal building in Oklahoma City, see Lee, *America for Americans*, Kindle Loc. 303.

Committee hearing on S. 390 and S. 735, Khalil E. Jahshan of the National Association of Arab Americans (NAAA) reminded the members that many Americans wrongly assumed that Arabs and Muslims were to blame for the Oklahoma City bombing. "By reinforcing stereotypes and implying collective guilt," Jahshan continued, "the rumors induced a backlash against the Arab and Muslim communities and caused considerable anguish and pain for many Americans of Arab descent, particularly to our children."[331] Jahshan and other advocates further argued that H.R. 1710 and S. 390 did nothing to unseat these racist views; as Mary Moura Ramada of the American-Arab Anti-Discrimination Committee (AAADC) wrote:

> In section after section of the proposed legislation, we hear echoes from dark moments in this nation's struggle for national civil and political rights. Those grievous periods are remembered most painfully by members of many once-persecuted groups or ethnic minorities, including Chinese-Americans in the late 1800's, Japanese Americans interned during the Second World War, and victims of McCarthyism in the 1950's.[332]

Jahshan and Moura Ramada went on to offer detailed critiques of the bills, highlighting how they would prevent the Arab American community from fully enjoying their constitutionally protected freedoms pertaining to speech, association, and privacy, among others. Both organizations also opposed the creation of a special immigration court that would have the authority to deport individuals on the basis of secret evidence as well as illegally collected evidence.[333] On the latter issue, Moura Ramada cautioned, in the same way that a spurned lover served as the source of the government's secret evidence in the famous case of Ellen Knauff,

---

[331] Counterterrorism Legislation, 56. At least 13 national Jewish organizations and 177 local Jewish agencies joined the NAAA in its expression of concern about the two bills.

[332] Counterterrorism Legislation, 97.

[333] Counterterrorism Legislation, 56-57, 101-103. On June 13, 1995, the NAAA, AAADC, and the American Muslim Council testified before the House Judiciary Committee on the racial discriminatory impacts of H.R. 1710. International Terrorism: Threats and Responses, Hearings Before the Committee on the Judiciary, House of Representatives, One Hundred Fourth Congress, First Session on H.R. 1710, Comprehensive Antiterrorism Act of 1995, April 6, June 12 and 13, 1995, 420-427, 440-445, 496-502.

""informants" with their own self-serving political agenda will rush at the opportunity to play a role in ex parte proceedings" against members of the Arab American community.[334]

Three years later McCollum expressed his regrets about the punitive turn in the nation's immigration laws. Speaking about the Illegal Immigration Reform and Immigrant Responsibility Act, he stated, "The 1996 law went too far. We are a just and fair nation and must strike a just and fair balance in our immigration laws."  On October 1, 1999, he introduced H.R. 2999, "The Fairness for Permanent Residents Act of 1999," a measure that would enable permanent residents convicted of minor crimes to receive a waiver of deportation. It also would provide relief for permanent residents indefinitely detained and awaiting deportation for crimes committed in the past.[335] He explained that his measure would "'right' a wrong that was created by the 1996 changes to the immigration law."[336] To illustrate the harsh impacts of the 1996 law, McCollum recounted the story of Bob, a permanent resident unjustly deported to Scotland with his family due to a crime he had committee thirteen years prior. Yet, during his presentation, McCollum neglected to mention that he himself had authored the provisions of the law that resulted in Bob's misfortune.[337]

Despite McCollum's effort to soften his aggressive approach to immigration law enforcement, he did not go far enough. He was careful to stress that H.R. 2999 did not apply to foreigners but only permanent residents. He also retracted nothing with respect to his revisions of

---

[334] Counterterrorism Legislation, 102. In an exclusion case, Ellen Knauff was detained on Ellis Island for two and a half years based on classified evidence. *United States ex. rel. Knauff v. Shaughnessy*, 388 U.S. 537 (1950).

[335] H.R. 2999, To permit the Attorney General to grant relief to certain permanent resident aliens of good moral character who are adversely affected by changes made in 1996 to the definition of aggravated felony under the Immigration and Nationality Act, and to amend certain provisions of such Act relating to detention of an alien pending and after a decision on whether the alien is to be removed from the United States.

[336] 145 Cong. Rec. 23794 (October 4, 1999)

[337] 145 Cong. Rec. 23794 (October 4, 1999)

§1326 under the VCCLEA and AEDPA. Perhaps most tellingly, McCollum had sought relief

from the 1996 law for two permanent residents from Global North countries.[338] He made no

mention of permanent residents from the Global South who might benefit from H.R. 2999. Most

importantly, he made no moves to expunge the racism from the 1996 law by acknowledging the

various forms of racial animus that inspired its creation.

Part IV: The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

*Historical Background and Legislative History*

FAIR was "elated" by the GOP victory in 1994. It began promoting its immigration

agenda in Congress more aggressively than it had before, as Dan Stein explained, "We expected

to see the tightening up of the whole deportation process, eliminating needless appeals,

presumption in favor of detention, curtailing of asylum, and summary exclusion at the border."[339]

To this end, it greatly benefited from the contributions of Cordelia A. Strom, Esq. who was a

favorite of Tanton's and had once worked for Dan Stein as a staff attorney at the Immigration

Reform Law Institute, the nonprofit litigation arm of FAIR.[340] She later served as one of two

senior immigration experts on Senator Simpson's staff. By 1995, Rep. Lamar Smith (R-TX)

hired her to be the chief counsel to the House immigration subcommittee, which he chaired from

---

[338] In addition to seeking relief for Bob and his family, McCollum tried in vain to obtain a private relief bill for Robert A. Broley, the son of the Republican Party treasurer in Orange County, Florida. Convicted on felony and fraud charges in 1993, Broley was deported to Canada in December 1998. Richard H. P. Sia, "Deportation Law Now Alien to McCollum," *National Journal*, October 30, 1999, 3141; 145 Cong. Rec. E62 (January 6, 1999) (Relief for Robert Anthony Broley).

[339] Schrag, *A Well-Founded Fear,* 56 (citing Marcus Stern, "U.S. Poised to Reform Immigration," *The San Diego Union Tribune*, November 10, 1994).

[340] As one indicator of her elite status within FAIR and her own views on white supremacy, she regularly participated in the organization's WITAN retreats. Journalist Deepa Fernandes describes the retreats as follows: "After the exposure of the WITAN memos, even the most conservative Republicans tied to Tanton anti-immigration groups could not deny the organization's racist intent. Thus, those like Strom, who chose to continue participating in WITAN retreats, appear unequivocal in their support of these groups' racist ideals." Fernandes, *Targeted,* 217.

1994 to 2000.[341] With her positive working relationships with the House and Senate immigration chairs (both of whom had longstanding relationships with FAIR and currently serve on its National Board of Advisors[342]), Strom could greatly influence the legislation that emerged from both committees.[343] Indeed, policymakers credited Strom with "ghostwriting" the bill that became the 1996 Illegal Immigration Reform and Immigration Responsibility Act; former INS commissioner, Doris Meissner was more emphatic about Strom's role and declared "she [Strom] directly wrote it."[344]  More broadly, Strom's work led some observers to conclude that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR."[345]

While Strom may have written H.R. 2202 (the bill that became IIRIRA), Smith served as its principal sponsor and introduced the bill on August 4, 1995. In so doing, he aimed to correct what he perceived to be the missteps of the Immigration and Nationality Act of 1965; it, in Smith's words rendered "immigration as a form of 'civil right' that is owed to an unspecified portion of the world's population without regard to objective criteria of selection based in the national interest."[346] The increases in both legal and undocumented entry that followed the passage of the Act, moreover, supposedly created numerous economic, social, and cultural crises.  As a result, Smith concluded "there exists an inchoate sense among the American people that our culture is changed by immigration and that the pace of and direction of that change

---

[341] Jake Bernstein, "Lamar's Alien Agenda: Why is Mr. Smith Still in Washington?" *Texas* Observer, October 25, 2002, https://www.texasobserver.org/1120-lamars-alien-agenda-why-is-mr-smith-still-in-washington/, accessed December 1, 2021; Schrag, *A Well-Founded Fear,* 59. See also, Fernandes, *Targeted* (citing interview with Doris Meissner, August 25, 2005), 216.
[342] https://www.fairus.org/about-fair/board-directors, accessed December 1, 2021.
[343] Schrag, *A Well-Founded Fear*, 59.
[344] Fernandes, *Targeted* (citing interview with Doris Meissner, August 25, 2005), 216, 218.
[345] Fernandes, *Targeted* (citing interview with Ira Kurzban, Esq., November 2005), 217.
[346] Rep. Lamar Smith and Edward R. Grant, "Immigration Reform: Seeking the Right Reasons," *St. Mary's Law Journal*, vol. 28, n. 4 (1997): 888.

ought to be debated more openly."[347] Through H.R. 2202, Smith not only provoked this debate but also sought to alter the "pace and direction" of migration to the United States.

Unlike recent immigration measures, Smith's bill addressed both legal and undocumented immigration.[348] With respect to the former, it reduced legal immigration by eliminating family reunification visas for siblings and adult children, capped humanitarian admissions at 70,000, and limited access to public benefits. With respect to the latter, it strengthened border and worksite enforcement, limited the adjudication of asylum claims, expanded the definition of an aggravated felony, and expedited the deportation of  criminal aliens. On March 19, 1996, the House agreed by voice vote to an amendment authored by Smith, which added a fourth paragraph to §1326(b). It added a penalty of up to 10 years imprisonment for individuals convicted of nonviolent offense who had been removed while on parole, supervised release, or probation, who then reenter.[349]

While the change to §1326 stirred no debate in Congress, the bill was repeatedly characterized as mean-spirited and racist. During floor debates, Jerrold Nadler (D-NY) criticized H.R. 2202,

> Let there be no mistake; This Nation has every right and obligation to control our borders and to enforce our immigration laws. But absurd boondoggles, like building a giant fence, mindless cruelty, like sending legitimate refugees back to be murdered or tortured by their oppressors, and good old-fashioned Xenophobia, have nothing to do with legitimate protection of our borders.[350]

---

[347] Smith and Grant, "Immigration Reform," 905.

[348] In this regard, Smith's bill echoed recommendations made by Stein before the Task Force on Illegal Immigration to restrict both legal and undocumented immigration. Testimony of Dan Stein, Executive Director of the Federation for American Immigration Reform before the Task Force on Illegal Immigration of the House Republican Research Committee, August 30, 1993, box 158, folder 14, Federation for American Immigration Reform, Special Collections MS2195, George Washington University.

[349] 142 Cong. Rec. H2441 (March 19, 1996).

[350] 142 Cong. Rec. H2390 (March 19, 1996).

As the debates continued, some members similarly attacked the immigration enforcement provisions of the bill. Becerra opposed an amendment that authorized state and local law enforcement officials to undertake the work of federal immigration law enforcement and warned that it might lead to racial profiling. As support for his argument, he referred to a report by the Commission on Civil Rights that found that local law enforcement officials had a history of "detain[ing] people because of their foreign-looking appearance or because of their racial or ethnic appearance."[351]  Taking a broader perspective on the questions raised by Becerra, Rep. Sheila Jackson Lee (D-TX) asked why local law enforcement needed to be engaged in immigration law enforcement when the Justice Department, FBI, and local law enforcement agencies "indicate[d] that over the last couple of years crime has gone down."[352]

Becerra and others further questioned the disparate treatment of undocumented border crossers and visa overstays. Thus, in debates with Rep. Tate (R-WA) over his "one-strike" proposal – an amendment that would forever bar undocumented immigrants from future legal admission to the United States, Becerra pointed out that least 50% of all undocumented persons in the United States were visa overstays. He, then, questioned why Tate's proposal "would do nothing to those individuals who have come into the country under legal means, yet overstayed and are now undocumented."[353] Becerra further argued that Tate's measure singled out Mexican migrants:

> Here again we seem to see an amendment that attacks the issue with a very small perspective, with blinders, and says only to those who have crossed a border, and certainly the focus is on the southern border, and certainly it is in regard to people who look like they come from across the southern border, and it says to those individuals, "Forever more you will be denied access to this country."[354]

---

[351] 142 Cong. Rec. H2478 (March 20, 1996).
[352] 142 Cong. Rec. H2478 (March 20, 1996).
[353] 142 Cong. Rec. H2458 (March 19, 1996).
[354] 142 Cong. Rec. H2458 (March 19, 1996). See also 142 Cong. Rec. H2487 (March 19, 1996).

Becerra conceded that undocumented border crossing merited punishment but that the Tate amendment meted out an excessive penalty for such an infraction. As Rep. John Bryant (D-TX), emphatically added, "There is no point in putting these folks in the same category that you put an international terrorist."[355]

Ultimately, Becerra, Bryant, and Jackson Lee voted against H.R. 2202. Yet, they were in the minority as 79% of the House voted to pass the bill on March 21, 1996.[356] Republicans and Democrats who initially opposed the bill because it reduced legal immigration supported it once those legal immigration provisions had been struck from the measure. As in earlier congresses, pro-immigration policymakers recognized that they had little "leverage"[357] against the Republican bill.[358] Thus, by splitting the bill, they hoped to "limit the damage" by blocking restrictions on legal immigration and some of the restrictions on asylum.[359] Yet, even though Becerra, Bryant, and Jackson Lee drew attention to the racial animus underlying the immigration enforcement provisions of the bill, the "criminal alien provisions," as immigration journalist Dara Lind observes, "were too popular to stop—not only among Republicans, but among congressional Democrats and the Clinton White House."[360] Moreover, the pressure to appear

---

[355] 142 Cong. Rec. H2459 (March 29, 1995).

[356] https://www.govtrack.us/congress/votes/104-1996/h89, accessed December 1, 2021.

[357] Dara Lind, "The disastrous, forgotten 1996 law that created today's immigration problem," *Vox*, April 28, 2016 (citing Charles Kamasaki of the National Council of La Raza), https://www.vox.com/2016/4/28/11515132/iirira-clinton-immigration, accessed December 2, 2021.

[358] Indeed, prior to the issuance of the final conference report on September 25, 1996, Republicans made sweeping changes to the bill, in Becerra's words, "in the back room in the dead of night." Becerra further asserted, "procedurally it is disappointing to see, in the greatest democracy in the world, that the Republicans, the majority in this Congress, saw fit not to allow anyone to participate in the structuring of this final version of the bill unless one happened to be Republican." 142 Cong. Rec. 11076 (September 25, 1996). Bernstein explains, "Many of the harsh revisions in the law occurred behind closed doors during conference committee meetings to reconcile the House and Senate versions of the legislation. Immigration advocates say that Democrats in Congress didn't get to see the sweeping changes until four days before they were supposed to vote on it." Bernstein, "Lamar's Alien Agenda."

[359] Lind, "The disastrous, forgotten 1996 law," (citing Charles Kamasaki of the National Council of La Raza).

[360] Lind, The disastrous, forgotten 1996 law."

tough on undocumented immigration was particularly acute given that 1996 was an election year. As a result, the bill also passed in the Senate and was signed by Clinton in late September.[361]

The final version of IIRIRA enhanced immigration law enforcement at the borders, established a consolidated removal process that applied to immigrant arrivals and noncitizens in the United States, expanded the offenses (including the definition of "aggravated felony") that led to removal, severely limited avenues of relief from removal, instituted expedited removals for undocumented migrants and asylum seekers apprehended at the border, created a one-year filing deadline for affirmative asylum applications, expanded mandatory detention to a broader range of noncitizens as well as asylum seekers, increased the penalties for immigration-related crimes, and rendered a new set of immigration offenses crimes. IIRIRA also made it more difficult for previously deported individuals to adjust their status, engaged state and local law enforcement agencies in the work of federal law enforcement under 287(g), and limited immigrant access to public benefits.

IIRIRA, as Smith himself wrote, was "the toughest legislation against illegal immigration enacted in our lifetimes."[362] Yet, by 1999, many, including Smith himself, argued that the law had gone too far. In November, he, along with 28 members of Congress, penned a letter to the Attorney General and INS urging the use of prosecutorial discretion in the case of legal permanent residents with citizen children.[363] Earlier that year, organizations such as the National Immigration Forum, the American Immigration Lawyers' Association, and the ACLU initiated

---

[361] Tichenor, *Dividing Lines,* Kindle Loc. 415.

[362] Smith and Grant, "Immigration Reform," 913.

[363] Patrisia Macías-Rojas, "Immigration and the War on Crime: Law and Order Politics and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996," *Journal on Migration and Human Security,* vol. 6, n. 1 (2018), 15 (citing Lamar Smith, "Guideline for Use of Prosecutorial Discretion in Removal Proceedings," Letter to Janet Reno, Attorney General and INS Commissioner Doris Meissner, *Interpreter Releases* 76: 1730).

the "Fix '96" campaign to amend a broader swath of IIRIRA's provisions, including mandatory detention, expedited removal, and retroactive deportation, among others. While Smith opposed changes to the law itself, Democrats and Republicans proposed five bills, including McCollum's H.R. 2999, that would amend the 1996 law.[364]

Since 1999, immigration advocates, legal experts, investigative journalists, and scholars have continued to challenge the legacies of IIRIRA. Their investigations have found that the law failed to achieve its principal goal of reducing undocumented immigration. Indeed, as Lind reports, IIRIRA itself facilitated the growth of the undocumented population from 5 million in 1997 to 12 million in 2006; its aggressive border enforcement provisions led many to settle in the United States while its barriers to legalization prevented them from adjusting their status.[365] Nevertheless, the federal government continues to expend vast resources in the detention, deportation, and prosecution of undocumented immigrants. Since IIRIRA, the detention system has expanded from 9000 beds to more than 38,000.[366] Deportation, according to Lind, "went from a rare phenomenon to a relatively common one."[367]  And, between 1996 and 2013, immigration prosecutions, primarily under §1325 and §1326, increased by a factor of ten.[368] As a result of IIRIRA and Operation Streamline, immigration prosecutions "monopolized the

---

[364] Eric Lipton (New York Times), "Tough deportation laws questioned," *Pittsburgh Post-Gazette,* December 22, 1999, A19.

[365] Lind, "The disastrous, forgotten 1996 law" (citing to studies conducted by Douglas Massey and Karen Pren of Princeton University).

[366] Donald Kerwin, "From IIRIRA to Trump: Connecting the Dots to the Current US Immigration Policy Crisis," *Journal of Migration and Human* Security, vol. 6, n. 3 (2018): 197.

[367] Lind, "The disastrous, forgotten 1996 law."

[368] Kerwin, "From IIRIRA to Trump," 198 (citing TRAC (Transactional Records Access Clearinghouse), "Criminal Immigration Prosecutions Down 14% in FY 2017," http://trac.syr.edu/tracreports/crim/494/).

resources of magistrate courts, federal prosecutors, and public defenders . . . with the predictable effect of limiting prosecutions for more serious offenses."[369]

Even more fundamentally, numerous social scientific studies have undermined the assumptions that drove the passage of IIRIRA, AEDPA, the VCCLEA, and the ADAA, among others. For decades, social scientists have found no evidence to support the claim that immigrants are more likely to commit crime than the native born.[370] In a widely cited 2007 study, Rubén Rumbaut and Walter A. Ewing find that "contemporary and historical data, including investigations carried out by major government commissions over the past century, have shown repeatedly and systematically that immigration is actually associated with *lower* crime rates."[371] When it comes to incarceration rates, in 2019, Alex Nowrasteh of the Cato Institute wrote, "All immigrants have a lower incarceration rate and there are lower crime rates in the neighborhoods where they live, according to the near-unanimous findings of the peer-reviewed evidence."[372] Since forty-nine states do not compile immigration status data on convicted and incarcerated persons, it has been difficult for experts to draw conclusions about

---

[369] Kerwin, "From IIRIRA to Trump," 198 (citing Joanna Lydgate, "Assembly-Line Justice: A Review of Operation Streamline," January, The Chief Justice Earl Warrant Institute on Race, Ethnicity and Diversity, University of California, Berkeley Law School, https://www.law.berkeley.edu/files/Operation_Streamline_Policy_Brief.pdf).

[370] See, for example, Anna Flagg, "Is There a Connection Between Undocumented Immigrants and Crime?" *The Marshall Project,* May 13, 2019, https://www.themarshallproject.org/2019/05/13/is-there-a-connection-between-undocumented-immigrants-and-crime, accessed December 5, 2021; Alex Nowrasteh, "Illegal Immigrants and Crime – Assessing the Evidence," *Cato* Institute, March 4, 2019, https://www.cato.org/blog/illegal-immigrants-crime-assessing-evidence, accessed December 5, 2019; Robert J. Sampson, "Open Doors Don't Invite Criminals," *New York Times*, March 11, 2006, A15; Matthew T. Lee, Ramiro Martinez, Richard Rosenfeld, "Does Immigration Increase Homicide? Negative Evidence from Three Border Cities," *The Sociological Quarterly,* vol. 42, n. 4 (2001): 559-580; Kristen F. Butcher and Anne Morrison Piehl, "Recent Immigrants: Unexpected Implications for Crime and Incarceration," *ILR Review*, vol. 51, n. 4 (July 1998): 654-679.

[371] Rubén Rumbaut and Walter A. Ewing, "The Myth of Immigrant Criminality," *Social Science Research Council,* May 23, 2007, https://items.ssrc.org/border-battles/the-myth-of-immigrant-criminality/, accessed December 5, 2021. See also, Nowrasteh, "Illegal immigrants and Crime."

[372] Nowrasteh, "Illegal immigrants and Crime."

the relationships between undocumented immigrants and crime. But, in a 2017 study, Nowrasteh and Michelangelo Landgrave estimated that undocumented immigrant incarceration rates were approximately half those of native-born Americans.[373] Multiple studies have also examined the conviction and incarceration data from Texas, the only state to record the immigration status of its inmates.[374]  These have repeatedly found that undocumented immigrants have "substantially lower rates of crime compared to both native US citizens and legal immigrants."[375] The authors of the most recent Texas study further conclude, "these findings clearly run counter to some of the basic assumptions behind strict immigration enforcement strategies."[376]

Conclusion

Even though Helena Torrez, the President of the Hispanic Chamber of Commerce in Merced, California wanted the federal government to assist states and localities with the issues related to legal and undocumented immigration, she was troubled by the tone of the congressmen who had solicited her testimony on this subject. As she explained to Chairman Gary Condit (D-CA), who led the 1993 and 1994 hearings on federal immigration policy,

> I would like to ask that, if you take one thing back with you, please take back the fact that referring to an immigrant as a criminal or an alien or any other referral to a resident

---

[373] Michelangelo Landgrave and Alex Nowrasteh, "Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origins," March 4, 2019, https://www.cato.org/publications/immigration-resgearch-policy-brief/criminal-immigrants-2017-their-numbers-demographics, accessed December5, 2021; Flagg, "Is There a Connection Between Undocumented Immigrants and Crime?"

[374] Alex Nowrasteh, "Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," *Cato Institute*, February 26, 2018, https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant, accessed December 5, 2021.

[375] Michael T. Light, Jingying He, and Jason P. Robey, "Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas, *Proceedings of the National Academy of Sciences of the United States of America,* vol. 117, n. 51 (December 22, 2020), https://www.pnas.org/content/117/51/32340, accessed December 5, 2021.

[376] Light, He, and Robey, "Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas."

coming from another country is disturbing. That word, I don't know where it came from; I am sure I could research back. But it is very disturbing. And, if anything, please cross it out of your policies, procedures, whatever may be occurring.[377]

Torrez understood that references to immigrants as "alien," "criminal," or "criminal aliens" were derogatory, insulting, and racist. Her comments underscored the fact that such terms were by no means objective or merely legal terms of art. Instead, she recognized that they had a history. As this affidavit has shown, the very notion of the "criminal alien" emerged in response to some of the most virulent strains of racism in the twentieth century. One cannot separate the history of this term, the history of the criminalization of undocumented immigration, and the history of 8 U.S.C. §1326 from the histories of racism and xenophobia in the United States. From 1929 to 1996, several varieties racial animus, particularly anti-Hispanic and anti-Black racism, informed the development of §1326 and the nation's immigration laws.

In the early twentieth century, anti-Mexican animus informed the passage of the 1929 Undesirable Aliens Act and its 1952 revision. Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness. In times of prosperity, agricultural labor programs, such as the Bracero Program, welcomed Mexicans to the United States; in moments of economic crisis, however, laws such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 could be used to deter prospective arrivals. In short, the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship.

The subsequent amendments to 8 U.S.C. §1326 failed to extinguish the racial animus of the 1929 and 1952 laws. Instead, they reproduced the anti-Mexican sentiments that first inspired

---

[377] The Impact of Federal Immigration Policy and INS Activities on Communities, 134.

the criminalization of undocumented immigration. In the early 1990s, anti-Mexican animus clearly informed McCollum's immigration policy agenda as he repeatedly lobbied for measures that would deny undocumented Mexican migrants a pathway to legal status and US citizenship, penalize Mexican nationals for unauthorized entry and re-entry, limit the access of ethnic Mexicans to Spanish-language resources in schools and at the ballot box, and strip Mexican Americans of birthright citizenship as guaranteed by the Constitution.

McCollum not only bolstered the racial animus underlying the 1929 and 1952 laws, he, along with Chiles and Graham, drew upon other varieties of racial animus in drafting the 1988, 1990, 1994, and 1996 iterations of §1326. The legislative history reveals that anti-Black racism led Chiles, Graham, and McCollum to use the immigration laws to prevent Mariel Cuban and Haitian refugees from becoming members of their South Florida communities. The three lawmakers drew upon racist stereotypes to characterize these refugees as lawbreakers, criminals, and public health threats and, in turn, rationalize their exclusion and expulsion from the polity. On other occasions, they relied upon the race-neutral vocabulary of population control, English-only campaigns, and the War on Drugs to make the same point—that Cubans and Haitians were not welcome in Florida. They also collaborated with or received the endorsement of FAIR, a hate group that articulated virulently anti-Latin American sentiments and argued that the nation's very existence hinged on the exclusion of Haitian and other Global South refugees.

Over the course of two decades, Chiles, Graham, and McCollum worked to transform US immigration and asylum law to deter the arrival of Black refugees on Florida's shores. Each attempted to retrench the few humanitarian protections available to refugees and asylum seekers under US immigration law; Chiles, for instance, tried to expand INS enforcement capacities, reduce refugee admissions, and check detained asylum seekers' right to habeas corpus. In an

even more aggressive attack on asylum, McCollum proposed legislation that would activate the military during so-called immigration emergencies, authorize indefinite detention, deny TPS protections, render HIV a justification for exclusion, and create a summary exclusion procedure for suspect asylum claims and a thirty-day deadline for the filing of affirmative asylum applications.

The Florida congressmen routinely characterized the Mariel Cubans and Haitians as undocumented immigrants and criminals rather than asylum seekers. As such, each recognized the importance of the criminal penalties against undocumented entry and re-entry as additional deterrents to the arrival of these refugees. At the same time, racial stereotypes of the Haitian refugees as drug traffickers led Chiles and Graham to enhance the deterrent effect of these laws by increasing the criminal penalties for undocumented re-entrants with previous felony and aggravated felony convictions. In the process, Chiles and Graham played a key role in transforming the immigration statute so that its provisions might be deployed in crime campaigns such as the War on Drugs. Building on the work of Chiles and Graham, McCollum further increased the penalties for undocumented re-entry for those migrants with felony and aggravated felony convictions.

By the early 1990s, the nativist campaign to criminalize undocumented immigration achieved one of its greatest victories in the passage of IIRIRA. Drafted by a former FAIR staffer and sponsored by Rep. Lamar Smith, a member of FAIR's National Board of Advisors, it aimed to cure what Smith referred to as the "excesses of multiculturalism."[378] It would do so by curtailing undesirable immigration to the United States and expanding the civil and criminal penalties for undocumented entry and re-entry, particularly vis-à-vis Mexican nationals. During

---

[378] Smith and Grant, "Immigration Reform," 906.

floor debates, the bill was regularly criticized as racist and cruel. To this day, journalists, legal experts, and scholars continue to compile data and publish much research on the racially discriminatory impacts of the law's enforcement provisions. Meanwhile, cognizant of the racial animus underlying §1325 and §1326, lawmakers, in 2019 and 2021, authored bills that would repeal these provisions of the immigration code.[379]

The historical record reveals that the racial animus informing the 1929 law and its subsequent re-enactments was not limited to the laws' sponsors. The passage of the reenactments rested upon the complicity of both liberal and conservative lawmakers who co-opted racist and restrictionist talking points to improve their election day chances. At other times, pro-immigration lawmakers conceded that structural factors—such as the power wielded by Senate Judiciary Chair McCarran and House Speaker Gingrich or Republican majorities in the 1994 House and Senate—led them to compromise their own values and vote for patently racist measures. In other words, these factors – the ballot box and the congressional balance of power – frequently led lawmakers to conclude that any attempt to examine and cleanse the racial animus from the nation's immigration laws would be futile and even antithetical to their own survival in Congress.

The legislative history of the Undesirable Aliens Act reveals that various forms of racial animus motivated the creation of the original act and its subsequent revisions. These revisions, moreover, not only failed to acknowledge and expunge the racial animus of the 1929 Act, they also propagated it. In sum, the racial animus that has infected the Undesirable Aliens Act and its revisions is profound.

---

[379] H.R. 5383, A New Way Forward Act (December 10, 2019); H.R. 536, A New Way Forward Act (January 28, 2021).

Exhibit C

Michael T. Light, Ph.D.
Associate Professor of Sociology
University of Wisconsin-Madison

*Purpose*

Upon request from the Federal Public Defender for the District of Oregon, I undertook an examination of statistical disparities pertaining to illegal re-entry cases in the sentencing data from the United States Sentencing Commission. Specifically, I was asked to examine the demographic composition of illegal re-entry defendants and the statistical features of how these defendants fare at sentencing compared to other offenders and offense types.

*Expertise*

Professor Light teaches courses on criminology and punishment and is a recognized expert in the field of criminal sentencing. He has published extensively using U.S. Sentencing Commission data.[1] This work appears in leading peer-reviewed, social science journals and has been cited in both state (*State of Wisconsin v. Salas Gayton*, 2016, No. 2013AP646–CR) and federal judicial opinions (*United States v. Valdovinos*, 2014, No. 13–4768). Both the National Science Foundation (SES Award # 1849297) and the National Institute of Justice (Award 2019-R2-CX-0058) currently fund his research on sentencing and criminal case processing.

---

[1] *See* Light, Michael T. 2021. "The Declining Significance of Race in Criminal Sentencing: Evidence from U.S. Federal Courts." *Social Forces* https://doi.org/10.1093/sf/soab018; Light, Michael T. and Julia Thomas. 2021. "Undocumented Immigration and Terrorism: Is there a Connection?" *Social Science Research* 94: https://doi.org/10.1016/j.ssresearch.2020.102512; Light, Michael T., Ellen Dinsmore, and Michael Massoglia. 2019. "How do Criminal Courts Respond in Times of Crisis? Evidence from 9/11." *American Journal of Sociology* 125: 485-533.; King, Ryan D. and Michael T. Light. 2019. "Have Racial and Ethnic Disparities in Sentencing Declined? *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press; Light, Michael T. 2017. "Punishing the 'Others': Citizenship and State Social Control in the United States and Germany." *European Journal of Sociology* 58: 33-71; Light, Michael T., Michael Massoglia, and Ryan D. King. 2014. "Citizenship and Punishment: The Salience of National Membership in U.S. Criminal Courts." *American Sociological Review* 79: 825-847; Light, Michael T. 2014. "The New Face of Legal Inequality: Noncitizens and the Long-Term Trends in Sentencing Disparities across U.S. District Courts, 1992-2009." *Law & Society Review* 48: 447-478; Ulmer, Jeffery T., Michael T. Light, and John Kramer. 2011. "Racial Disparity in the Wake of the Booker/Fanfan Decision: An Alternative Analysis to the USSC's 2010 Report." *Criminology & Public Policy* 10: 1077-1118; Ulmer, Jeffery T., Michael T. Light, and John Kramer. 2011. "Does Increased Judicial Discretion Lead to Increased Disparity? The "Liberation" of Judicial Sentencing Discretion In the Wake of the Booker/Fanfan Decision." *Justice Quarterly* 28: 799-837; Ulmer, Jeffery T. and Michael T. Light. 2010. "Federal Case Processing and Sentencing Before and After the Booker/Fanfan Decision: Little Has Changed." *Journal of Gender, Race, and Justice* 14:143-178; Ulmer, Jeffery T. and Michael T. Light. 2011. "Beyond Disparity: Changes in Federal Sentencing Post-Booker and Gall." *Federal Sentencing Reporter* 23(5):333-341.

1

**An Empirical Analysis of § 2L1.2 Offenses in U.S. Federal Courts**

This memo uses the U.S. Sentencing Commission's (USSC) Standardized Research Files from 2015 to 2019 (the five most recent years of data available) to examine cases sentenced under § 2L1.2 - Unlawfully Entering or Remaining in the United States – of the U.S. Sentencing Guidelines. 2L1.2 cases consist almost entirely of those prosecuted under 8 U.S.C. 1326. Over the last 5 years, 99.4% of 2L1.2 cases had only 1 count of conviction. Of the 2L1.2 cases, 99.2% were 8 U.S.C. 1326 convictions.

2L1.2 cases were the second most numerous offense on the federal docket, behind only § 2D1.1 – Unlawful Manufacturing, Importing, Exporting, or Trafficking Drugs. Throughout this memo, I compare 2L1.2 cases to the other guidelines that comprise the 10 most numerous non-immigration offenses. The guidelines section, definition, and number cases for each offense type are shown in Table 1. Combined, these 10 guidelines make up the overwhelming majority (84.5 percent) of cases sentenced over the past 5 years.

**Table 1. 10 Most Numerous Sentencing Guidelines, 2015-2019**

| Section | Description | Cases |
|---------|-------------|-------|
| 2D1.1 | Drugs - Unlawful Manufacturing, Importing, Exporting, or Trafficking | 96,062 |
| 2L1.2 | Unlawfully Entering or Remaining in the United States | 87,841 |
| 2B1.1 | Larceny, Embezzlement, and Other Forms of Theft | 32,975 |
| 2K2.1 | Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition | 32,382 |
| 2B3.1 | Robbery | 8,305 |
| 2G2.2 | Trafficking in Material Involving the Sexual Exploitation of a Minor | 7,328 |
| 2S1.1 | Laundering of Monetary Instruments | 5,353 |
| 2A3.5 | Failure to Register as a Sex Offender | 1,963 |
| 2T1.1 | Tax Evasion | 1,963 |
| 2D1.2 | Drug Offenses Occurring Near Protected Locations or Involving Underage or Pregnant Individuals | 1,706 |

*Notes*: Total number for top 10 guidelines is 275,878, representing 84.5% of all cases between 2015 and 2019 where the guideline section is known.

*Demographic Differences*

The demographic composition of 2L1.2 cases is markedly different than the other guidelines. Looking at Figure 1, 99% of all 2L1.2 cases involve Hispanic defendants. As shown in Table 2, none of the other guidelines have a similarly skewed racial/ethnic make-up.

2

**Figure 1. Racial/Ethnic Composition of 2L1.2 Cases**



**Table 2. Racial/Ethnic Composition by Sentencing Guideline**

| *Section* | White | Black | Hispanic | Other Race |
|-----------|-------|-------|----------|------------|
| 2D1.1     | 24%   | 25%   | 48%      | 3%         |
| 2L1.2     | 1%    | 1%    | 99%      | 0%         |
| 2B1.1     | 44%   | 32%   | 18%      | 7%         |
| 2K2.1     | 26%   | 51%   | 19%      | 3%         |
| 2B3.1     | 24%   | 58%   | 15%      | 3%         |
| 2G2.2     | 81%   | 4%    | 12%      | 3%         |
| 2S1.1     | 37%   | 20%   | 36%      | 7%         |
| 2A3.5     | 45%   | 26%   | 11%      | 17%        |
| 2T1.1     | 64%   | 19%   | 10%      | 7%         |
| 2D1.2     | 9%    | 23%   | 66%      | 2%         |

3

*Likelihood of a Trial*

Although trials in federal court are generally rare, they are virtually non-existent among 2L1.2 cases. As shown in Figure 2, of the nearly 88,000 2L1.2 cases sentenced over the last 5 years, less than 0.3% of them were convicted by trial. The only other offense that even comes close to such a small number of trials are 2A3.5 cases, "Failure to Register as a Sex Offender." Still, even at a 1% trial rate, this means that 2A3.5 cases are over three times more likely to go to trial than 2L1.2 cases.

**Figure 2. Percent of Cases Convicted at Trial by Sentencing Guideline, 2015-2019**



*Likelihood of Incarceration*

2L1.2 cases are among the guidelines most likely to result in incarceration. As shown in Figure 3, 97% of 2L1.2 cases result in a prison sanction, a higher proportion than Drug Trafficking (2D1.1), Larceny (2B1.1), Money Laundering (2S1.1), Tax Evasion (2T1.1), and even Firearms offenses (2K2.1).

4

**Figure 3. Percent of Cases Sentenced to Prison by Sentencing Guideline, 2015-2019**



*Severity of Cases*

The comparatively high rate of incarceration for 2L1.2 offenses could be a result of the severity of cases. I examine this possibility in two ways. First, I examine the average final offense level (ranging from 1-43) for each guideline. As shown in Figure 4, 2L1.2 cases are in fact the least severe among the top 10 most numerous sentencing guidelines. The juxtaposition between 2L1.2 cases, drug trafficking and money laundering is illuminating. The average offense level for both drug trafficking (2D1.1) and money laundering (2S1.1) cases is roughly 2.5 times the average offense level for 2L1.2 cases. Yet, 2L1.2 cases are more likely to result in a prison sanction.

The second approach is to examine the average statutorily required minimum sentence based on all counts of conviction. These results are shown in Figure 5. There is considerable variation across these different offenses, ranging from 68 months for 2D1.2 cases (Drug Offenses Occurring Near Protected Locations or Involving Underage or Pregnant Individuals) to virtually no required imprisonment. Important for this memo, the statutory minimum sentence is lowest for 2L1.2 cases, at 0.01 months on average. Combined, the results in Figures 3-5 suggest that 2L1.2 offenders are among the most likely to receive a prison sentence despite having the lowest mandatory minimums and final offense levels.

**Figure 4. Average Final Offense Level by Sentencing Guideline, 2015-2019**



**Figure 5. Average Statutory Minimum Sentence by Sentencing Guideline, 2015-2019**



6

*Do 2L1.2 Cases Predict Incarceration net of Offense Severity, Criminal History, and Mandatory Minimums?*

The results thus far provide suggestive evidence that 2L1.2 cases are punished uniquely in U.S. federal courts. However, one would need to account for other relevant sentencing factors before drawing strong conclusions. I thus turn to multivariate regression analysis to examine the influence of 2L1.2 cases on sentencing outcomes. As the U.S. Sentencing Commission notes, "the goal of multivariate regression analysis is to determine whether there is an association between the factors being studied and, if so, to measure the extent to which each factor contributes to the observed outcome…The principal benefit of multivariate regression analysis is that it controls for the effect of each factor in the analysis by comparing offenders who are similar to one another in relevant ways" (USSC 2017: 3).[2]

In this analysis, I compare the likelihoods of receiving a prison sentence among different guidelines, controlling for the three most important determinants of sentencing in U.S. federal courts: the final offense level (ranging 1-43), the final criminal history category (ranging from 1-6), and the statutory minimum penalty based on all counts of conviction (measured in months). I use a linear probability model to examine the likelihood of incarceration. For illustrative purposes, in Figure 6 I show the predicted probability of prison for each guideline holding all variables constant at their means. In other words, the results in the figure show the likelihood of incarceration for offenders sentenced under different guidelines but with the same offense severity, the same criminal history, and the same statutory minimum (the full regression results are shown in Appendix Table 1).

The results in Figure 6 make clear that the sentencing differences observed above are not driven by statutory minimums, offense severity, or criminal history. When these three factors are held constant at their means, 2L1.2 offenders are effectively guaranteed to receive a prison sentence (the predicted probability is 1). Save for 2A3.5 cases (Failure to Register as a Sex Offender), the likelihood of incarceration is higher among 2L1.2 offenders than all other guidelines in the study. Indeed, none of the other offenses have a predicted probability above 95%, including drug trafficking, sexual exploitation of a minor, robbery, money laundering, or firearms offenses.

---

[2] *See* U.S. Sentencing Commission. 2017. "Demographic Differences in Sentencing: An Update to the 2012 Booker Report." Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171114_Demographics.pdf.

7

**Figure 6. Predicted Probability of Incarceration by Sentencing Guideline, 2015-2019**



*Do 2L1.2 Cases Help Explain Sentencing Disparities between White and Hispanic Defendants?*

The results thus far reach two general conclusions: (a) 2L1.2 cases disproportionately involve Hispanic defendants and (b) 2L1.2 cases are significantly more likely to result in a prison sentence compared to similarly situated non-2L1.2 offenders. Combining these insights, this next analysis examines how much of the sentencing difference between white and Hispanic offenders in U.S. federal courts is attributable to 2L1.2 cases. I do this by conducting a multivariate analysis where the dependent variable is the likelihood of incarceration. Here again, I use a linear probability model and calculate predicted probabilities of prison by race after controlling for the final offense level, the final criminal history category, and the statutory minimum penalty. These results are shown in two models in Figure 7 (full regression results are shown in Appendix Table 2). The first shows the predicted probability of incarceration for white and Hispanic offenders without accounting for the guideline offense. In this model, I observe a 13.5-percentage point gap, favoring white offenders. The second model adds an indicator for 2L1.2 cases to the explanatory variables. With this inclusion, the relative incarceration gap between white and Hispanic offenders decreases substantially, down to an 8-percentage point gap. In other words, adjusting for the punitive sanctions 2L1.2 offenders receive decreases the amount of Hispanic-white disparity in federal sentences by roughly 40 percent (1 - [8.1 / 13.5] = .4).

8

**Figure 7. Predicted Probabilities of Incarceration for White and Hispanic Defendants**



*Notes*: Both models include controls for final offense level, criminal history category, and the statutory minimum penalty.

*Summary*

Using U.S. Sentencing Commission data from 2015 to 2019, this analysis examined the key sentencing features involving cases sentenced under § 2L1.2 - Unlawfully Entering or Remaining in the United States. The data reveal several notable findings, summarized as follows:

- 99% of all 2L1.2 cases involve Hispanic defendants. Such large demographic disparities are observed for no other guideline among the 10 most numerous non-immigration offense types.
- 2L1.2 cases are the least likely to be convicted at trial.
- Despite having the lowest statutory minimums and offense levels, 2L1.2 cases are among the most likely to receive a prison sentence (97%).
- Accounting for previous criminal history, offense severity, and the statutory minimum sentence, 2L1.2 offenders are still substantially more likely to be incarcerated.
- The differential punishment of 2L1.2 cases explains roughly 40% of the observed sentencing differences between white and Hispanic defendants, net of controls for offense severity, criminal history, and mandatory minimums. Put differently, 2L1.2 offenses contribute significantly to the differential likelihood that white and Hispanic offenders are sentenced to incarceration in U.S. Federal Courts.

9

**Appendix**

**Appendix Table 1. Linear Probability of Incarceration, 2015-2019**

| Measures | b | se | |
|---|---|---|---|
| *Offense Type* | | | |
| 2D1.1 (reference) | -- | -- | |
| 2L1.2 | 0.14 | (0.00) | *** |
| 2B1.1 | -0.15 | (0.00) | *** |
| 2K2.1 | 0.02 | (0.00) | *** |
| 2B3.1 | 0.02 | (0.00) | *** |
| 2G2.2 | -0.01 | (0.00) | *** |
| 2S1.1 | -0.06 | (0.00) | *** |
| 2D1.2 | 0.04 | (0.01) | *** |
| 2T1.1 | -0.23 | (0.01) | *** |
| 2A3.5 | 0.10 | (0.01) | *** |
| | | | |
| Final Offense Level | 0.01 | (0.00) | *** |
| Criminal History Category | 0.01 | (0.00) | *** |
| Statutory Minimum | 0.00 | (0.00) | *** |
| Constant | 0.70 | (0.00) | *** |
| *N* | 275,695 | | |

*Notes* : *** $p < .001$

**Appendix Table 2. Linear Probability of Incarceration by Ethnicity, 2015-2019**

| | Model 1 - No Offense Controls | | | Model 2 - Controlling for 2L1.2 | | |
|---|---|---|---|---|---|---|
| Measures | b | se | | b | se | |
| White (reference) | -- | -- | | -- | -- | |
| Hispanic | 0.14 | (0.00) | *** | 0.08 | (0.00) | *** |
| *Offense Type* | | | | | | |
| 2L1.2 | -- | -- | | 0.14 | (0.00) | *** |
| | | | | | | |
| Final Offense Level | 0.01 | (0.00) | *** | 0.01 | (0.00) | *** |
| Criminal History Category | 0.03 | (0.00) | *** | 0.02 | (0.00) | *** |
| Statutory Minimum | 0.00 | (0.00) | | 0.00 | (0.00) | ** |
| Constant | 0.68 | (0.00) | *** | 0.61 | (0.00) | *** |
| $R^2$ | 0.10 | | | 0.138 | | |
| *N* | 208,292 | | | 208,292 | | |

*Notes* : *** $p < .001$; ** $p < .01$

10